**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-3**

MIKAL D. MAHDI,

    Petitioner - Appellant,

v.

BRYAN STIRLING, Commissioner, South Carolina Department of Corrections;
MICHAEL STEPHAN, Warden of Broad River Correctional Institution,

    Respondents - Appellees.

Appeal from the United States District Court for the District of South Carolina, at
Anderson.  Timothy M. Cain, District Judge.  (8:16-cv-03911-TMC)

Argued:  March 9, 2021                          Decided:  December 20, 2021

Before GREGORY, Chief Judge, AGEE, and RICHARDSON, Circuit Judges.

Affirmed by published opinion.  Judge Agee wrote the opinion, in which Judge Richardson
joined. Chief Judge Gregory wrote a dissenting opinion.

**ARGUED:**  Ernest Charles Grose, Jr., GROSE LAW FIRM, LLC, Greenwood, South
Carolina, for Appellant.  Melody Jane Brown, OFFICE OF THE ATTORNEY GENERAL
OF SOUTH CAROLINA, Columbia, South Carolina, for Appellees. **ON BRIEF:** Thania
Charmani, New York, New York, for Appellant.  Alan Wilson, Attorney General, Donald
J. Zelenka, Deputy Attorney General, J. Anthony Mabry, Senior Assistant Attorney
General, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA,
Columbia, South Carolina, for Appellees.

AGEE, Circuit Judge:

In this death penalty case, Mikal Mahdi ("Mahdi") appeals from the district court's denial of his 28 U.S.C. § 2254 petition for habeas relief and his accompanying request for supplemental expert funding. We granted a Certificate of Appealability ("COA") on five issues. *See* 28 U.S.C. § 2253. For the following reasons, we affirm the district court's judgment in its entirety.

I.

As a federal court reviewing a state court's decision under § 2254, we do so through a narrow lens, "carefully consider[ing] all the reasons and evidence supporting [it]." *Mays v. Hines*, 141 S. Ct. 1145, 1149 (2021) (per curiam). We must examine the record in its entirety as it existed before the state post-conviction relief ("PCR") court at the time of its decision. *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011). Only upon a full review of the record may we consider whether that court's judgment was the result of "an error that lies beyond any possibility for fairminded disagreement." *Mays*, 141 S. Ct. at 1146.[1]

Unsurprisingly, this case has an extensive procedural history. We begin by recounting Mahdi's conduct that gave rise to his convictions and provide an overview of the plea and sentencing hearings in the South Carolina state trial court (the "trial court"). We then turn to Mahdi's first PCR proceeding in state court—which resulted in the decision we are reviewing here—and focus on his claims alleging ineffective assistance of

---

[1] Internal quotation marks, citations, and alterations have been omitted unless otherwise indicated.

counsel ("IAC") under *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny. After reviewing Mahdi's second state-court PCR proceeding, we summarize the federal district court's denial of his request for supplemental expert funding and his § 2254 petition.

## A. The Underlying Conduct

Then-South Carolina Supreme Court Chief Justice Jean Hoefer Toal described Mahdi's criminal acts as "particularly heinous," emphasizing that in her time as a jurist, she "ha[d] seen few cases where the extraordinary penalty of death was so deserved." *Mahdi v. State*, 678 S.E.2d 807, 808–09 (S.C. 2009) (Toal, C.J., concurring). We recite the following from her opinion concurring in that court's rejection of Mahdi's direct appeal and affirming his death sentence:

> On July 14, 2004, [Mahdi], then a resident of Virginia, embarked upon a crime spree that would span four states. [He] stole a .380 caliber pistol from his neighbor, a set of Virginia license plates, and a station wagon. [Mahdi] left Virginia and headed to North Carolina.
>
> On July 15, [Mahdi] entered an Exxon gas station in Winston-Salem, North Carolina armed with the .380 pistol. [He] took a can of beer from a cooler and placed it on the counter. The store clerk, Christopher Jason Boggs, asked [Mahdi] for identification. As Boggs was checking [his] identification, [Mahdi] fatally shot him at point-blank range. [Mahdi] fired another shot into Boggs as he lay on the floor. [Mahdi] then attempted unsuccessfully to open the store's cash register. [He] left the store with the can of beer, and headed to South Carolina.
>
> Early in the morning of July 17, [Mahdi] approached Corey Pitts as he sat at a traffic light in downtown Columbia, South Carolina. [Mahdi] stuck his gun in Pitts' face, forced him out of his car, and stole Pitts' Ford Expedition. [Mahdi] replaced the Expedition's license plates with the plates he had stolen in Virginia, and headed southeast on I-26.

3

About thirty-five minutes down the road, [Mahdi] stopped at a Wilco Hess gas station in Calhoun County and attempted to buy gas with a credit card. The pump rejected the card, and [Mahdi] spent forty-five minutes to an hour attempting to get the pump to work. Due to his suspicious behavior, the store clerks called the police. Aware that the clerks' suspicions had been alerted, [Mahdi] left the Expedition at the station and fled on foot through the woods behind the station.

About a quarter to half mile from the station, [Mahdi] came upon a farm owned by Captain James Myers, a thirty-one year veteran law enforcement officer and fireman. [Mahdi] broke into a work shop on the Myers property. Once inside the work shop, [Mahdi] watched television and examined Myers' gun collection. [Mahdi] found Myers' shotgun and used the tools in the shop to saw off the barrel and paint it black. [Mahdi] also took Myers' .22 caliber rifle and laid in wait for Myers.

That day, Myers had been at the beach celebrating the birthdays of his wife, sister, and daughter. Myers had visited with his father before returning to his farm. Upon arriving at the farm, Myers stopped by the work shop, where he was confronted by [Mahdi]. [Mahdi] shot Myers nine times with the .22 rifle. [Mahdi] then poured diesel fuel on Myer's [sic] body and set the body on fire. [Mahdi] stole Myers' police-issued truck, and left with Myers' shotgun, his .22 rifle, and Myers' police-issued assault rifle.

Later that evening, Myers' wife, also a law enforcement officer, became worried when Myers did not return home. Mrs. Myers drove to the work shop and discovered Myers' burned body lying in a pool of blood.

[Mahdi] escaped to Florida, where he was spotted by police on July 21 driving Myers' truck. Fleeing the police, [Mahdi] abandoned the truck [and proceeded] on foot in possession of the assault rifle. When cornered by police, [Mahdi] abandoned the rifle and was eventually taken into custody.

*Id.* at 809.

## B. The Plea Hearing

On August 23, 2004, the Calhoun County, South Carolina, Grand Jury indicted Mahdi for Captain Myers' murder, second-degree burglary, and grand larceny. The State filed a Notice of Intent to Seek the Death Penalty and a Notice of Evidence in Aggravation,

alleging Mahdi killed Captain Myers: (1) "while in the commission of burglary"; (2) "while in the commission of robbery while armed with a deadly weapon"; and (3) "while in the commission of larceny with use of a deadly weapon." J.A. 935 (citing S.C. Code Ann. § 16-3-20). The State later filed an amended Notice of Evidence in Aggravation, alleging an additional statutory aggravating factor: (4) the murder occurred during "the performance of [Captain] Myers' official duties as a law enforcement officer." J.A. 937.

In November 2006, Mahdi went to trial. Following three days of voir dire, the trial court judge, Judge Clifton Newman, empaneled a jury. Soon thereafter, the Solicitor announced "a security issue," explaining that court security had discovered "a homemade handcuff key" in Mahdi's pocket during a brief recess. J.A. 1167. Mahdi "indicated . . . he had made [the key] in the department of corrections. He had been transporting it in his mouth and ha[d] attempted to use it at the jail, but he hadn't had the opportunity to use it [at the courthouse]." J.A. 1168. The Solicitor and Sheriff recommended—and Mahdi's counsel, Glen Walters, Sr., and Joshua Koger, Jr. (collectively "trial counsel") agreed—to put his legs in irons and chains for the duration of the trial.

After the trial court resolved the security issue and dismissed the jurors for the day, the proceedings continued in chambers at Mahdi's trial counsel's request for "an ex parte conversation . . . concerning this case and a possible resolution." J.A. 1173–74. There, they informed the court that Mahdi was considering "whether he should proceed forward with trial or whether he should go in front of [the trial court] and plead guilty." J.A. 1179. To that end, Walters represented—in Mahdi's presence—the following:

5

[He] discussed with [his] client options that are available with regards to this case. Mr. Mahdi is very intelligent and in conveying the options to him, of course, he's aware of the fact that there are two phases to a trial, the guilt phase and also the sentencing phase, if it should reach that point.

One option that was discussed with Mr. Mahdi was with regards to the guilt phase. And, of course, there's been a discussion with regards to the balancing of options or the lesser of two evils in that process.

What's been conveyed to Mr. Mahdi is . . . that there are no guarantees with regards to either process. We have a jury that's been empaneled and there are certain pluses and minuses with that jury. And, of course, Mr. Mahdi's in a position where he's saying, well, what about the judge. And, of course, Your Honor's conveyed from the beginning that there is no policy by this Court that they will agree to a plea or agree to a certain sentence being rendered.

So I've explained to him that there are no guarantees wherever you go. And, of course, he's pondering the issue of whether he should proceed forward with trial or whether he should go in front of Your Honor and plead guilty.

Of course, with the second phase with regards to the sentencing phase, he has been informed that the State will have to put up their case and information and, of course, he'll be allowed to put up information. The question is whether he will do that in front of a jury or whether he will do that in front of a judge. And, again, there are no guarantees and there are pluses and minuses with regards to either option that he pursues.

J.A. 1178–79. Mahdi never interjected or contradicted counsel's representations. The court

allowed Mahdi to consider his options overnight.

The next morning, the trial court resumed the ex parte conference with trial counsel

and Mahdi and explained that

the law provides that if the defendant pleads guilty, the sentencing proceeding will be conducted before the Judge. And that's statutory. And that's the same as in any criminal proceeding that if a person pleads guilty, the Judge does the sentencing.

. . . .

And this is certainly not . . . being mentioned to suggest that that is advisable or not advisable. It's simply the law. . . . And after more closely reviewing

6

the statute and also the case of *State v. Downs*, it is clear that sentencing is conducted by the Judge in any capital case where a defendant pleads guilty.

J.A. 1183–84. Mahdi indicated that he understood and agreed to plead guilty to all charges.[2]

During the subsequent plea hearing, Mahdi's counsel averred that he had

explained to [Mahdi] his constitutional rights, including the right to have a jury trial and the rights to have the jury determine whether his sentence would be life without the possibility of parole, if he were to be found guilty during the guilt phase of the trial, or the jury could return a verdict for death[.]

J.A. 1193. The court also detailed the mechanics of a jury trial and the rights Mahdi would waive by pleading guilty. Specifically, the trial court emphasized that "in order for a jury to find [him] guilty, all 12 jurors must unanimously agree" and "in order for a jury to recommend a death sentence, . . . all 12 jurors must agree to recommend the death sentence." J.A. 1197. Mahdi indicated that he understood he had "the constitutional right to have the jury decide [his] guilt or innocence and, also . . . the constitutional right to have the jury determine [his] sentence." J.A. 1197.

The trial court further explained that if it were to accept Mahdi's guilty plea, "the jury [would] have no role in [his] sentencing and the decision as to what sentence [he would] receive [would] be left solely up to [the trial court]." J.A. 1198. The court then engaged in the following dialogue with Mahdi:

---

[2] At the trial court's insistence, Mahdi met with Dr. Michael Cross to assess his competency before entering the plea. Dr. Cross testified that Mahdi "understood the risks and benefits of entering into this plea . . . and had a rational understanding of both, what the possible consequences for each"—i.e., trial and sentencing by a jury or guilty plea and sentencing by a judge—"[could have] be[en]." J.A. 1189. Mahdi also "had a good understanding of the process," "had a factual knowledge of the legal system," and knew "what he [was] doing." J.A. 1190.

7

The Court: And do you voluntarily give up such a right [to be tried and sentenced by a jury]?

Mahdi: Yes, sir, Your Honor.

The Court: And do you understand what waiving that right means?

Mahdi: I do, Your Honor.

The Court: And what does it mean?

Mahdi: It means I've given up all of my rights to a 12 party jury. And I just admitted guilt to the crimes I'm being charged with.

. . . .

The Court: And have you discussed with your lawyers thoroughly the constitutional safeguards that you have and the essential protections inherent in a jury trial?

Mahdi: I was made fully aware of that by my attorneys.

J.A. 1198, 1200. Mahdi further indicated that he was "satisfied with the services of [his] attorneys in this case," that they had represented him effectively, and that they had "done everything to the full extent of their power to assist . . . and defend [him]." J.A. 1201–02.

The court accepted Mahdi's guilty plea and scheduled the sentencing hearing.

C. The Sentencing Hearing

Over the course of three days, the trial court "heard additional evidence in extenuation, mitigation [and] aggravation of the punishment" as well as "the arguments of counsel for or against the sentence to be imposed." J.A. 1661. The State reiterated its intention to seek the death penalty, while Mahdi's counsel urged the trial court to sentence him to life without the possibility of parole.

1. The State's Evidence in Aggravation

The State sought to prove that Mahdi had "killed Captain Jimmy Myers . . . because his heart and mind [were] full of hate and malice." J.A. 1223. In doing so, the State called

8

twenty-eight witnesses to testify about: (1) the events leading up to Captain Myers' murder; (2) the murder; (3) Mahdi's arrest; (4) his prior criminal history; (5) his behavior while in custody; and (6) the impact Captain Myers' death had on his friends and family. The testimony most relevant to our present analysis is summarized below.

### a. The Events Leading to Captain Myers' Murder

Detective Michael Poe from the Winston-Salem, North Carolina Police Department, testified about and introduced a surveillance tape showing Mahdi's execution-style murder of Boggs on July 15, 2004. Specifically, the tape showed Mahdi's movements throughout the store before "shoot[ing] [Boggs] in the face with the gun[,] . . . com[ing] up on to the counter[,] . . . and fir[ing] a second shot at [him]." J.A. 1420. The trial court viewed the tape over trial counsel's objections.

Corey Pitts, Mahdi's carjacking victim from Columbia, South Carolina, recounted that at around 3:25 AM on the morning of July 18, 2004, he was driving home. As he was sitting at a traffic light waiting to make a left turn, Mahdi approached his car, held a gun to his face, and directed Pitts to "[g]et the fuck out and walk." J.A. 1380.

### b. Captain Myers' Murder

Officer Stephen Curtis, a former deputy sheriff in Columbia, was among the first responders to the scene of Captain Myers' murder. He testified that he found Captain Myers lying "face down in the workshop area." J.A. 1392. "There were several matches on him," all of which were spent, "and there was a heavy odor of gasoline." J.A. 1394. Officer Curtis testified that investigators recovered nine shell casings from the scene which were later

matched to Captain Myers' .22 caliber rifle discovered in Mahdi's possession upon his arrest.

Janice Ross, the forensic pathologist who performed Captain Myers' autopsy, testified that his clothing "was partially burned and smelled of diesel fuel." J.A. 1544. "He had some singeing of the hair in the back of the head and some thermal injury, burning of the skin, on the back and around the sides of the abdomen." J.A. 1545. Captain Myers also had nine gunshot wounds: three in his head, four in his chest, one in his abdomen, and one in his left hand. All but two would have been fatal or potentially fatal.

### c. Mahdi's Arrest

Sergeant Darren Frost from the Satellite Beach, Florida, Police Department testified about the circumstances surrounding Mahdi's arrest. According to Sergeant Frost, Mahdi led officers on a brief chase while driving Captain Myers's stolen truck. As Mahdi stepped out of the vehicle and began to flee, Sergeant Frost saw him carrying Captain Myers' stolen rifle. Sergeant Frost testified that he drew his service weapon and directed Mahdi to drop the gun. Mahdi turned towards him, with his "hand . . . close to the trigger." J.A. 1232. As Sergeant Frost prepared to fire, Mahdi dropped the weapon and ran.

Sergeant Frost then released his canine, which tracked Mahdi to a condominium complex, where he was taken into custody. Sergeant Frost testified that he later "thanked [Mahdi] for not using [the weapon on him] . . . and allowing [him] to go home to [his] family that night," stating that a round from the rifle "would have gone through [him], [his] vest and [anyone] standing behind [him]]." J.A. 1243. According to Sergeant Frost, Mahdi "looked at [him], [with] very cold eyes," and said that the gun's "selector was stuck on a

three shot and [he did not] think [he] could have . . . shot [Sergeant Frost], the other cop, and . . . that fucking dog." J.A. 1243.

### d. Mahdi's Criminal History

The State called several witnesses to present Mahdi's extensive criminal history. The testimony related to Mahdi's juvenile convictions is summarized first before turning to his adult conduct.

### i. Juvenile Crimes and Convictions

Sheriff James Woodley from Brunswick County, Virginia, testified that he first met Mahdi as a young teenager while investigating a report of stolen property. Mahdi, who was fifteen at the time, was later convicted of breaking in and entering a house where he stole "speakers, [a] tape player and also . . . a handgun, a .44 caliber magnum." J.A. 1278.

After Mahdi failed to appear for sentencing in June 1998, an officer attempted to execute an order to remand him to the Virginia Department of Juvenile Justice ("DJJ"). At the same time, the officer tried to serve a show cause order on Mahdi's father, Shareef. When the officer arrived at Mahdi's grandmother's house—where they were living— Shareef came out, read the orders, said, "We're not going," and proceeded to run back into the house. J.A. 1278. Sheriff Woodley eventually arrived at the scene and spoke with Shareef through a window. At that time, "the other officers [were] putting on their gear, the bullet proof vests and getting weapons out of the vehicle." J.A. 1279. Sheriff Woodley heard Mahdi "holler to his father" that "[t]he mother fuckers got guns out there." J.A. 1279. Around nine hours after the standoff began, officers breached the house and arrested Mahdi and Shareef. After he was in custody, Mahdi told the officers escorting him that he was

11

"going to kill a cop before [he] die[s]." J.A. 1280. Sheriff Woodley made clear in his testimony that both Mahdi and his father were responsible for the standoff.

Officer Mike Koehler from the Richmond City Police Department testified about an encounter he had with Mahdi in November 2000. Officer Koehler went to Mahdi's "house with another officer . . . to serve a summons on him for slashing his mother's tires" along with "an outstanding detention order." J.A. 1307. Officer Koehler tried to take Mahdi into custody, but Mahdi "got upset" and "started to pull away." J.A. 1308. The officers wrestled with him, and Mahdi reached for one of their guns. Eventually, after using pepper spray and an ASP baton, the officers were able to subdue Mahdi. He later told Officer Koehler that "he slashed his mother's tires because she wouldn't come to the door when he knocked," referring to her as "a crazy bitch" and saying "that he should have killed her." J.A. 1309–10. Mahdi also "begg[ed]" the officers to "shoot him." J.A. 1310.

ii. Adult Crimes and Convictions

Turning to Mahdi's adult conduct, the State called Moises Rivera, a maintenance worker from Richmond, Virginia. Rivera said that on April 17, 2001, he discovered Mahdi standing outside of a window to an apartment where he did not live. Mahdi immediately "jumped [Rivera] and [they] started fighting." J.A. 1323. During the exchange, Mahdi stabbed Rivera once in the arm and five times in the back, puncturing one of his lungs. After Mahdi ran away, Rivera "took three steps, collapsed, started coughing up blood and . . . was rushed to [the hospital]." J.A. 1323.

Mahdi was convicted of malicious wounding and served thirty-nine months of active incarceration. Though he was also sentenced to fifteen years of supervised probation,

12

Joseph Owen, Mahdi's probation officer, testified that he only served two months before beginning the crime spree that ended in Captain Myers' murder.

Amanda Jean Weaver, Mahdi's next-door neighbor from Brunswick County, testified that he was anything but compliant during his time on probation between May and July 2004. Mahdi told her that he "was doing a little drug pedaling or pushing or whatever," J.A. 1349—i.e., selling marijuana—and that he "was going to knock [someone] off," J.A. 1363.

Weaver testified that she owned a .380 caliber semiautomatic pistol at that time. On July 13, 2004—the day before Mahdi left Virginia for North Carolina—Weaver returned home and discovered there had been a break-in, though nothing initially appeared to be missing. The following week, upon seeing news coverage of Mahdi's arrest, Weaver recognized his picture and began to fear for her safety. She went to retrieve her gun and discovered it was missing. Weaver later learned that Mahdi had stolen it and used it to kill Boggs.[3]

### e. Mahdi's Behavior in Custody

The State called several witnesses to testify about Mahdi's failure to adapt to incarceration. We begin by summarizing his time at the DJJ before turning to his terms of incarceration with the Virginia and South Carolina Departments of Corrections ("VDOC" and "SCDC," respectively).

---

[3] Weaver also testified that Mahdi believed "all white people were white devils," J.A. 1357, and that he "had a very strong dislike for police officers," J.A. 1358.

13

### i. The DJJ

The State called Linda Coulson, a former counselor at the DJJ's Reception and Diagnostic Center, who worked as "part of an assessment team to evaluate all [committed] juveniles," including Mahdi. J.A. 1285. Coulson testified that when she met Mahdi, he "was tested to have a full scale IQ of 108," which is considered "in the upper average range." J.A. 1288. During his intake interview, Mahdi "described himself as a quiet person who [was] always up to something. He denied . . . [having] any strengths except for robbing people." J.A. 1288. Mahdi also advised Coulson "that he had been involved in selling crack cocaine." J.A. 1289. He relayed his history of escapes and attempts to elude law enforcement. At bottom, Mahdi's comments suggested to Coulson "that he had little respect for the rights and property of others. He expressed no remorse" or "empathy for the impact of his acts upon others." J.A. 1290. In her final assessment, Coulson observed that Mahdi was "the product of a dysfunctional single parent family characterized by a lack of involvement with his mother, an absence of a positive adult role model, instability, unemployment, and a lack of structure and supervision." J.A. 1703.

Barbara Amos, who worked as a DJJ counselor, introduced portions of Mahdi's records from his time in custody there. These records reflected: Mahdi's regular meetings with counselors; consistent efforts by Shareef and Mahdi's grandmother, Nancy Burwell ("Nancy"), to visit and communicate with him and his counselors; as well as his various disciplinary violations for conduct including, among other things, attempted assault on an officer and the use of threatening language/behavior. At one point Mahdi made "suicidal statements" to his counselor before stating that "he would become homicidal first. He gave

14

very graphic descriptions of how he would hurt others. He also graphically described how [DJJ staff] would find [Mahdi's victims and him after he committed suicide] (i.e. 'hanging')." J.A. 1978–79.

## ii. VDOC

To introduce Mahdi's VDOC records, the State called Cindy Collins, VDOC's criminal records manager. According to a summary of Mahdi's disciplinary record, he had a couple dozen violations, including setting fires, "[p]ossession of a sharpened instrument," and "[a]ssault on [a] non-inmate." J.A. 1698. Mahdi was transferred twice during his time in VDOC's custody due to his "continued poor institutional adjustment and increase in security level." J.A. 1698.

## iii. SCDC

The State called several SCDC officers to testify about Mahdi's behavior while awaiting trial. Officer Henry Johnson spoke about a disciplinary hearing where Mahdi was charged with striking a correctional officer (who suffered a concussion). During the hearing, Mahdi said that "the next chance he [got], he[] [was] going to . . . kill that mother fucking officer. . . . The first chance he [got], he would finish him off." J.A. 1465. Officer Johnson also testified about a search he conducted in Mahdi's cell where he discovered "[s]ome rope and . . . some pieces of metal." J.A. 1466. Officer Terrance Prioleau testified about a separate search where officers discovered a piece of metal Mahdi had hidden in a hole in the wall.

Officer Janet Driggers testified about a grievance form she received from Mahdi, where he wrote,

15

I cannot be diplomatic with you people, so my last action would be to kill you. Why not? You're no good to anybody. I could easily get someone to murder you. What is wrong with you, bitch? I bet you'll respond quick to this, won't you? You people think this shit is a game.

J.A. 1482. Officer Driggers testified that "[i]n [her] capacity as a grievance coordinator," this was the only time she "was ever threatened to be killed." J.A. 1489.

SCDC disciplinary officer Annie Sellers testified that Mahdi made additional threats during the subsequent disciplinary hearing. Even "[a]s he was being removed from the area and while he was out in the hallway, he was still making threats towards [Officer Driggers]." J.A. 1497.

Eventually, SCDC officials determined that Mahdi should be moved to more restrictive custody in the Kirkland Maximum Security Unit ("Kirkland"). Captain Gary Lane testified that Kirkland is "a 50 bed facility" reserved for "the worst of the worst inmates in the State of South Carolina." J.A. 1500. Within the facility, there are six cells in what is called the "High D Wing," where "the lights are kept on 24 hours a day, seven days a week" and inmates are monitored by video cameras "24 hours a day." J.A. 1501. That is where the SCDC housed Mahdi, meaning "he [was] one of the six most secure inmates in the whole department of corrections" at the time of his sentencing. J.A. 1502.

Captain Lane testified about separate incidents at Kirkland when they discovered various contraband in Mahdi's cell including: a "hammer-like weapon," J.A. 1502; "two pieces of a metal, one sharpened to a point," J.A. 1506; and pieces of "knotted rope," J.A. 1506.

f. Victim Impact Statements

16

Finally, the State called several witnesses, including Captain Myers' father, wife, and daughter, as well as his colleagues and friends on the police force, who testified about Captain Myers' character and the impact his death had on them.

### 2. Mahdi's Evidence in Mitigation

Mahdi's counsel began their mitigation presentation by asking the trial court for mercy, arguing that he "took full responsibility . . . for what he did" by pleading guilty, "that at the time of this particular crime, . . . he was 21 years of age and very young," and that he had a troubled childhood. J.A. 1224. No laypersons testified on Mahdi's behalf. Nor did he take the stand. Instead, trial counsel called two expert witnesses: James Aiken and Marjorie Hammock.

### a. James Aiken: Prison Adaptability

Aiken, a former warden and prison adaptability expert, testified that the SCDC was equipped to handle Mahdi and that he would likely present no future threat while incarcerated. Though Aiken considered Mahdi's disciplinary infractions "serious," he testified that "when you compare [Mahdi's] contraband issues and the behavior issues . . . to the type of population that [the SCDC has] to manage, it's fairly reduced." J.A. 1565. The conduct was "[n]ormal and routine" and "a reflection of an immature boy in a big prison system." J.A. 1567. According to Aiken, Mahdi was "not demonstrating . . . predator[y] behaviors," J.A. 1566, i.e., he did not have "total control to call a signal and have an officer killed" or "caus[e] a riot between two rival gangs," J.A. 1581. Mahdi also was not "a person with connections with international terrorists that [could] call hits on

17

officials within the prison systems." J.A. 1581. He was, by Aiken's account, simply "immature and [had] done some very violent, stupid things." J.A. 1582.

### b. Marjorie Hammock: Biopsychosocial Assessment

Mahdi's second witness was Hammock, a licensed clinical social worker and assistant professor at Benedict College in Columbia, South Carolina, who had an extensive background in capital litigation. Before Mahdi's sentencing, she had participated in twenty-five death penalty cases and had testified in fourteen of them.

Hammock's testimony centered on her biopsychosocial assessment[4] of Mahdi, which she prepared by "conducting interviews with family members, reviewing records, interviewing the defendant himself, [and] taking information from anyone who would give information about him, his life and his development." J.A. 1595. Specifically, Hammock interviewed "someone who was a part of the community," but "didn't know much about [Mahdi]," J.A. 1595, as well as his paternal grandmother Nancy, his paternal uncles Nathan Burwell ("Nathan") and Carson Burwell ("Carson"), and Lawanda Burwell ("Lawanda"),

---

[4] A biopsychosocial assessment considers

all of the social, the biological and the clinical factors, [and] the environmental factors about the defendant and bring[s] them together to really form a family or a social history. It examines at every aspect of the life to present a picture, particularly in this instance to give some understanding as to why we are here and that resulted in his being in this situation.

J.A. 1594–95.

Carson's wife. She also spoke with Shareef; Mahdi's "mother, [Vera[5]] Mahdi; [Corliss Artis ("Corliss")], his maternal aunt; and Sophia Gee, . . . [an]other maternal aunt." J.A. 1596. Further, Hammock "reviewed a synopsis of [Mahdi's] school records" and a mental health report from when he was a juvenile. J.A. 1596.[6]

Hammock described Mahdi's childhood as "rather chaotic," highlighting "the nature of the transience [and] the changes in his living circumstances." J.A. 1597. She emphasized his parents' "inability . . . to parent appropriately and correctly," observing that Mahdi was "abandoned by his mother at quite an early age and that his father . . . had his own experiences which limited his ability to parent effectively." J.A. 1597.

Hammock testified at length about Shareef, whom she characterized as having "a lot of difficulties." J.A. 1598–99. She conveyed Shareef's

> experiences in desegregating the local school . . . and how traumatic that was for him. He was constantly in conflict with those around him. . . . [H]e considered himself unwanted.
>
> And so [Shareef's] own childhood was difficult and he grew up in a situation feeling alienated from anybody else around him. He didn't finish school. He was the only one in his sibling group that didn't and that was a source of consternation between he and his family members.

---

[5] Shareef changed his wife's name from "Vera" to "Tilea" upon their marriage. Testimony and other evidence from the record use both names interchangeably to refer to Mahdi's mother. For the sake of consistency, this opinion refers to her as "Vera."

Hammock described Vera as "very, very withdrawn" and indicated that she "did not want to participate in the interview at all, somewhat—really almost frightened about being involved with the family again." J.A. 1605–06.

[6] As discussed in greater detail below, Hammock did not work alone in compiling this information. Rather, along with trial counsel, she worked in conjunction with a private investigator, a mitigation investigator, a psychiatrist, and a forensic psychologist in their efforts to present mitigation evidence on Mahdi's behalf.

19

> This looked like an intact family that he grew up in, but they had their problems. There was alcoholism in the family and there was some neglect on the part of [Shareef's father]. And, again, this also culminates in [Mahdi's] father deciding to become a Muslim, change his name, which also brought some grief to the family.
>
> So [Shareef] . . . goes to the Marines, he gets out. . . . [H]e says he has an honorable discharge, but it was under some circumstances that really kind of compromised the nature of that discharge. . . . He has odd jobs, but he's not really able to function well. There is some description of continuing depression and a number of incidents with law enforcement locally.
>
> At the age of 27, he meets and participates in an arranged marriage with [Vera,] a 16-year-old woman from Richmond, whose mother helped to arrange the wedding. [Vera was] not supportive of this, but she has no choice but to join the marriage and that marriage was conflict from the very, very beginning.
>
> [Mahdi's] older brother [Saleem] is born and then [Mahdi] is born into this family, which is very unstable and chaotic. [Mahdi's] father is not able to take care of his family. They move several times, ultimately ending back in Lawrenceville [Virginia] living with [Shareef's] mother and not able to, again, sustain himself.
>
> There is a great deal of conflict described between . . . [Vera] and [Shareef]. And this the children witnessed. Ultimately, [Mahdi's] mother leaves the family and she describes her trying to get away from the abuse.

J.A. 1599–1600. Hammock explained that Shareef attempted to care for the boys with his family's help, but that "the relationship between [Mahdi's] father and his grandmother and the other members of the family" was "constantly confrontational." J.A. 1601. During this time, Vera was "forced to return . . . ostensibly to see the boys," but that resulted in "some physical conflict. And she [left] again not to see her son for a number of years." J.A. 1601.

In 1991, when Mahdi was eight years old, he went to live with his paternal uncle and aunt-in-law, Carson and Lawanda, in Baltimore. They discovered he "simply could not

20

read even though he appeared to have other kinds of skills." J.A. 1602. Hammock summarized Mahdi's relevant school history:

> [H]e spends the second and the third grade in Scotts Branch Elementary School in Baltimore, Maryland. And he has uneven skills. He's placed in an average math program, but . . . below average reading programs. And the narrative indicates that he needs improvement in a number of areas, including standards for behavior, showing respect for authority. And his reading and writing skills remained below grade level.
>
> That continues in the third grade and . . . it's especially noted again the [unevenness] of his performance because he is considered by his teacher, in that year, that he was outstanding in science; however, the reading and the vocabulary and the spelling remain below average. It's also noted several places where he clearly has poor self-esteem and often has difficulty with relationships with others.
>
> Ultimately, he leaves school [in Baltimore] and is placed in . . . a mental health facility [the "Carter Center"]. And after he is released . . . , he stays only with his aunt and uncle for a short period of time[.]

J.A. 1604–05. By the time Mahdi returned to Brunswick County, his father was "known to be at odds with people in the community, with his own family and with law enforcement." J.A. 1610.[7] But Mahdi "care[d] about his father, wanted more than anything else an intact family and an ongoing relationship, but that just didn't happen." J.A. 1610. That said, Mahdi never received "the consistent help in growing up and developing good skills and developing a sense of values. Even though folks tried, it just wasn't consistent enough for him to learn how to do those kinds of things." J.A. 1610.

Hammock concluded that Mahdi had "been traumatized throughout his early life," which "had an impact on his inability to make good choices, to have a good sense of himself

---

[7] Hammock testified that Mahdi "live[d] with [his mother] for a very short period of time, . . . but it was not a good reunion. They did not get along at all." J.A. 1607.

and others and to behave according to societal norms." J.A. 1611. In short, she told the trial court, "[h]e never had really a chance to develop appropriately." J.A. 1611–12.

During Hammock's testimony, trial counsel submitted a "Time Line" of the major events in Mahdi's life, which included the following entries among others:

- 1955[8]: Sareef [sic] enters a desegregated school, 5th grade. The experience was destructive. He was ridiculed, isolated, challenged physically by classmates, ignored or received negative feedback from some instructors. Felt traumatize[d] by the experience. Only child in the family that does not finish high school. Sareef [sic] described as disturbed as a young child, threw tantrums, Mother not emotionally available[.]

  . . . .

- 1975: Sareef [sic] converts to Islam. Sareef [sic] involved in a series of misdemeanors locally all said to be racially motivated.

- 1980–81: Sareef [sic] age 27 and Vera (Tilea) age 16 marry. The marriage is arranged by Vera's mother, who is raising 16 children. Sareef [sic] changes Vera's name to Tilea.

  . . . .

- March 20, 1983: Mikal Mahdi born.

  . . . .

- 1986: Vera (Tilea) leaves Sareef [sic] and the boys. Sareef [sic] lives in the Burwell home with the boys. Sareef [sic] took [the] boys to Richmond to live but could not keep a job, could not supervise or provide care for the boys. Sareef [sic] moves back to Lawrenceville. Sareef [sic] can not [sic] take care of himself or the boys.

- 1988: Vera (Tilea) is taken to Lawrenceville from Richmond by Sareef [sic] who abuses her. Nathan rescues Vera. Mikal and Saleem witness more abuse and violence.

  . . . .

---

[8] This date is obviously incorrect, given that the Time Line lists Shareef as being born in 1954.

- October 1991: Saleem sent to Texas to live with aunt. Mikal went to Baltimore to live with Uncle Carson and Aunt Lawanda Green Burwell. Carson described Mikal as very smart but unable to read at age 8.

- August 23, 1992: Mikal involuntarily admission in a psychiatric facility after suicide threat/gesture and Mikal hospitalized Admission DX Axis I, Major Depression with suicidal ideation, adjustment disorder, R/O Adjustment Disorder, Axis II Developmental Reading Disorder, Axis III Hx of right arm and right leg fractures. Saleem comes back from Texas after disrupting his aunt['s] home.

- October 19, 1992: Mikal Discharged from Walter P. Carter Mental Health. Discharge DX Axis I Major Depression, Single episode. Mikal also becomes more disruptive in his uncle's home in order to force his return to Lawrenceville to join his father and brother. He has become even more defiant after he learns that his brother has joined his father. The three reunite and live on Burwell property with the boys. This was an isolated place in the country and they often had no food, heat or money.

- December 1997: Mikal sent to reception and diagnostic center— Culpepper in a juvenile facility for two counts of b & e and two counts of grand larceny. Mikal released from facility and Sareef [sic] sent Mikal to Richmond to live with his mother[.]

- December 1997: Mikal committed to juvenile facility

- April 2001: Mikal transferred VA Dept of Corrections

J.A. 6322–23.

### D. The Trial Court's Sentence and Mahdi's Direct Appeal

After hearing closing arguments and taking a day to deliberate, the trial court sentenced Mahdi on December 8, 2006.[9] The court began by summarizing the underlying facts before finding that the State had proven two of the alleged statutory aggravating

---

[9] During the sentencing hearing, the trial court reaffirmed that Mahdi "understood that as a consequence of his guilty plea to murder while in the commission of burglary and grand larceny, that the Court would conduct a separate sentencing proceeding and determine whether he should be sentenced to life imprisonment without the possibility of parole or death." J.A. 1661. Neither Mahdi nor his trial counsel objected to this statement.

23

factors beyond a reasonable doubt—that Mahdi had killed Captain Myers "while in the commission of burglary" and "while in the commission of larceny with use of a deadly weapon," J.A. 935 (citing S.C. Code Ann. § 16-3-20)—meaning Mahdi was eligible for the death penalty.[10]

The trial court then summarized the State's evidence in aggravation, which it described as "compelling" and "established by clear and convincing evidence the defendant's bad character and propensities." J.A. 1665, 1668. "These incidents covered a period of over eight years showing [Mahdi] committing a series of crimes, including housebreaking, stealing guns, robbing people, selling crack cocaine, vandalism and malicious wounding." J.A. 1665–66. And "[d]uring each of these periods of incarceration, Mr. Mahdi's behavior was maladaptive, assaultive and demonstrated an utter disrespect for authority, including threatening the life of a detention officer." J.A. 1667. Moreover, "[w]hile in safekeeping in the South Carolina Department of Corrections awaiting this trial, Mr. Mahdi made numerous threats to kill various department employees." J.A. 1668.

The trial court then considered and rejected each of Mahdi's arguments in mitigation before announcing its decision:

> Defense counsel argues that the defendant's youth should be considered by the Court in determining the appropriate sentence to be imposed.
>
> Mikal Deen Mahdi was 21 years old at the time of the murder of Captain Myers. When last tested at age 14, the defendant's IQ was 108, slightly above

---

[10] The trial court expressly found the State had not carried its burden of proof on the other statutory aggravating grounds and thus had not proved beyond a reasonable doubt that Mahdi killed Captain Myers "while in the commission of a robbery while armed with a deadly weapon" or "during or because of the performance of [Captain Myers'] official duties" as a law enforcement officer. J.A. 1664–65.

average. While this is a young age for such a serious crime, Mikal Deen Mahdi began his criminal career at an early age having entered the Virginia Department of Juvenile Justice at 14. He is experienced in the world of crime. By the time he committed these crimes, Mr. Mahdi was well aware of the severity of his crimes and the possible consequences.

I have considered the defendant's young age, but I have not afforded it great weight in reaching my decision. There is nothing about Mr. Mahdi's age or mentality that in any way mitigates, excuses or lessens his culpability and neither should it be given any significant weight in the Court's ultimate decision as to his sentence.

I have also given consideration to what the defense contends to be the defendant's turbulent and transient childhood and upbringing. In reviewing the testimony of Marjorie Hammock, the defense's clinical social worker expert, there's no reference to physical or sexual abuse suffered by the defendant. In addition, records of the Virginia Department of Juvenile Justice indicates [sic] that the defendant's father, brother and grandmother continually expressed great care and concern for his well-being.

While Mr. Mahdi's family life may have been less than ideal, particularly without the presence of a loving and caring mother, I do not believe that his difficult childhood and family life contributed in any significant way to his senseless criminal activities; therefore, while I have considered this . . . nonstatutory mitigating circumstance, I do not believe that it should be given any significant weight in the Court's ultimate decision as to the sentence to be imposed.

The defense presented testimony from Mr. James Akin, a prison adaptability expert. Mr. Akin, a highly credential[ed] expert, testified concerning Mr. Mahdi's potential adaptability to prison life.

I have considered and reviewed Mr. Mahdi's records regarding his prior behavior in various correctional institutions. He has consistently been disruptive and uncooperative and has threatened to kill prison employees. Officers have repeatedly found homemade weapons, ropes and other contraband in the defendant's cell.

During this trial, the defendant brought a homemade handcuff key into the courthouse with the intent of using it, if possible, to escape, thus, posing a serious threat to courtroom security. The Sheriff of Calhoun County testified that Mr. Mahdi stated to him that he made the key while being housed and monitored at the State's highest security level facility.

While Mr. Akin gave impressive testimony, based on Mr. Mahdi's behavior in correctional institutions throughout his adolescence and adult years, I do not believe that he is sufficiently adaptable to prison life for this nonmitigating [sic] circumstance to be given any significant weight in the Court's ultimate decision as to the sentence to be imposed.

The defense further . . . argues as a nonstatutory mitigation circumstance that the Court should consider the defendant's guilty plea in determining the appropriate sentence to be imposed.

The defendant's guilty plea occurred during the fourth day of his trial following jury selection, but prior to the jury being sworn. This was one day following his attempted escape through the use of a homemade key. In addition, Mr. Mahdi has failed to demonstrate any remorse for his actions at any point in time known to this Court. Therefore, I conclude that no significant weight should be given to this nonstatutory mitigating circumstance and the Court's ultimate decision as to the sentence to be imposed.

. . . .

My challenge and my commitment throughout my judicial career has been to temper justice with mercy and to seek to find the humanity in every defendant that I sentence. That sense of humanity seems not to exist in Mikal Deen Mahdi.

. . . .

Today, the defendant also seeks mercy, the same mercy that perhaps Captain James E. Myers sought for an instant before Mikal Deen Mahdi fired nine bullets into Captain Myers' body from one of Captain Myers' prized weapons before setting his body on fire with matches and diesel fuel belonging to Captain Myers. In extinguishing the life, hope and dreams of Captain Myers in such a wicked, depraved and consciousless [sic] manner, the defendant Mikal Deen Mahdi, also extinguished any justifiable claim to receive the mercy he seeks from this Court.

J.A. 1669–74.

The trial court sentenced Mahdi to death for Captain Myers' murder, fifteen years of incarceration for second-degree burglary, and ten years for grand larceny, to be served consecutively. Mahdi appealed to the Supreme Court of South Carolina, raising a single

26

issue not relevant here. That court affirmed. *Mahdi*, 678 S.E.2d at 136. He did not appeal to the U.S. Supreme Court.

## E. The First State-Court PCR Proceedings

After exhausting his direct appeals, Mahdi filed an initial pro se PCR application in South Carolina state court. The Supreme Court of South Carolina assigned the case to a judge (the "PCR court"), who subsequently appointed statutorily qualified counsel ("PCR counsel"). PCR counsel filed several amended PCR applications, raising the following relevant IAC claims:

- The "Jury Sentencing Claim": Trial counsel failed to adequately advise Mahdi of the advantages of jury sentencing, which resulted in him pleading guilty and purporting to waive his right to jury sentencing;

- The "Mitigation Evidence Claim": Trial counsel failed to adequately investigate, develop, and present mitigation evidence concerning Mahdi's family, social, institutional, and mental health history; and

- The "Judicial Sentencing Claim": Trial counsel failed to assert that S.C. Code Ann. § 16-3-20[11] is unconstitutional because it automatically precludes jury sentencing following a guilty plea in violation of the Sixth, Eighth, and Fourteenth Amendments as addressed in *Ring v. Arizona*, 536 U.S. 584 (2002). Though PCR counsel acknowledged that South Carolina state courts had rejected this argument, *see State v. Downs*, 604 S.E.2d 377 (S.C. 2004), they nevertheless maintained it had not been reviewed by federal courts and that trial counsel were thus ineffective in failing to adequately preserve the record for subsequent litigation.

---

[11] South Carolina Code § 16-3-20(B) provides:

> If trial by jury has been waived by the defendant and the State, or if the defendant pleaded guilty, the sentencing proceeding must be conducted before the judge. In the sentencing proceeding, the jury or judge shall hear additional evidence in extenuation, mitigation, or aggravation of the punishment.

27

The PCR court scheduled an evidentiary hearing during which it "had the opportunity to view and hear the witnesses who testified in person, and make a credibility assessment with regard to each witness." J.A. 7524.

## 1. Mahdi's PCR Evidence

PCR counsel's presentation focused on the Mitigation Evidence claim. Specifically, they argued that trial counsel "presented . . . short[,] brief[, and] cursory testimony from Ms. Hammock," J.A. 2212, which conveyed "the basics of the story . . . with a very broad brush," but omitted crucial details. J.A. 2213–14. PCR counsel promised "to show the humanity" in Mahdi that the trial court could not find. J.A. 2213. In doing so, they called members of Mahdi's family, non-family lay witnesses, and mental health experts.

### a. Mahdi's Family Members

Four members of Mahdi's extended family—one uncle and three aunts—testified on his behalf. None of his immediate family members—Shareef, Vera, or Saleem—were present at the evidentiary hearing or submitted affidavits to the PCR court. We first summarize the testimony from Carson and Lawanda before turning to Mahdi's maternal aunts, Rose Gupton ("Rose") and Sophia Gee ("Sophia").

#### i. Carson and Lawanda

Carson began by recounting the role that race played in Mahdi's paternal family, the Burwells. He described Shareef's enrollment in a predominantly White school in Lawrenceville as "a fairly terrible experience," which resulted in him becoming angrier, "a lot more uncontrollable, a lot more despondent," and hostile towards White people. J.A.

28

2229–30. Carson also remembered his mother, Nancy, as someone obsessed with race who was constantly trying to "pass[]" as White.[12] J.A. 2232.

According to Carson, Shareef was the only one of his siblings who did not graduate from high school or attend college. Instead, he enlisted in the U.S. Marines. Carson testified that "something happened to him [during his service]. He had a discharge and . . . [i]t was not good. . . . [I]t made him a more radical person, [an] angry person[.]" J.A. 2235.

Turning to Mahdi's childhood, Carson testified that Vera "wasn't cruel, but she just wasn't doting." J.A. 2240. In contrast, Shareef was "very affectionate, very concerned, very much concerned. . . . [H]e was always doting on his sons and always very, very affectionate with them." J.A. 2240. "He certainly tried to . . . show favoritism to [Mahdi] as much as he could[.]" J.A. 2240. However, according to Carson, Shareef was incapable of adequately raising his children: "He never had a job to speak of—consistently [un]employed . . . They didn't consistently go to school and he lived in public housing and section eight or whatever. No, he couldn't take care of them." J.A. 2241. Lawanda agreed, suggesting that Shareef's constant moving was due, in part, to his efforts to "stay under the

_____

[12] Lawanda described Nancy as someone who "definitely wanted to be more than she thought people thought she was." J.A. 2449. For instance,

> [i]f she went to downtown and interacted with white people, they knew she was a light red-headed black woman, but when she left Lawrenceville then it depended upon what people thought. If they didn't think she was black, she could be white, and if they did, well, she'd be black.

J.A. 2450. Lawanda attributed "the family lightness and red hair" to Nancy's grandfather, who "was the product of a relationship between a slave and an [I]rish woman." J.A. 2496. The "woman was sent to Boston with child and the father of the child disappeared, was never seen again." J.A. 2496.

radar with the . . . educational system" by not drawing too much attention due to the boys' mounting absences. J.A. 2464.

After one visit where Carson found Mahdi and his brother skipping school, "playing out in the yard and being destructive, tearing up toys that were left out," while Shareef was "not really noticing what they were doing . . . not saying anything," J.A. 2243–44, he decided to take Mahdi to live with him and Lawanda in Baltimore.

Carson described that experience as a very difficult period. At one point, he had to attend a meeting with Mahdi's principal because Mahdi made several suicidal statements such as, "Well, why doesn't someone just shoot me?" and "If I had a gun I would just shoot myself." J.A. 2248. Carson testified that Mahdi made similar statements at home as well. Despite these threats, Carson concluded Mahdi "didn't really want to kill himself. . . . He was just playing games." J.A. 2265. Lawanda agreed, testifying that Mahdi would often say, "Just shoot me," J.A. 2467, but she "never thought that he was serious about it," J.A. 2468.

To that end, Carson recounted an incident when he came home and found his wife "giving [Mahdi] a whipping," which he "monitor[ed] to make sure she didn't go overboard." J.A. 2248. Lawanda testified that she took Mahdi's belt and spanked him with it, though her "purpose was not to really hurt him but to let him know that [she] was in charge." J.A. 2467. Afterwards, Mahdi "put soot on his face, on parts of his body to make it look like it was bruised and some ketchup on his face and called 9-1-1 and the police came to the door." J.A. 2248. The officers took Mahdi to the hospital, where he told them, "You need to just give me your gun so I can shoot myself," and they "took him straight to"

30

the Carter Center. J.A. 2250. "It took [Carson and Lawanda] two months to get him out of there[.]" J.A. 2250. While Mahdi was committed, Lawanda testified that his doctors told her that Mahdi was being disruptive, "throwing chairs" and "kicking doors," and that they had to put him in isolation. J.A. 2493.

Upon his release, the Carter Center recommended Mahdi receive follow-up care and counseling. Carson testified that he "sent [Mahdi] to a psychiatrist every Monday" for "[t]hree or four months." J.A. 2252. But, according to Lawanda, Mahdi refused to talk during these sessions.

Carson testified that he did not remember being interviewed by anyone from Mahdi's South Carolina defense team but that he "most definitely" would have testified on Mahdi's "behalf and [told] the family story." J.A. 2256. Carson further stated that he would have asked for mercy because Mahdi "didn't have a chance in hell" because of "the parenting he had, the moving around, the mother abandoning him, all kinds of poverty, hunger at times, clothing—lack of. You name it." J.A. 2257.

Lawanda remembered speaking with Mahdi's South Carolina defense team after his arrest but said she was not asked to testify. At the PCR evidentiary hearing, when asked in retrospect if she would have been willing to speak on Mahdi's behalf, she responded that she was "not sure." J.A. 2477.

ii. Mahdi's Maternal Aunts

Rose testified about Mahdi as a child, describing him as "very angry. He was angry. . . . [He threw] cereal bowls across the kitchen floor. He hit [his mother] a couple of times."

31

J.A. 2288. Sophia described Vera as "really protective," even "over-protective," of Mahdi and his brother. J.A. 2296–97. "She wouldn't let them play." J.A. 2297.

That said, according to Rose and Sophia, the only reason Vera left her sons under Shareef's care when she fled the relationship was "[b]ecause he threatened to kill her if she took them and he meant it, too." J.A. 2288, 2298. After Vera left, Shareef "wouldn't let her see [the boys] or speak to them, but . . . she used to send them toys and clothes." J.A. 2298. Sophia testified that Shareef "was abusive; that he used to beat [Vera] and he was controlling." J.A. 2298. She recounted a time when Vera came to her house "covered in bruises from head to toe and she said Shareef beat her up. She was trying to see the children and he beat her up." J.A. 2299. Years later, when Mahdi was around sixteen or seventeen, Sophia tried to reunite him with his mother. She testified that, at the time, neither Mahdi nor his brother knew she was alive. "[A]t first [the reunion went well] but then after a while . . . it went bad." J.A. 2301. Mahdi "slashed her tires" because Vera "wouldn't let him use the car." J.A. 2306–07.

Rose said she did not speak with anyone from Mahdi's South Carolina defense team before his trial. Indeed, she claims to have not even been aware that he had been arrested for capital murder until her sister told her he had already been convicted. In contrast, Sophia testified that she, along with her sister Corliss spoke with the South Carolina defense team

32

for around an hour.[13] Both Rose and Sophia stated they would have testified on Mahdi's behalf during his sentencing hearing had they been asked.[14]

b. Non-Family Lay Witnesses

PCR counsel also called several lay witnesses from Mahdi's childhood. Myra Harris, Mahdi's third-grade teacher from Baltimore, testified that he was prone to outbursts and came to her class with significant gaps in his education. According to Harris, "sometimes the anger would get to a level where . . . he would have to go into a time out." J.A. 2325. Other times he refused to do work. And on one occasion, Mahdi ran "out of the classroom," out of the building, "and ha[d] to be retrieved." J.A. 2326. Nevertheless, his behavior improved during his time in her class after he and Harris developed a relationship.

Carol Wilson, Mahdi's fifth-grade teacher from Brunswick County, presented a similar narrative. She testified that Mahdi was referred to the child study team as a candidate for special education based on his behavioral deficiencies. Wilson observed that Mahdi's marks on the Burks Rating Scale—which tests behavior—demonstrated "very significant and excessive self-blame, poor impulse control, and excessive resistance. He ha[d] also exhibited periods of extreme sadness at times." J.A. 2335. Wilson concluded Mahdi was "unable to cope with these feelings," making "him unable to function and

---

[13] Rose testified that she spoke with Sophia and Corliss "every day" and did not believe either was aware of Mahdi's trial. J.A. 2291.

[14] PCR counsel also submitted an affidavit from Mahdi's paternal aunt, Sandra Wynn Burwell ("Sandra")—Nathan's ex-wife—much of which was devoted to the Burwell men's ineptitude in supporting their families. Sandra also addressed Shareef's volatile relationship with Vera, including his attempt "to kill [her] with their sons watching." J.A. 2931.

effectively learn in school." J.A. 2335–36. That said, the child study team, which she chaired, determined he "had a full scale IQ of 118," and Wilson considered him "an intelligent kid." J.A. 2337.

Wilson's team later had a meeting to discuss Mahdi's eligibility for special education, which Shareef attended. According to Wilson, when the team's psychologist presented his findings, Shareef "became very angry . . . and he got up and he cursed us and he left," saying "that he didn't want any white man writing negative reports about his son." J.A. 2333. Ultimately, the team determined Mahdi was "eligible for the emotionally disabled program with recommended assistance in the area of reading." J.A. 2341. They also recommended that he receive counseling.

Eventually, Shareef allowed Mahdi to join Wilson's class, albeit briefly. She described Mahdi as "depressed and . . . very sad," but "never disrespectful." J.A. 2344. But "it came [to] a point of time that [she] had to sit him next to [her] in order for him to get his work done." J.A. 2344. Mahdi liked to draw, but Wilson testified "he would use ink and draw pictures of people hanging, the nooses and things like that." J.A. 2345. Mahdi did not finish the school year due to Shareef's decision to homeschool the boys. After that, Wilson said Mahdi "got lost in the cracks." J.A. 2348. Neither Harris nor Wilson spoke with Mahdi's South Carolina defense team, but both stated they would have testified on his behalf at sentencing. Both teachers conceded that they had no knowledge about Mahdi's home life.

George Smith also testified at the PCR hearing. Smith was well-known and respected in the local Black community for having successfully sued Brunswick County

34

under the Voting Rights Act. According to Smith, Shareef admired him "for taking on these white people and winning because . . . he didn't particularly like white people. . . . [H]e just hated them with a passion." J.A. 2371–72. Smith recalled an incident when Shareef jumped into the local White swimming pool and refused to leave. According to Smith, Shareef "was in the pool swimming around and cursing, using extremely vile language . . . and hollering as loud as he possibly could as to try to inflame these policemen that were standing around." J.A. 2374–75. The police called Smith and asked him to help resolve the issue. Eventually, Shareef agreed to leave the pool so long as Smith would accompany him to the jail. Smith testified that when they arrived at the cell, Shareef "just went wild. He took the furniture and started throwing the chairs against the wall . . . . [I]t was just as violent as anything [Smith] ha[d] ever seen in [his] life." J.A. 2377.

Smith also testified about Mahdi's court hearing following the standoff at his grandmother's house. Smith recalled that the judge described Mahdi as a "smart" and "nice-looking kid" and recognized that "[h]is problem [was] his father." J.A. 2379. Had anyone from Mahdi's South Carolina defense team contacted him, Smith said he would have testified and "probably would have" asked the trial court to show mercy. J.A. 2378.[15]

---

[15] Sharon Pond, a mental health therapist from Lawrenceville also testified on Mahdi's behalf, though she had never met him before the evidentiary hearing. She testified about Shareef's treatment for various mental illnesses, but acknowledged that when Shareef was referred to the state hospital after the pool incident, the doctors there did not find any indication of major mental illness. Pond was not contacted by Mahdi's South Carolina defense team.

In addition to the witnesses who testified at the hearing, PCR counsel introduced affidavits from Dora Wynn, Douglas Pond, and Sheriff Woodley. Wynn, Mahdi's kindergarten teacher and elementary school principal, stated that he "often simply refused (Continued)

### c. Mental Health Experts

PCR counsel called mental health experts to testify as well, including: Dr. Nicholas Cooper-Lewter, a licensed social worker; Dr. Craig Haney, a social psychologist; Dr. DeRosset Myers, Jr., a clinical psychologist; and Dr. Donna Schwartz-Watts, a psychiatrist. Collectively, they testified about the impact various events in Mahdi's life had on his mental health and diagnoses.

Dr. Cooper-Lewter spoke about incidents where Mahdi witnessed Shareef beating Vera and Nancy, which "sen[t] a very, very unhealthy message about how you solve life's problem and how you [relate to] others." J.A. 2403. To that end, Shareef told Dr. Cooper-Lewter that he "wanted [Mahdi] to be [his] warrior. [Shareef] said [Mahdi] was fearless. He would do things that [Shareef] was afraid to do." J.A. 2429. "They practiced shooting and using knives and moving about in the countryside as if there was an enemy and how

---

to do his work, refused to eat, and would just walk away from school." J.A. 2922. But she "never could figure out why he was so angry" because she "was not aware of other circumstances in his home and life" beyond his mother's absence. J.A. 2922.

Douglas Pond, Lawrenceville's Mayor and former Chief of Police, relayed the incident when Shareef jumped in the Whites-only pool and refused to leave. Sharon Pond testified that Shareef was involuntarily committed after this incident based on an emergency worker's conclusion that he suffered from a mental illness and was imminently dangerous to himself or others.

Sheriff Woodley recalled an incident when Nancy "showed [him] bruises on her legs and thighs and told [him] that [Shareef] had beaten her with the buckle end of a belt while his sons, Saleem and Mikal, [were] watching." J.A. 2925. Ultimately, though, she refused to testify or press charges. Sheriff Woodley also recounted an incident when Shareef "kidnaped [sic] and beat[] his wife after she left him," which the boys witnessed. J.A. 2926. In another incident, Shareef "threw a brick at his sister Kathy through the door of the house" and on another occasion "damaged his sister Loretta's car and put a cinder block through her car windows." J.A. 2926.

Regarding the standoff, Sheriff Woodley stated that Shareef initiated the disturbance because he "had no respect for authority." J.A. 2927.

you could distract people and to do whatever you feel you need to do to the enemy. They were being taught that regularly on a daily basis." J.A. 2429. Dr. Myers testified that he was "struck by the fact that there seemed to have been a good deal of violence in his family of origin" as well as "the fact that there seemed to be a lot of psychopathology there." J.A. 2621–22. Dr. Cooper-Lewter acknowledged, however, that there was no evidence that Mahdi was physically or sexually abused by his father or any other figure in his life.

Regarding Mahdi's suicidal ideations as a child, Dr. Cooper-Lewter referred to an incident where Mahdi "attempt[ed] to kill himself by jumping off of a bridge," J.A. 2411, as well as his diagnosis at the Carter Center with major depression recurrent with suicidal ideation and severe attachment disorder. Nevertheless, Mahdi's records indicated to Dr. Cooper-Lewter that he "only want[ed] to hurt [him]self when [he could not] have [his] way." J.A. 2528. Dr. Haney agreed that there were clear instances when Mahdi expressed suicidality for purposes of manipulation.

Further, Dr. Haney testified that Mahdi's "social history became an institutional history at age 14," after which he "was institutionalized for approximately eight and a half out of every 10 days of his life . . . in juvenile facilities and adult prison facilities." J.A. 2570. And Mahdi's records are "replete with . . . impulsive acting out." J.A. 2574. During Mahdi's time in the DJJ, he was diagnosed with conduct disorder, which "means that you . . . act in ways that are unacceptable, maybe even harmful. In other words, you don't behave properly" and typically do not show remorse. J.A. 2435. At one point, the DJJ had to ban Mahdi from participating in an anger control group, citing an incident where he became "very upset and continually threatened that if he [did] not get released from DJJ

37

on 9/23/99 he [was] going to fuck people up and go around acting crazy." J.A. 2523. In a separate report, Mahdi stated that if he was not released on time, the DJJ would find him hanging in his cell. They later found him "with a sheet tied around his neck sitting in his cell and they put him on suicide watch." J.A. 2524. Mahdi "reported that he did not really intend to harm himself. He just wanted to go to special housing because he believed he could receive more recreation time there." J.A. 2525.

Dr. Cooper-Lewter testified that when Mahdi returned to the DJJ after the standoff, his personality assessment revealed a "dysphoric emotionally immature adolescent with a conduct disorder." J.A. 2501–02. "He operated in a . . . way as if he was emotionally isolated and mistrustful of the world around him." J.A. 2504. This culminated in "suicidal ideation or suicidal threats and gestures," including an instance when he tried to electrocute himself in his cell. J.A. 2504. Mahdi also "began to act out in destructive ways." J.A. 2506.

Soon after he was released from the DJJ, Mahdi went back into custody after his conviction for stabbing Rivera. Dr. Haney[16] testified that upon entering custody, a VDOC psychologist diagnosed Mahdi "with intermittent explosive disorder and antisocial personality disorder."[17] J.A. 2596. Dr. Myers agreed this was "a justifiable diagnosis at the

---

[16] Significantly, Dr. Haney cabined his assessment of Mahdi to "what [he] believe[d] that institutionalization did to [Mahdi]," not whether "it had anything to do with the commission of these crimes." J.A. 2604. Dr. Haney knew nothing of the specific facts of Captain Myers' murder and could not testify as to any connection between Mahdi's time in jail and his crimes "because [Dr. Haney did not] know the specifics of those events." J.A. 2605.

[17] Antisocial personality disorder is "a pattern of behavior in which a person disregards the rights of other people, feels entitled to have whatever he wants to, [and] is typically associated with criminal behavior but not necessarily." J.A. 2657.

38

time." J.A. 2657. Mahdi was sent to Wallens Ridge, an adult super-max facility in Virginia, which Dr. Cooper-Lewter described as an "environment where racial epithets were spoken to the correctional officers, where people were tasered. [Mahdi] was. He speaks of at least 14 or 15 times that he was tasered." J.A. 2510. However, Dr. Cooper-Lewter acknowledged that Mahdi's VDOC records did not reflect any such incidents.

Dr. Schwartz-Watts conducted an independent psychological assessment of Mahdi for purposes of the PCR evidentiary hearing. She diagnosed him with major depression recurrent with psychotic features and remission, reactive attachment disorder of childhood inhibited type, anxiety disorder, paranoid personality disorder, and antisocial personality disorder. She also testified that "he [was] suffering these same diagnoses" when he committed the underlying offenses, J.A. 2669, though she later conceded that "on that day he may not have been depressed at all," J.A. 2694. Dr. Schwartz-Watts further clarified that Mahdi

> did not kill this officer because of PTSD. He did not kill Officer Myers because of his depression. He wasn't irritable. He was at a point in my opinion [that] it's a robbery gone bad. He is at a place. He gets surprised and he kills a person. So, [the diagnoses are] present but in terms of like having a statutory mitigator that they diminished his capacity, I don't see that.

J.A. 2676.

Further, Dr. Schwartz-Watts testified that Mahdi told her "that he was not really suicidal," "denie[d] that he's ever been depressed," "denied that he asked police to kill him," and "repeatedly stated [during his time] in super-max that there is nothing wrong with him." J.A. 2691. She also believed Mahdi "is very intelligent . . . above average in intelligence and very perceptive." J.A. 2693.

39

## 2. The State's PCR Evidence

The State called seven members of Mahdi's South Carolina defense team: (1) private investigator James Gordon, Jr.; (2) mitigation investigator Paige Haas; (3) psychiatrist Dr. Thomas Martin; (4) forensic psychologist Dr. Geoffrey McKee; (5) attorney Carl B. Grant; (6) lead trial counsel Walters; and (7) second-chair trial counsel Koger.[18]

### a. The Mitigation Investigation Team

Gordon and Haas (collectively, the "Mitigation Investigation Team") testified about their efforts to compile evidence for the sentencing portion of Mahdi's trial. Gordon helped the South Carolina defense team locate members of Mahdi's family and also participated in team meetings. The State asked Gordon about a memorandum from one of those meetings, which included a note from Mahdi's North Carolina mitigation investigator[19] stating that Carson "classified Mahdi as a demon because of all the . . . trouble that he [got] into" and "indicate[d] that there was conflict in their home." J.A. 2706; *accord* J.A. 6642 (admitted copy of the memorandum, stating "[Mahdi's] uncle thought he was a demon and conflicts did occur").[20]

---

[18] The only team members not called were Aiken and Hammock—both of whom testified at the sentencing hearing—as well as Don Grindt, a retired South Carolina Law Enforcement Division agent hired as a crime-scene investigator.

[19] Mahdi was indicted for Boggs' murder and was represented by an independent North Carolina defense team.

[20] When asked at the PCR hearing if he called Mahdi a "demon," Carson claimed he had no memory of doing so but conceded, "Yea, given his behavior I guess I could have said it." J.A. 2272.

Haas had an active role interviewing potential witnesses.[21] She began her work by meeting with Mahdi, who relayed his background and family history. Haas also submitted requests to each school Mahdi attended, hospitals (specifically seeking his psychiatric records), and correction facilities (including DJJ, VDOC, and SCDC). She testified that she went to the schools that Mahdi had attended and spoke with teachers from Lawrenceville and Baltimore. Haas said that, though there were "[s]ome nice teachers that remember[ed] him," she did not speak with anyone "that spent lots and lots of time with him while he was there." J.A. 2787.

As part of her efforts, Haas created a psychiatric chronology for Mahdi. She also traveled to Lawrenceville, Baltimore, and Philadelphia to meet with Mahdi's family members, once by herself and another time with Hammock. During these visits, Haas met with Nancy, Nathan, Vera, Shareef, and Carson.

Haas believed Nancy "potentially" could have been a good witness, but testified that Nathan was not "helpful at all." J.A. 2777. As for Vera, Haas described her difficulty in establishing a basic rapport with her and her shortcomings as a potential witness:

> The first time I was supposed to be able to talk to her and was unable to because she wouldn't come out of her house. The second time she had agreed to see us but when we got there she said that she was sorry but she had to wash her hair and would not be able to come outside or talk to us—did speak by phone like from the inside of the house to us like on the speaker phone on the cellphone. So we did talk to her by phone outside of her house—you know, her inside of her house and us outside of the house.

J.A. 2768–69.

---

[21] Haas estimated she had served as a mitigation investigator in approximately thirty to forty capital cases.

Regarding her conversation with Shareef, Haas said that she did not "know what kind of witness he would have been," given that they "spen[t] a lot of time . . . talking a lot about his . . . personal beliefs." J.A. 2773. And Haas relayed that when she asked Carson about the incident that led to Mahdi's involuntary commitment, he said he "still laughs about th[at] today because he feels [Mahdi] was just being manipulative and really wasn't struggling [with suicidality]." J.A. 2774.

Haas also met with Mahdi's North Carolina attorney, Mark Rabil, and mitigation investigator, Janet Holahan. Haas testified that she would have relayed any information "dealing with [any] of the potential witnesses in the case" that she received from Holahan to Mahdi's South Carolina defense team. J.A. 2776.

### b. Mahdi's Mental Health Experts

The State called Dr. Martin and Dr. McKee, Mahdi's mental health experts hired by his South Carolina defense team. Both provided a similar account of Mahdi's reason for leaving Virginia for North Carolina at the beginning of his crime spree. According to Dr. Martin, it had "something to do with a murder" and he wanted to "avoid homicide detectives" in Virginia. J.A. 2714. Mahdi told Dr. Martin "that he had murdered . . . in a bad drug deal another individual which he thought had not been discovered—at least that he was perhaps a suspect . . . because he said it was unreported." J.A. 2715.

Mahdi told Dr. McKee a similar story, stating that he "felt that his life was in danger . . . because of a rumor that he . . . had killed this other guy's cousin." J.A. 2751. Mahdi also told Dr. McKee

that he and this other person were going to force another person to make meth

42

and . . . that this other person went to rob this person who shot back and . . . that he was just there and not the trigger man, but the man got killed and so apparently there was some sort of homicide that he was at least present for.

J.A. 2751.[22]

Turning to their professional assessments, Dr. Martin determined that Mahdi "had a behavioral problem that led to a lot of failed relationships, interactions that were hostile[,] aggressive, sometimes quite violent in nature, and that he had some depressive issues that were . . . subsequently recurrent due to failure to integrate into society." J.A. 2717. Mahdi was "a loner" who "was essentially becoming a racist militant in his own way." J.A. 2717. "His outlook on life was quite violent. His way of surviving [was] by force. He seemed to have no difficulty talking about killing people if necessary in order to achieve independence." J.A. 2717. Dr. Martin also found Mahdi "didn't seem to have remorse about any of the circumstances that were violent in his past." J.A. 2718. Regarding Mahdi's "recurrent suicidal threats," Dr. Martin found he was "very manipulative," citing Carson's statements that "he [did] this all the time to get his way." J.A. 2718.

Ultimately, Dr. Martin diagnosed Mahdi with antisocial personality disorder and determined he did not "appear to be acting under any influence of any depression at the

_____

[22] At the PCR hearing, Mahdi's counsel who represented him before the trial court conveyed a similar version of this story. Grant testified that Mahdi "was running from an incident that occurred [in Virginia] where he was involved in supposedly in somebody being killed or stabbed." J.A. 2793. Mahdi told Walters that "he was with some other individuals and he wanted to create an artificial drought" by "kill[ing] a number of drug dealers" so that "everyone would have to buy drugs from Mr. Mahdi and his associates." J.A. 2805. According to Walters, "in the process of creating that artificial drought there was an individual that was killed and as a result of that there was an investigation that was going on and in addition to that there were other skirmishes that were going on." J.A. 2805.

time" of Captain Myers' murder. J.A. 2719. Mahdi "described very clearly to [Dr. Martin] what he was feeling and what he was perceiving during this event. There was no talk of feeling depressed, psychotic." J.A. 2720. Rather, Mahdi said he "was justified," stating, "Great leaders or mass murderers, people only understand force." J.A. 2723.

Dr. McKee administered various tests, including a personality assessment screener; the information and orientation questions from the Wechsler Memory Scale, Third Edition; and "a device for measuring short-term . . . memory." J.A. 2752. He also diagnosed Mahdi with antisocial personality disorder. Dr. McKee opined that Mahdi was not suffering from any other mental illness at the time of Captain Myers' murder.

Both Dr. Martin and Dr. McKee relayed their findings and told trial counsel they did not believe their testimony would be helpful for Mahdi's case.

c. Mahdi's Counsel

The State also called the attorneys who represented Mahdi before the trial court.[23] Grant testified about assembling Mahdi's South Carolina defense team,[24] upon which he greatly relied, "trust[ing] professionals who normally [were] very competent in that responsibility," whom he felt obtained "everything that [they] felt [they] needed." J.A. 2794. In describing a motion for a continuance he filed after visiting Mahdi's North Carolina counsel, Grant said that he was "discover[ing] that there was going to be a whole lot more information [related to Mahdi's background and family for mitigation purposes]

---

[23] Grant was initially appointed as lead counsel, but later had to withdraw after a motorcycle accident. Walters was first appointed as second-chair and became lead counsel after Grant's withdrawal. Koger replaced Walters as second-chair.

[24] Grant had been involved in one death penalty case prior to representing Mahdi.

that [they] would need in order to adequately present Mahdi's case on the case in South Carolina." J.A. 2798. The trial court granted the motion and continued the case from January 2006 to November of that year.

Grant and Walters further testified about the mental health experts they hired to evaluate Mahdi. According to Grant, neither Dr. Martin nor Dr. McKee found anything "that could have been used in the penalty phase." J.A. 2792. To the contrary, Grant recalled "the things that were presented by Dr. McKee actually could have been irritating as far as personality and things that would indicate that maybe we were dealing with . . . somebody who would [not] be painted in a good light in front of a jury." J.A. 2792. Walters provided a similar account, testifying that Dr. Martin and Dr. McKee suggested Mahdi was "fine" and that there was "no insanity defense here, and there [were] no impairments." J.A. 2812. In response, trial counsel took the position that they could not "keep going down this road and [the doctors could not] write this report." J.A. 2812.

Walters and Koger also testified about their interviews with potential witnesses from Mahdi's family. Ultimately, Walters concluded that Mahdi's family members "were unwilling to assist" and "were just simply indifferent about him. They didn't really care." J.A. 2828–30. Specifically, Walters testified:

> [Mahdi's] father refused to participate or his position was sort of standoffish and he didn't want to be involved.[25] His mother made it clear she wasn't going to be involved because she was going to wash her hair, and as far as the other sibling [Saleem] he was serving in the military, and as far as the

---

[25] According to Koger, Mahdi told trial counsel he did not want his father to participate, and trial counsel agreed "that any type of testimony from his father would not be advantageous to Mr. Mahdi's cause." J.A. 2895–96.

45

close family—the aunts—they made it clear, you know, we're through with this.

. . . .

They seemed as if it was a self-fulfilling prophecy that something bad was going to happen to him anyway.

. . . .

My people went in. They did the best they could. They're experts and they are good at what they do. They garnered all of the information they could and they attempted to put forth the best defense for Mr. Mahdi.

. . . .


[W]e wanted an individual that would testify favorably for him and . . . [i]n our search to determine if someone wanted to help Mr. Mahdi, they were standoffish. If you want to find information about someone you start with the family and the family can then relate to you to other people and say maybe these people can assist you. Their position was it started off bad, something bad has happened now, and we knew it was headed this way, and we're not going to jump in an [sic] save him.

J.A. 2837–39.

Walters recalled Nathan as someone who "didn't want to be bothered" and "was proud of the fact that he had identified his nephew for the North Carolina authorities." J.A. 2814. Koger agreed. When asked if Nathan was cooperative with the mitigation team's efforts, Koger responded, "Not at all." J.A. 2892.

Walters described Nancy as "a very proud woman" who "wanted to brag about the accomplishments of the family. She did not want to address the issues with regard to her grandson and how he got there." J.A. 2815–16. Walters determined "this testimony [would not have been] helpful" if all she planned to do was "brag about the accomplishments and

46

the educational ability of all of [her] children" other than Shareef. J.A. 2816. Koger provided a similar account, testifying that although Nancy was cooperative, she was not helpful:

> She was there every day of the trial, and we talked to her every day after the trial. . . . [A]nd we would speak with her . . ., but she consistently wanted to talk about clearing the family name and we're not these type of people and things of that nature, and really didn't get the point[.]

J.A. 2893.

Walters testified that he also spoke with Carson and Lawanda by telephone, but decided not to call Carson as a witness because

> he laughed after the issue where Mr. Mahdi said he was going to kill himself and that he had been abused, and . . . had a sadistic sense of humor about each event in this child's life as if he was malingering, he was a faker. It was sort of twisted.

J.A. 2819, 2820. Further, Lawanda

> had to severely beat [Mahdi] over and over again. It moved from being chastising the child and whipping the child to a significant beating every day, and, of course, Carson even in the interviews admitted that sometimes he would not stop his wife from doing so because he wanted the united front.

J.A. 2820. "[T]heir position was[,] We're glad he's out of our house. We did the good deed. No one applauded us for it, and now you want us to get involved in attempting to help him in a murder case . . . . [H]e is getting his just desserts." J.A. 2820.

Though trial counsel "wanted someone there that would assist Mr. Mahdi in this process," Nancy was the only one who was present for sentencing. J.A. 2821. Again, though, "[t]he problem with Nancy was [that] she wanted to explain to a Calhoun County jury all of the accolades of the family and how successful they were." J.A. 2821. But trial

47

counsel did not "need testimony coming in to save the family name." J.A. 2821. They needed "testimony that directly deal[t] with Mikal Mahdi." J.A. 2821.

Trial counsel decided Hammock was their best option to present Mahdi's family history and articulate the issues that occurred in his life, in part, because this would allow them to limit the amount of negative evidence that would have otherwise come in had they called any lay witnesses. The "bigger problem," according to Walters, was the fact that there was a videotape of Mahdi killing Boggs.[26] J.A. 2826. "So [trial counsel] could [have] [m]arch[ed] in 100 family members. . . , [but they] knew this was a disk sitting in everybody's file that would show an execution-style murder . . . that occurred." J.A. 2826. Thus, it was imperative to curb any additional evidence that would have undermined their mitigation strategy.

Finally, when asked why trial counsel did not challenge the constitutionality of judicial sentencing under S.C. Code Ann. § 16-3-20, Walters responded,

> [W]e wanted [the trial court] to sentence him and the reason was sitting judges that have practiced law for an extensive period of time and are also involved in the prosecution and defense of criminal cases they are desensitized and sort of immune when they hear—not to say anything disparaging, but they've seen plenty of murder cases over and over and over again as opposed to a lay person that may see this film. If you've handled murder case after murder case after murder case, you can focus on the issues. You can take in the significance of the murder itself and the other factors and make a rational decision.

J.A. 2883–84.

---

[26] As noted earlier, the tape was admitted into evidence during the sentencing hearing over Mahdi's objection.

F. The PCR Court's Ruling and Appeals

After deliberating, the PCR court entered an exhaustive opinion denying each of Mahdi's IAC claims. In so doing, it set out the proper standard for reviewing claims under *Strickland* and its progeny, and framed its analysis around the Supreme Court's controlling precedent. This is the opinion we review here, so a detailed summary of that court's findings and conclusions follows.

1. The Jury Sentencing Claim

The PCR court found "no merit" to Mahdi's Jury Sentencing Claim because he failed to "specify the jury sentencing advantages to which he allude[d], []or how counsel inadequately advised him of those advantages." J.A. 7528. At bottom, Mahdi "did not testify, and offered no testimony or other evidence at the merits hearing on this issue." J.A. 7528. Nor did he "question any of his former appointed attorneys" about it. J.A. 7528. As a result, the PCR court determined Mahdi "failed to meet his burden of proof," J.A. 7528, resulting in both his waiver and abandonment of this claim.

Nevertheless, the PCR court concluded in the alternative that the record established "Mahdi was fully advised of his rights to jury sentencing and the pros and cons of having a jury conduct his sentencing verses [sic] a judge determining his sentence." J.A. 7529. Between representations from trial counsel about how they advised Mahdi on this issue and statements from the trial court, the PCR court found that "Mahdi clearly understood his right to have a jury determine his sentence." J.A. 7529. And Mahdi "offered no testimony on this issue and offered no evidence that contradicted counsel's sworn testimony on this issue" at the PCR evidentiary hearing. J.A. 7530. The PCR court found

49

"counsel's testimony on this issue to be credible" and "supported and corroborated by Mahdi's responses to [the trial court's] questions during the guilty plea itself." J.A. 7530.

According to the court, "[t]here [was] no proof that [trial] counsel was deficient in any manner in this regard." J.A. 7531. But even if they were, the PCR court held that Mahdi could not prove prejudice because there was no "reasonable probability he would not have pled guilty, and would have proceeded to trial with a different outcome," in light of the "record, including counsel's credible testimony, the record of the plea proceeding, and the evidence that would have been submitted to the chosen jury, including the horrendous facts of Myers's murder, the murder of Christopher Boggs in North Carolina, and Mahdi's maladaptive prison behavior and atrocious criminal record," J.A. 7531.

### 2. The Mitigation Evidence Claim

The PCR court bifurcated its analysis of the Mitigation Evidence Claim into *Strickland*'s familiar two-pronged approach. First, it considered whether trial counsel were deficient in their representation of Mahdi. Though the PCR court found "no merit to these allegations," J.A. 7532, it nevertheless proceeded to the second prong of the analysis and considered whether Mahdi would have been prejudiced had counsel's performance been deficient.

### a. Deficient Performance Prong

In the Mitigation Evidence Claim, Mahdi asserted trial counsel were deficient by: (1) failing to call several of Mahdi's extended family members and community members; (2) presenting testimony through Hammock as opposed to Dr. Cooper-Lewter; (3) failing to introduce testimony from an expert like Dr. Haney concerning the effect of Mahdi's life

50

of incarceration; (4) failing to adequately investigate, develop, and present evidence of Mahdi's mental health history; and (5) failing to introduce various records at the sentencing hearing. The PCR court rejected each of these subclaims on their merits. As discussed below, Mahdi procedurally defaulted all but one aspect of the first subclaim (non-family lay witnesses) because he failed to appeal the dismissal of all the remaining subclaims (2 through 5 above) to the Supreme Court of South Carolina. Therefore, we focus our attention on that portion of the PCR Court's analysis denying Mahdi's first subclaim that trial counsel provided ineffective assistance by failing to call non-family lay witnesses during his sentencing hearing.

The court concluded that "[t]he record supports counsel in this case conducted a reasonable and thorough mitigation investigation and presented what mitigation they could that was favorable to Mahdi at the time of the sentencing proceeding." J.A. 7556. According to the PCR court, counsel's performance could not have been deficient because "much, if not all, of the evidence Mahdi offered at PCR regarding his family and social history, whether through family or community witnesses, was cumulative to the evidence presented in Mahdi's capital sentencing proceeding" through Hammock's testimony and exhibits. J.A. 7560.

In addition, the PCR court cited the "credible evidence at the merits hearing show[ing] counsel retained a qualified mitigation investigator," Haas, who "went to the schools Mahdi attended," "spoke with teachers" who were familiar with him, and compiled a summary of his school records, which were introduced at the sentencing hearing. J.A. 7600–01. The PCR court also cited Hammock's testimony about Mahdi's difficulties in

51

school, frequent moves, and educational gaps before concluding that trial counsel "conducted a reasonable investigation of Mahdi's school history and presented the same" to the trial court. J.A. 7602.

## b. The Prejudice Prong

After reviewing the "overwhelming," aggravating evidence presented at the guilty plea and sentencing hearings, "along with all the evidence in mitigation Mahdi alleges should have been presented"—"along with the aggravating evidence that would have almost certainly come in on cross-examination, rebuttal, or contained within the evidence itself, and the mitigation evidence presented at the sentencing hearing before [the trial court]"—the PCR court found there was "no reasonable probability [the trial court] would have returned with a different sentence." J.A. 7627. Thus, even if trial counsel had been deficient, Mahdi had "failed to prove prejudice." J.A. 7627.

## 3. The Judicial Sentencing Claim

Turning to Mahdi's final IAC claim, the PCR court dismissed any suggestion that trial counsel were ineffective for failing to assert that S.C. Code Ann. § 16-3-20 is unconstitutional. The South Carolina Supreme Court had rejected that exact argument on several occasions before Mahdi's sentencing. "Therefore, counsel could not have been deficient in failing to preserve an issue that has no merit under law." J.A. 7635.

Moreover, "counsel correctly testified at the PCR hearing" that "Mahdi decided to plead guilty because [he] believed he had a better chance of receiving a life sentence from [the trial court] than from the jury he had selected." J.A. 7636. And the PCR court, having "had the opportunity to view the witnesses and hear their testimony on this issue," found

52

"trial counsel's testimony on these issues to be credible." J.A. 7636. And "Mahdi offered no testimony to contradict trial counsel's testimony on these issues." J.A. 7636. Thus, the PCR court determined that "Mahdi wanted to be sentenced by [the trial court], not the jury he had initially selected and [e]mpaneled." J.A. 7636. And so, "it would have made no sense for Mahdi to have objected to the constitutionality of the statute and insist on pleading guilty and being sentenced by the jury, and counsel was not ineffective in failing to object to the constitutionality of" S.C. Code Ann. § 16-3-20. J.A. 7636

**\*\*\*\***

Represented by separate appellate counsel, Mahdi appealed only one aspect of the PCR court's denial of his Mitigation Evidence Claim:

> Was [Mahdi] denied the effective assistance of counsel at his capital sentencing proceeding by trial counsel's decision to rely entirely on a single expert witness to present mitigating evidence about [Mahdi's] background instead of calling available lay witnesses who could have provided detailed and specific testimony in mitigation?

J.A. 7721. In his filings with the South Carolina Supreme Court, Mahdi clarified that he was challenging only the PCR court's ruling "denying his claim that available non-family members, i.e., members of the community, including his former teachers, should have been called as witnesses." J.A. 7822. He did not challenge the remainder of the PCR court's decision, including its rejection of the other subclaims from the Mitigation Evidence Claim. Both that court and the U.S. Supreme Court denied his appeal.

### G. The Second State-Court PCR Proceedings and Appeals

Seven years after filing his first PCR application, Mahdi's federal habeas counsel filed a successive one in South Carolina state court. In addition to re-raising the Jury

53

Sentencing, Mitigation Evidence, and Judicial Sentencing Claims from his first PCR application, Mahdi presented a fourth IAC claim for review:

- The "Guilty Plea" Claim: Trial counsel rendered ineffective assistance because they "advised [Mahdi] that the guilty plea would be considered as mitigation." J.A. 8181.

The State moved to dismiss. The PCR court granted the motion and entered an order denying Mahdi's application because: (1) it was time barred under the one-year South Carolina statute of limitations for PCR actions, S.C. Code Ann. § 17-27-45; (2) it was improperly successive, S.C. Code Ann. § 17-27-90 (the Supreme Court of South Carolina will refuse to consider claims raised in a second appeal that could have been raised at an earlier time); S.C. App. Ct. R. 203(d)(3), 243 (if a prisoner has failed to file a direct appeal or a PCR application and the deadlines for filing have passed, he is barred from proceeding in state court); (3) the State was entitled to judgment as a matter of law based on the pleadings; and (4) the State was entitled to judgment as a matter of law because there was no genuine issue of material fact. Mahdi appealed to the South Carolina and the U.S. Supreme Courts. Both denied his petitions.

H. Mahdi's Emergency Motion in the District Court for Supplemental Expert Funding

After filing a placeholder § 2254 petition, Mahdi's federal habeas counsel submitted an ex parte emergency motion in the district court to amend the expert witness budget, noting that they had "recently discovered evidence related to race-based trauma that [Mahdi] experienced during his childhood that . . . warrant[ed] presentation" as a claim under *Martinez v. Ryan*, 566 U.S. 1 (2012). J.A. 11. Counsel indicated they had contacted Dr. Hope Hill, a Professor at Howard University, who agreed to develop and present this

evidence. The motion asked the district court to authorize $22,500 in fees and $2,500 in travel expenses for her.

The following day, the magistrate judge entered an ex parte text order directing counsel to provide the following relevant information:

> (1) a brief outline of the "recently discovered evidence" related to race-based trauma that [Mahdi] experienced that provides the basis for an additional expert witness; [and] (2) a brief summary of how this information impacts the claims to be raised by [Mahdi] in the Amended Petition.

J.A. App. F, ECF No. 69.

In response to the first query, Mahdi represented that "[t]rial counsel and PCR counsel failed to investigate, in detail, [his] genealogy" because, although "counsel very generally pieced together family biographies, there was no in-depth examination of Mr. Mahdi's lineage." J.A. 29. Federal counsel, however, represented that they had "been able to explore the history of Mr. Mahdi's paternal side of the family," which they discovered "descends directly from the relationship between a slave-owner and a slave."[27] J.A. 29–30. According to Mahdi, "[t]his information is critical, particularly in light of [his] mindset prior to the crimes at issue in this case." J.A. 30. And had trial or PCR counsel been aware of this "slave lineage," it should have "led to an examination of the intersection of race and trauma." J.A. 30.

---

[27] Mahdi particularly faults his PCR counsel, pointing to a note in a report from Dr. Cooper-Lewter that Mahdi was a descendent of a White homeowner's relationship with the family's Black gardener. Mahdi submits that, "[a]t a minimum, that should have warranted a closer investigation of [his] lineage, which would have revealed [his] slave lineage and led to an examination of the intersection of race and trauma." J.A. 30.

55

Mahdi pointed to a letter he wrote to Nancy in 2003 expressing "a deep desire and yearning to learn about his ancestry, as he believed that helped define who he was as a person."[28] J.A. 30–31. This was important, according to federal habeas counsel, because Mahdi

> grew up in a home with conflicting dualities about race: His grandmother constantly emphasized the importance of "fitting in" and "passing as white," while his father converted to Islam to shed his "slave name" and repeatedly taught [Mahdi] to rebel against "white society" and indoctrinated [him] in anti-white and anti-establishment propaganda.

J.A. 31. Mahdi's counsel stated that their "aim [was] to continue to explore information about Mr. Mahdi's family history and lineage in order to develop new mitigation themes and evidence that ha[d] not been presented." J.A. 31.

As for how this information would impact his claims, Mahdi submitted that the new evidence could show that race and his family history played some part in his development and subsequent criminal acts. Mahdi's "prior defense teams—both at trial and PCR—did not focus or develop any strong evidence or narrative to address the multiple aspects of trauma that [he] experienced throughout his life." J.A. 31. "While some evidence was presented in PCR about generalized stressors that Mr. Mahdi experienced, PCR counsel completely overlooked the importance that race and Mr. Mahdi's family history played in

---

[28] The letter stated:
I have gotten to a point in my life when I start to wonder who my ancestors are, trace my roots to see where I come from. I really want to know these things . . . Where does the Burwell lineage come from? I want to know these things, it's sad that I don't know my ancestry. I should know these things. This is somewhat of an important issue to me. Please tell me.
J.A. 31.

his development and subsequent criminal acts." J.A. 31. Dr. Hill, according to counsel, would be able to examine the "impact of these traumatic events and stress factors on Mr. Mahdi in the context of his unique ancestry and extrinsic and intrinsic racial identity," J.A. 31, while also analyzing "the additional impact of the repeated racial 'microaggressions' that Mr. Mahdi experienced from his grandmother, father, community, and other family members," J.A. 32, and how they emboldened his survivalist mentality.

The district court denied the emergency ex parte motion. Noting that "counsel want[ed] to present as much beneficial evidence as possible," the court reiterated its own duty to determine "what [was] reasonably necessary for adequate representation" to warrant funding under 18 U.S.C. § 3599(a)(2). J.A. 39. And here, the district court had already approved "$20,000 in funding for a mitigation investigator (and an additional $2,000 for the mitigation expert's travel expenses) and $12,500 for a social historian." J.A. 40. Mahdi's federal mitigation investigator, Sam Dworkin, had already "compiled a detailed family history, tracing Mr. Mahdi's family back to English settlers who arrived in Virginia in 1648 and set up large plantations." J.A. 30.

To that end, the court specifically found Mahdi's "[c]ounsel ha[d] not set out why the issue of trial counsel's alleged ineffectiveness regarding the failure to present mitigation evidence could not be fully developed through the use of the mitigation investigator and social historian." J.A. 40 (citing *Wright v. Angelone*, 151 F.3d 151, 163 (4th Cir. 1998) ("[A]n expert should be appointed when a substantial question exists over an issue requiring expert testimony for its resolution and the defendant's position cannot be fully developed without professional assistance.")). "While counsel may find it

57

preferable to present this claim through a psychologist with a specialty in race-based trauma, the court [found] such an expert unnecessary to fully develop the claim of ineffective assistance of counsel in regard to mitigation evidence." J.A. 40.

Mahdi moved to alter or amend, claiming the standard used by the district court was more demanding than the one announced by the Supreme Court's intervening decision in *Ayestas v. Davis*, 138 S. Ct. 1080 (2018). According to Mahdi, "*Ayestas* required [the district court] to [have] provide[d] [him] with necessary resources so he would have [had] a fair opportunity to show why [it] should [have] excuse[d] the procedural bars" as to his claim. J.A. 555.

The district court denied the motion and explained that it had "recited the applicable standard [for funding requests] and focused on whether the requested services were reasonably necessary to adequately represent Mahdi." J.A. 911. After summarizing the *Ayestas* decision—which was decided a year after Mahdi's emergency ex parte motion was denied—the district court rejected Mahdi's contention that it "ha[d] an obligation to authorize funding for experts where a mitigation investigator ha[d] identified a need for expert assistance" as being "directly contradicted by *Ayestas*'s emphasis on the district courts' broad discretion in assessing funding requests." J.A. 911. "Counsel's preferences . . . do not equate to a showing that a reasonable attorney would disregard certain services as sufficiently important or reasonably necessary." J.A. 911.

The district court explained that

> [a] review of Mahdi's original funding request suggests that counsels' mitigation investigator had already gathered all of the pertinent factual information counsel planned to allege [that] trial and PCR counsel should

58

have presented and that counsel had already formed reasoned arguments as to why that information was critical to Mahdi's mitigation presentation.

J.A. 912. "Those arguments included the impact of Mahdi's lineage and upbringing on his own racial identity and how the resulting internal conflict may have affected him." J.A. 912. "The court could not discern from counsels' request what additional value a psychological report on this subject would offer and, thus, could not find the requested services reasonably necessary." J.A. 912. Indeed, even in his motion to reconsider, "Mahdi broadly assert[ed] the necessity of the psychologist's services . . . but still fail[ed] to articulate specific reasons why the services were warranted." J.A. 912. Thus, the court reaffirmed its decision to deny the motion.

## I. Mahdi's § 2254 Petition for Habeas Corpus

## 1. Mahdi's Petition

Mahdi's § 2254 petition raised the Jury Sentencing, Mitigation Evidence, Judicial Sentencing, and Guilty Plea Claims. *See Mahdi v. Stirling*, No. 8:16-3911, 2018 WL 4566565 (D.S.C. Sept. 24, 2018).[29] The State moved for summary judgment. Mahdi attached an affidavit from Dworkin, to his response in opposition.[30] Dworkin suggested trial and PCR counsel were ineffective for failing to investigate and present certain evidence in five key areas of Mahdi's life: (1) his history of race-based trauma; (2) alleged physical abuse by his father; (3) his father's mental illness and admissions to instilling

---

[29] Mahdi raised other claims as well, which we do not address here. We limit this summary to only those claims that received a COA.

[30] As previously noted, the district court granted Mahdi's request for $22,000 in expert funding to hire Dworkin to conduct his investigation.

59

violence in his children; (4) his attempts to get his life back on track during the summer of 2004; and (5) Nancy's letters to North Carolina counsel suggesting South Carolina trial counsel were not engaging with her.

Regarding race-based trauma, Dworkin stated that federal habeas counsel's investigation "uncovered that African American lineage resulting in [Mahdi's] immediate family line was the product of slave and slave owner." J.A. 367. He claimed this lineage was relevant because "a core component of mitigation" stems from Mahdi's "significant race-based trauma, . . . including knowing who [he] is, where he comes from, and how the experiences of his, and his family's, past directly form mitigating information." J.A. 367.

Concerning allegations of Shareef's physical abuse, Dworkin cited an interview with Nate Burwell, IV ("Nate"), Nathan's son and Mahdi's paternal cousin, who "recall[ed] [Mahdi] and Saleem being beaten by their father as children, saying that he [Nate] 'can hear them screaming still.'" J.A. 371 (alteration in original). He also remembered "Vera needing to abandon her family to avoid the abuse of Shareef." J.A. 371.

Turning to Shareef's mental illness and indoctrination of his sons, Dworkin represented that he had interviewed Mahdi's father and discovered information trial and PCR counsel had failed to uncover. Specifically, Dworkin referred to Shareef's decision to change his name and remove Mahdi from formal schooling as "isolating" events. J.A. 369–70. Shareef also admitted he was "on a more 'Jihadist tip' for a while and imparted those radical lessons to his son," telling Mahdi "that the American Way and society was 'built on killing people and taking shit.'" J.A. 370.

60

Regarding the brief period during the summer of 2004 immediately following Mahdi's release from VDOC's custody, Dworkin posited that he "was engaged in sincere efforts to re-enter society." J.A. 372. These included a desire to return to school to complete his GED as well as applying for food stamps. According to Dworkin, "[t]hese are steps one does not take if they are truly disengaged from society. . . . These are all solid and concrete examples of a young man trying to integrate and take his second chance seriously." J.A. 373.

Finally, Dworkin suggested trial counsel were "disengaged from the Burwell family, who wanted to be involved." J.A. 373. In support, Dworkin cited a 2005 letter Nancy wrote to Mahdi's North Carolina trial counsel, "relay[ing] that there had been no communication with South Carolina counsel." J.A. 374.

## 2. The District Court Denies Mahdi's Petition

After reviewing the issues and extensive record (including Dworkin's affidavit), the district court entered a thorough opinion granting the State's motion for summary judgment. On the Jury Sentencing Claim, the court determined Mahdi's assertion that his trial counsel were ineffective for failing to adequately advise him of the advantages of jury sentencing was directly contradicted by the record. Citing the transcripts from the ex parte and guilty plea hearings as well as Walters' testimony from the PCR evidentiary hearing, the district court found "nothing in this evidence to rebut the presumption that trial counsel provided effective representation and adequately advised Mahdi so that he could make a fully-informed decision to plead guilty." *Mahdi*, 2018 WL 4566565, at *45.

61

Addressing the Mitigation Evidence Claim, the district court concluded Mahdi preserved only one aspect of it for review under § 2254(d)—whether "trial counsel were ineffective in failing to investigate and present mitigating evidence from non-family lay witnesses"—because that was the sole issue he raised on appeal from his first state-court PCR proceeding. *Id.* at *15. After providing a detailed summary of the evidence presented at sentencing, the trial court's judgment, and the evidence presented at the PCR merits hearing, the district court determined the PCR court had properly applied *Strickland* and its progeny—as well as their South Carolina state law equivalents—in holding that Mahdi had not shown trial counsel were deficient. Moreover, the district court found "the PCR court's determination that the PCR evidence was cumulative [was] not unreasonable. While the PCR evidence certainly expanded on and added depth to Ms. Hammock's testimony and the other evidence offered at sentencing, it would not have significantly altered the sentencing profile presented to the" trial court. *Id.* at *30.

The district court determined the remaining aspects of Mahdi's Mitigation Evidence Claim were procedurally barred. In considering Mahdi's arguments to overcome that bar, the court focused its analysis on his assertion that he had established cause and prejudice under *Martinez*. At bottom, Mahdi suggested the district court should excuse his procedural default because his PCR counsel were ineffective for failing to investigate the five claims Dworkin identified in his affidavit.

The district court rejected each of Mahdi's arguments, finding trial and PCR counsel had conducted an adequate investigation and, even if they hadn't, that he was nevertheless not prejudiced by any failure by PCR counsel to present this newly discovered information.

62

Nor did any of these new points fundamentally alter Mahdi's claims. The district court reasoned that "the evidence in Mr. Dworkin's affidavit was included, to various degrees, in the PCR evidentiary hearing." *Id.* at *38. And "even assuming that counsel were deficient in all the ways Mahdi alleges, after independently reweighing all of the aggravating and mitigating evidence, . . . absent the alleged errors," the district court determined "there is no reasonable probability that [the trial court] would have reached a different sentencing decision and the court remains confident in this case's outcome." *Id.* at *40. Mahdi therefore had not carried his burden to excuse his procedural default.

Turning to the Judicial Sentencing Claim, the district court found South Carolina's capital sentencing procedures did not violate Mahdi's constitutional rights. It summarized that "*Ring* established that when a defendant exercises his right to a jury trial on a capital offense, he is entitled to have a jury determine any aggravating factors necessary to impose a death sentence." *Id.* at *41. But it noted that the Supreme Court of South Carolina had distinguished *Ring* because it "'did not involve jury-trial waivers and [thus] is not implicated when a defendant pleads guilty' under South Carolina's death penalty statute." *Id.* at *42 (quoting *Downs*, 604 S.E. 2d at 380). Thus, it concluded, "trial counsel were not ineffective for failing to raise a meritless claim." *Id.* at *43; *see also id.* at *43 n.40 (observing that "[i]n the two years prior to Mahdi's trial, the Supreme Court of South Carolina decided three cases expressly finding the death penalty statute constitutional and noting *Ring* was not implicated when a capital defendant pled guilty"). Moreover, the court determined that, "[a]long with waiving his right to a jury trial, Mahdi expressly and

63

voluntarily waived his right to jury sentencing," while also "admit[ing] to the facts of the crime as stated by the [State]." *Id.* at *42.

Finally, regarding the Guilty Plea Claim, the district court found "trial counsel [were] not at fault for Mahdi's alleged misunderstanding that his guilty plea would automatically preclude a death sentence." *Id.* at *45. It observed that, in fact, the record suggests Walters "explicitly informed" Mahdi that "pleading guilty *did not* guarantee a life sentence." *Id.* (emphasis added). Moreover, it concluded trial counsel's advice was not incorrect as the trial court expressly incorporated Mahdi's guilty plea into the penalty phase and considered it as part of his sentence. And the trial court, "[which] was in a unique position to assess these factors, did not refuse to consider Mahdi's guilty plea or penalize him for the timing" since it occurred one day after he was caught with the handcuff key in the courtroom. *Id.* at *46. In the district court's view, the trial court "properly assessed how the plea, in context, reflected Mahdi's character and, in particular, his alleged acceptance of responsibility. This is exactly the type of individualized consideration required in capital sentencing." *Id.* (citing *Lockett v. Ohio*, 438 U.S. 586, 605 (1978) ("Given that the imposition of death by public authority is so profoundly different from all other penalties, we cannot avoid the conclusion that an individualized decision is essential in capital cases.")).

Mahdi filed a timely notice of appeal. This Court has jurisdiction under 28 U.S.C. § 1291 and 28 U.S.C. § 2253(c)(1)(A).

64

## II.

We granted a COA on five issues: (1) whether the district court abused its discretion in denying Mahdi's supplemental expert funding request; (2) the Jury Sentencing Claim; (3) the Mitigation Evidence Claim; (4) the Judicial Sentencing Claim; and (5) the Guilty Plea Claim. We first address Mahdi's funding request before considering his IAC claims.

### A. Supplemental Expert Funding Request

Under 18 U.S.C. § 3599, district courts "may authorize" expert funding in capital cases so long as it is "reasonably necessary for the representation of the [petitioner]." *Id.* § 3599(f); *see id.* § 3599(a)(2). The Supreme Court has explained that

> [p]roper application of the "reasonably necessary" standard . . . requires courts to consider [(1)] the potential merit of the claims that the applicant wants to pursue, [(2)] the likelihood that the services will generate useful and admissible evidence, and [(3)] the prospect that the applicant will be able to clear any procedural hurdles standing in the way.

*Ayestas*, 138 S. Ct. at 1094. Though it may be error for a district court to refuse funding, it is only so in "those cases in which funding stands a *credible chance* of enabling a habeas petitioner to overcome the obstacle of procedural default." *Id.* (emphasis added). To that end, the Supreme Court and "Congress ha[ve] made it clear . . . that district courts have *broad discretion*" in this assessment. *Id.* (emphasis added); *see also id.* (noting that by using the word "may" in § 3599, Congress "made it perfectly clear that determining whether funding is 'reasonably necessary' is a decision as to which district courts enjoy broad discretion"). Thus, we will reverse a district court's denial of a funding request only if we determine it abused that considerable discretion. This is a heavy burden not easily carried.

65

Mahdi renews his argument that the district court applied an overly demanding legal standard in denying his ex parte emergency motion to amend the expert witness budget to facilitate further investigation into a possible mitigation claim related to race-based trauma. According to Mahdi, the court improperly relied on our decision in *Wright*, which he alleges is "outdated." Opening Br. 53. Had the district court "applied the correct standard, as dictated by *Ayestas*," Mahdi contends, "it would have necessarily found that a 'reasonable attorney would regard the services as sufficiently important.'" Opening Br. 54 (quoting *Ayestas*, 138 S. Ct. at 1093). Indeed, Mahdi suggests "the District court was *required* to provide" him with the requested funds "to demonstrate that he could overcome the procedural default" on his race-based trauma claim. Opening Br. 55 (emphasis added).

We find no merit in Mahdi's argument. Before turning to its substance, however, we observe at the outset that the factual premise upon which it rests is contrary to the record. In his ex parte emergency motion to amend the budget, Mahdi represented that the *only* "recently discovered evidence" warranting further review as a potential *Martinez* claim was that his father was descended from the union between a slave and his owner. J.A. 29. The record, however, refutes Mahdi's claim because it plainly shows that "the history of Mr. Mahdi's paternal side of the family," specifically the fact that he is a direct descendent "from the relationship between a slave-owner and a slave," J.A. 29–30, was expressly presented to the PCR court during the evidentiary hearing, *see* J.A. 2496 (Lawanda testifying that Nancy's ancestor "was the product of a relationship between a slave and an [I]rish woman" and that the "woman was sent to Boston with child and the father of the child disappeared, [meaning he] was never seen again"); J.A. 2959 (Dr.

66

Cooper-Lewter's social history of Mahdi's family stating that Shareef's "great-grandmother was a white woman from Broadnax, Virginia" who was "impregnated by the family's black gardener who is believed to have been subsequently murdered by her family").

The district court could not have abused its discretion by denying a motion for supplemental funding that, on its face, was premised entirely on "recently discovered evidence" that was already developed and presented to the PCR court. Thus, Mahdi's efforts to expand this *previously* discovered evidence into a *Martinez* claim had little chance of bearing fruit because the PCR court had already heard this same evidence. *See Vandross v. Stirling*, 986 F.3d 442, 450 (4th Cir. 2021) (noting that one of the requirements for invoking *Martinez* is that "it is likely that no state court will hear the prisoner's claim"). The district court was therefore well within its "broad discretion," *Ayestas*, 138 S. Ct. at 1094, in concluding the requested funding was not "reasonably necessary," 18 U.S.C. § 3599(f).

But even looking past this disqualifying defect, as the district court did, and considering the merits of Mahdi's argument, we would reach the same conclusion. We note that the district court did not cite *Ayestas* or expressly set out that case's framework in its initial decision. But it couldn't have, given that the Supreme Court decided *Ayestas* one year *after* the district court entered its order. Nevertheless, the court did consider the exact argument Mahdi now presents when it rejected his motion to alter or amend the decision. In doing so, the district court explained and applied the three-pronged *Ayestas* standard, making clear that it had denied the funding request because: (1) "counsels' mitigation

67

investigator had already gathered all of the pertinent factual information counsel planned to allege [that] trial and PCR counsel should have presented and that counsel had already formed reasoned arguments as to why that information was critical to Mahdi's mitigation presentation"; and (2) it "could not discern from counsels' request what additional value a psychological report on this subject would offer and, thus, could not find the requested services reasonably necessary." J.A. 912. In other words, under *Ayestas*, the district court determined the services were not "reasonably necessary" because they were cumulative, unlikely to generate additional useful and admissible evidence, and lacked merit. That determination was not an abuse of discretion, and it negates Mahdi's main contention that the court failed to consider his funding request in light of *Ayestas*.

Furthermore, as the district court pointed out in its first denial order, at no point in Mahdi's emergency motion or at any point thereafter did he identify any themes that he intended to pursue through this supplemental funding request or make even a minimal showing that he would be able to overcome the procedural bar to warrant review. Nor did he forecast what Dr. Hill's report would contribute beyond the information his previously approved $34,500 in funding for a mitigation investigator and social historian had already yielded.[31] *See* J.A. 40 ("Counsel has not set out why the issue of trial counsel's alleged ineffectiveness regarding the failure to present mitigation evidence could not be fully

---

[31] We observe that this appears to be the entirety of what Mahdi asked for in his initial proposed budget. *See* J.A. 11 ("Petitioner previously submitted a budget in this case, which was approved by the Court."). Eventually, Mahdi determined he did not need a social historian. As a result, he did not use the $12,500 allocated for that expert. But he never asked that those funds be reallocated to Dr. Hill. Rather, his ex parte motion sought $25,000 *in addition to* the $34,500 he had already received.

68

developed through the use of the mitigation investigator and social historian. While counsel may find it preferable to present this claim through a psychologist with a specialty in race-based trauma, the court finds such an expert unnecessary to fully develop the claim of ineffective assistance of counsel in regard to mitigation evidence."). Instead, Mahdi presented what he incorrectly claimed to be a newly discovered fact—that his father was descended from the union between a slave and his owner—of which he had *no knowledge* at the time he committed his crimes. Mahdi offered no context for how this previously presented fact could have played a role in Captain Myers' murder. Nor did he present any compelling argument in his emergency motion justifying the expenditure of $25,000 to convert this latent fact into a *Martinez* claim. What's more, despite the district court's specific ruling in the first denial order, Mahdi wholly failed to address in his motion to alter or amend why Dr. Hill's services were warranted. *See* J.A. 912 ("In the current briefing, Mahdi broadly asserts the necessity of the psychologist's services and conclusively alleges that those services would enable him to establish both prongs of his *Martinez* claim . . . , but [he] still fails to 'articulat[e] specific reasons why the services [were] warranted.'" (citing *Ayestas*, 138 S. Ct. at 1094) (alterations in original)).

The dissent suggests that in reaching this conclusion, we "ignore[] . . . the expertise that mental health clinicians bring to the table." Diss. Op. 116. But we cannot ignore what wasn't presented to the district court or to this Court. In his response to the district court's ex parte text order, Mahdi suggested that Dr. Hill would "be able to examine the impact of [race and his family history] on Mr. Mahdi in the context of his unique ancestry and extrinsic and intrinsic racial identity." J.A. 31. He further suggested that Dr. Hill would

"systemically evaluate how Mr. Mahdi's background, racial identity, and the trauma that he experienced emboldened his 'survivalist' mentality." J.A. 32. Thus, he concludes, Dr. Hill would "tie together cogent and powerful mitigation themes that have not yet been presented in this case." J.A. 33.

But these vague representations were made in the context of Mahdi's initial ex parte motion, which was premised entirely on the "recently discovered evidence" concerning his slave lineage and Dr. Hill's ability to help "develop and present" it. J.A. 11. Again, in his response filing, Mahdi made clear that the "'recently discovered evidence' . . . that provide[d] the *basis for an additional expert witness*" was his assertion that "[t]rial counsel and PCR counsel failed to investigate, in detail, [his] genealogy." J.A. 29 (emphasis added). At no point, despite multiple opportunities and invitations to do so, did Mahdi offer any justification for how yet another mental health professional's assessment of his genealogy would help him "tie together cogent and powerful mitigation themes" for the court to understand his ineffective assistance claim beyond those he was already able to present through Dworkin. J.A. 33. Nor did Mahdi provide even a hint of what those "themes" might have been or how Dr. Hill's assessment would assist in developing them. J.A. 33. Unlike the dissent, we decline to speculate and fill in those gaps for him.

Mahdi has been evaluated by no less than *seven* mental health experts since his arrest for Captain Myers' murder. Dr. Hill would have been at least the eighth. Particularly relevant here, Mahdi's *own* expert witness in the PCR court, Dr. Cooper-Lewter, had already conducted an extensive evaluation of Mahdi's race-based trauma and family history. *See, e.g.*, J.A. 2955 (examining the "Family and Cultural Context" of Mahdi's

70

upbringing, including Dr. Cooper-Lewter's belief that they were "fragile people who were often overwhelmed by their efforts to find acceptance in society, especially in light of racial and socioeconomic issues"); J.A. 2956 (addressing Shareef's "passionate[]" and "religious[]" lectures "about the 'unfairness' of white people"); J.A. 2957 (summarizing Mahdi's experiences at Wallens Ridge, which he maintains were filled with "racial epithets" and threats of violence, proving "that everything his father taught him was true"); J.A. 2958–65 (providing a detailed social history of Mahdi's family, including the "social limitations and frustrations of the[] cultural and racial relations growing up in the Jim Crow South," his slave lineage, Nancy's efforts for she and her children to "pass for white," and Shareef's intense racial views and animus towards white people); J.A. 2978–80 (discussing Shareef's rantings, home-schooling, and survivalist training to protect his children from "white folks coming to kill them"). And Mahdi never delineated for the district court what Dr. Hill's additional analysis of these topics would "bring to the table," Diss. Op. 116, beyond what Dr. Cooper-Lewter's review had already contributed.

At bottom, Mahdi did not present any meaningful argument beyond his own ipse dixit representations as to why his *supplemental* request for funding—that is, beyond what had already been provided—was "reasonably necessary." We cannot say that the district court abused its discretion by denying Mahdi carte blanche to pursue any theory he wished based on nothing more than his vague request. *See Hartsell*, 127 F.3d at 349 ("[A] defendant does not have the right to public funding for all possibly helpful avenues of investigation or all possibly useful expert services, but only to the level of support required by the Due Process Clause."). And *Ayestas* does not compel a contrary result.

71

The Fifth Circuit reached the same conclusion in *Jones v. Davis*, 927 F.3d 365 (5th Cir. 2019). There, the petitioner—raising a similar argument to the one Mahdi presents here—asserted that the district court improperly denied his request for investigative funding because it failed to follow the rubric set out in *Ayestas* (which, like here, post-dated the district court's decision). *Id.* at 373–74. The court had denied the petitioner's request because "he had not shown that he was likely to uncover anything beyond what his experts had already addressed." *Id.* at 374. The Fifth Circuit affirmed, holding that "[b]ecause the reasons the district court gave for its ruling remain sound after *Ayestas*, . . . remand [was] unnecessary." *Id.* The same is true here.

Moreover, this Court's decision in *Wright*—upon which the district court relied in rejecting Mahdi's expert funding request—requiring petitioners to present a "substantial question" over an issue to secure funding, 151 F.3d at 163, is a far cry from the Fifth Circuit's practice condemned in *Ayestas*, which required petitioners to demonstrate a "substantial need" for funding by essentially "*prov[ing]* that [they] *will* be able to win relief if given the services [they sought]," 138 S. Ct. at 1094 (second emphasis added). Indeed, *Wright*'s requirement aligns with the second part of the *Ayestas* rubric—i.e., a petitioner must establish that the evidence he seeks to develop is useful and admissible. *See Wright*, 151 F.3d at 163 (noting that "a substantial question" must "exist[] over an issue requiring expert testimony for its resolution and the defendant's position cannot be fully developed without professional assistance" in order to justify the expenditure of funds). In other words, *Wright* stands for the uncontroversial proposition that in order to justify expert funding, a petitioner must show that there is an issue warranting expert review. *Ayestas* did

72

nothing to undermine that requirement. *See* 138 S. Ct. at 1094 (holding that "the 'reasonably necessary' test requires an assessment of the likely utility of the services requested"). And Mahdi did nothing to satisfy it. *See id.* (approving the requirement that "an applicant must articulate specific reasons why the services are warranted").

The dissent suggests that the district court erred by "impos[ing] a strict necessity requirement" mandating that Mahdi prove "it was impossible to develop his claim without Dr. Hill." Diss. Op. 111–112. There is no basis in the record for that contention. The district court simply required Mahdi to specify why this "recently discovered evidence" concerning his genealogy necessitated the assistance of a psychology expert in addition to those experts for whom funding had already been allocated. And, after being afforded multiple opportunities to do so, Mahdi failed to present any explanation as to why Dr. Hill's assistance was "reasonably necessary" in light of what he had already received. As a result, the district court did not abuse its discretion in denying his request.

The dissent appears to take issue with the district court for applying *any* standard in reviewing Mahdi's supplemental funding request as opposed to the limitless one it proposes. *See* Diss. Op. 111 n.5 (suggesting § 3599 imposes no specificity requirement and grants broad access for petitioners to hire experts without offering any suggestion of what those experts may uncover). To adopt this reading of 18 U.S.C. § 3599 as compelling courts to grant funding requests whenever counsel subjectively deems them necessary would eviscerate any semblance of their discretionary function. The Supreme Court did not establish such a broad construction in *Ayestas*. And we decline to do so here. We therefore affirm the district court's denial of Mahdi's supplemental request for expert funding.

## B. The IAC Claims

We turn next to the district court's denial of Mahdi's IAC claims, which we review de novo. *Grueninger v. Dir., Va. Dep't of Corr.*, 813 F.3d 517, 523 (4th Cir. 2016). We first set out the standards guiding that review.

### 1. Standards of Review

#### a. AEDPA Deference

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), federal courts may "entertain" an application for a writ of habeas corpus from an inmate in state custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). In doing so, we follow "Congress' prohibition on disturbing state-court judgments . . . absent an error that lies beyond any possibility for fairminded disagreement." *Mays*, 141 S. Ct. at 1146. Thus, § 2254 "is not to be used as a second criminal trial, and federal courts are not to run roughshod over the considered findings and judgments of the state courts that conducted the original trial and heard the initial appeals." *Williams v. Taylor*, 529 U.S. 362, 383 (2000).

To that end, federal courts cannot grant habeas relief under § 2254 unless the state PCR court's decision: (1) "was contrary to" clearly established Supreme Court case law; (2) "involved an unreasonable application" of the same; or (3) "was based on an unreasonable determination of the facts in light of the" record before it. 28 U.S.C. § 2254(d)); *Harrington v. Richter*, 562 U.S. 86, 100 (2011); *Vandross*, 986 F.3d at 449. This standard is "intentionally difficult to meet" to safeguard principles of comity, finality, and federalism. *Woods v. Donald*, 575 U.S. 312, 316 (2015) (per curiam).

74

A decision is "contrary to" clearly established federal law "if the state court applies a rule different from the governing law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). Stated differently, the petitioner must show that the state court's decision was "diametrically different, opposite in character or nature, or mutually opposed" to federal law as determined by the Supreme Court. *Vick v. Williams*, 233 F.3d 213, 216 (4th Cir. 2000).

For an "application of federal law" to be "unreasonable," it must be "objectively" so. *Owens v. Stirling*, 967 F.3d 396, 411 (4th Cir. 2020). To qualify, the state court must "correctly identif[y] the governing legal principle from the Supreme Court's decisions but unreasonably appl[y] that principle to the facts of the particular case." *Tyler v. Hooks*, 954 F.3d 159, 166 (4th Cir. 2019). The state court's decision must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

Finally, determinations of facts are "unreasonable" when they are "sufficiently against the weight of the evidence." *Williams v. Stirling*, 914 F.3d 302, 312 (4th Cir. 2019) (quoting *Winston v. Kelly*, 592 F.3d 535, 554 (4th Cir. 2010)). That said, a "state court's factual determinations are presumed correct, and the petitioner must rebut this presumption by clear and convincing evidence." *Bennett v. Stirling*, 842 F.3d 319, 322 (4th Cir. 2016); *accord* § 2254(e)(1). "We must be especially deferential to the state PCR court's findings on witness credibility, and we will not overturn the court's credibility judgments unless its error is stark and clear." *Elmore v. Ozmint*, 661 F.3d 783, 850 (4th Cir. 2011). Thus, "[a]

75

state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Burt v. Titlow*, 571 U.S. 12, 18 (2013) (quoting *Wood v. Allen*, 558 U.S. 290, 293 (2010)).

### b. Procedural Hurdles

Before we can consider whether relief is available through one of § 2254's three narrow exceptions, however, the petitioner must first demonstrate that he has cleared a series of procedural hurdles. For example, the petitioner must exhaust his state court remedies, 28 U.S.C. § 2254(b)(1)(A), by "present[ing] his claim to the state's highest court," *Matthews v. Evatt*, 105 F.3d 907, 911 (4th Cir. 1997), *abrogated on other grounds by United States v. Barnette*, 644 F.3d 192 (4th Cir. 2011), including "both the operative facts and the controlling legal principles associated with each claim," *Longworth v. Ozmint*, 377 F.3d 437, 448 (4th Cir. 2004).

"A distinct but related limit on the scope of federal habeas review is the doctrine of procedural default"—often referred to as a procedural bar—one example of which occurs "when a habeas petitioner fails to exhaust available state remedies and the court to which [he] would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998); *see also Reed v. Ross*, 468 U.S. 1, 11 (1984) (stating that a petitioner's failure to abide by a state court's procedural rules for presenting claims in state court results in a procedural default of those claims in federal court absent "cause and actual prejudice"). In addition, procedural default occurs when "a state court clearly and expressly bases its dismissal of a habeas petitioner's claim on a state procedural rule, and that procedural rule

76

provides an independent and adequate ground for the dismissal." *Breard*, 134 F.3d at 619.

Relevant here, a claim is procedurally barred if the petitioner "fail[s] to raise [it] in his petition for certiorari to the South Carolina Supreme Court for review of the State PCR Court's decision." *Longworth*, 377 F.3d at 447.

Petitioners may nevertheless overcome this bar in limited circumstances by "demonstrat[ing] cause for the default and actual prejudice." *Sigmon v. Stirling*, 956 F.3d 183, 198 (4th Cir. 2020) (quoting *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)).[32] To establish "cause," the petitioner must show "'that some objective factor external to the defense impeded counsel's efforts' to raise the claim in state court at the appropriate time," *Breard*, 134 F.3d at 620 (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)), or that "the factual or legal basis for the claim was not reasonably available . . . at the time of the state proceeding," *Roach v. Angelone*, 176 F.3d 210, 222 (4th Cir. 1999). "An attorney error does not qualify as 'cause' . . . unless [it] amounted to constitutionally ineffective assistance of counsel." *Davila v. Davis*, 137 S. Ct. 2058, 2062 (2017). Generally, "[b]ecause a prisoner does not have a constitutional right to counsel in state postconviction proceedings, ineffective assistance in those proceedings does not qualify." *Id.*

A narrow exception exists under the Supreme Court's decision in *Martinez* "when (1) the state PCR court is the first occasion for raising the claim," which is the case in South

---

[32] Petitioners may also overcome the procedural bar if they can establish that a "fundamental miscarriage of justice would result from" the federal court's failure to consider their claim. *Farabee v. Clarke*, 967 F.3d 380, 395 (4th Cir. 2020). To do so, the petitioners must demonstrate they are actually innocent, which requires "factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). Mahdi makes no such argument here.

77

Carolina; "(2) the petitioner's counsel provided ineffective assistance in the PCR court";

and "(3) it is likely that no state court will hear the prisoner's claim." *Vandross*, 986 F.3d

at 450. Thus, a petitioner

> satisfies *Martinez* by showing, *first*, that initial postconviction counsel performed deficiently, under the first prong of *Strickland*, by failing to exhaust the underlying ineffective-assistance-of-trial-counsel claim, but not that said counsel's deficient performance was prejudicial, under the second prong of *Strickland*; and *second*, that the underlying claim is substantial, or has some merit, with respect to both prongs of *Strickland*.

*Owens*, 967 F.3d at 423. To be clear, the Supreme Court created this narrow exception to

be applicable only to allegations of IAC by PCR counsel. It does *not* apply to claims of

IAC by PCR appellate counsel. *See Johnson v. Warden of Broad River Corr. Inst.*, No. 12-

7270, 2013 WL 856731, at *1 (4th Cir. 2013) (unpublished) (per curiam) ("Accordingly,

because Johnson alleges only ineffective assistance of *appellate* postconviction counsel,

his allegations do not constitute cause for his failure to exhaust under the limited exception

in *Martinez*.").

### c. IAC

To establish IAC, a petitioner must prove: (1) his counsel was deficient in his

representation; and (2) he was prejudiced as a result. *Strickland*, 466 U.S at 687. For the

first prong, the petitioner must show that "counsel's representation fell below an objective

standard of reasonableness." *Id.* at 688. Stated differently, "[t]he challenger's burden is to

show that counsel made errors so serious that counsel was not functioning as the 'counsel'

guaranteed the defendant by the Sixth Amendment." *Harrington*, 562 U.S. at 104. To

satisfy the second prong, a petitioner must show that "there is a reasonable probability that,

but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In the context of a guilty plea, the petitioner has to show that "there is a reasonable probability that, but for counsel's errors, [he] would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

We are ever mindful that "[j]udicial scrutiny of counsel's performance must be highly deferential," and "court[s] must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. And when we apply *Strickland* and § 2254's highly deferential standards "in tandem, [our] review is doubly so." *Harrington*, 562 U.S. at 105.

As the Supreme Court directs, we only discern "whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Id.* at 101. The critical question thus is not whether we or the district court can see a "substantial . . . likelihood of a different result" had counsel taken a different approach. *Cullen*, 563 U.S. at 189. Rather, "[a]ll that matter[s] [is] whether the [*South Carolina*] court, notwithstanding its substantial 'latitude to reasonably determine that a defendant has not [shown prejudice],' still managed to blunder so badly that every fairminded jurist would disagree." *Mays*, 141 S. Ct. at 1149 (final alteration in original) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). That is a very high bar.

****

Having set out the relevant standards of review, we now turn to Mahdi's claims.

79

## 2. The Jury Sentencing Claim

In Mahdi's first IAC claim, he contends the PCR court erred in finding trial counsel were not ineffective for purportedly failing to explain the general proposition that "jury sentencing may actually result in a life sentence, while on the same facts and arguments judge sentencing may result in a death sentence." Opening Br. 76. He maintains the district court's conclusion that this claim was "directly contradicted by the record" improperly interpreted the facts in a "light most favorable to" the State rather than to him as the non-moving party. *See id.* According to Mahdi, "[a] description of 'pluses and minuses' does not show that [he] was made aware by his trial counsel that [the trial court's] sentencing could," in theory, "be more likely to result in a death sentence than a jury's sentencing." Opening Br. 77. Nor, Mahdi alleges, does the fact that he understood "how a jury . . . sentencing would proceed" necessarily show that he knew how a judge sentencing would proceed. J.A. 537.[33] We find Mahdi's argument without merit.[34]

---

[33] Mahdi also challenges the district court's rejection of his argument that trial counsel were ineffective because "they had not obtained a guarantee that the judge would not impose a death sentence" before advising him to plead guilty. Reply Br. 15–16; *Mahdi*, 2018 WL 4566565, at *45. Because Mahdi raised this argument for the first time in his reply brief, it is waived, and we do not consider it. *Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 722 F.3d 591, 602 n.13 (4th Cir. 2013).

[34] The district court reached the merits of the Jury Sentencing Claim without addressing whether it was procedurally barred. *See Mahdi*, 2018 WL 4566565, at *44 n.42. As previously noted, Mahdi did not appeal the PCR court's rejection of this claim in his first PCR proceeding. And the Supreme Court of South Carolina rejected the Jury Sentencing Claim on procedural grounds during the second proceeding. As such, the claim is procedurally barred. *See Longworth*, 377 F.3d at 447. However, because the Parties did not brief this issue and the procedural bar is not jurisdictional, *see* 28 U.S.C. § 2254(b)(2); *Lambrix v. Singletary*, 520 U.S. 518, 523 (1997), we too will sidestep that analysis for this claim and address the district court's judgment on the merits.

80

As a threshold matter, neither the Parties nor the district court address the PCR court's factual finding that Mahdi waived and abandoned the Jury Sentencing Claim by failing to "specify the jury sentencing advantages to which he allude[d]," "testify," "offer[] . . . testimony or other evidence," or "question any of his former appointed attorneys on this issue" at the PCR evidentiary hearing. J.A. 7528. And Mahdi has pointed to no record evidence or presented any colorable argument in his briefs before this Court suggesting this aspect of the PCR court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief or by failing to develop its argument—even if its brief takes a passing shot at the issue." (cleaned up)). Moreover, Mahdi has failed to submit any evidence—"clear and convincing," *Bennett*, 842 F.3d at 322, or otherwise—to overcome the presumption that the PCR court's factual determination regarding his waiver is correct. Thus, we affirm the district court's denial of Mahdi's Jury Sentencing Claim on this independent ground. *See Scott v. United States*, 328 F.3d 132, 137 (4th Cir. 2003) (reiterating that the Court is "entitled to affirm on any ground appearing in the record").

Even if we were to reach the merits of Mahdi's argument, we find no flaw in the district court's conclusion that the record establishes he was fully advised of his rights to a jury trial and sentencing, as well as the possibility that a jury could sentence him to life. Specifically, before pleading guilty, trial counsel "discussed with [Mahdi the] options that

81

[were] available with regards to this case" and observed that he was "aware of the fact that there are two phases to a trial, the guilt phase and also the sentencing phase." J.A. 1178. Trial counsel told Mahdi "that there [were] no guarantees with regards to either process" and that "there [were] certain pluses and minuses with [a] jury." J.A. 1179. Trial counsel further

> explained to [Mahdi] his constitutional rights, including the right to have a jury trial and the rights to have the jury determine whether his sentence would be life without the possibility of parole, if he were to be found guilty during the guilt phase of the trial, or the jury could return a verdict for death.

J.A. 1193.

Before accepting Mahdi's plea, the trial court emphasized that "in order for a jury to find [him] guilty, all 12 jurors must unanimously agree" and "in order for a jury to recommend a death sentence, . . . all 12 jurors must agree to recommend the death sentence." J.A. 1197. The trial court also explained that "sentencing is conducted by the Judge in any capital case where a defendant pleads guilty." J.A. 1184. Mahdi indicated that he understood he had "the constitutional right to have the jury decide [his] guilt or innocence and, also . . . the constitutional right to have the jury determine [his] sentence." J.A. 1197. And he testified that trial counsel had "made [him] fully aware of" "the constitutional safeguards that [he had] and the essential protections inherent in a jury trial." J.A. 1200. To that end, Dr. Cross confirmed Mahdi's understanding of both judicial and jury sentencing, as well as "the possible consequences for each," before he pleaded guilty. J.A. 1189.

On this record, there is simply no basis to conclude trial counsel's performance was

deficient in this regard. And there is even less ground for finding the PCR court's determination was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," *Harrington*, 562 U.S. at 103, or "sufficiently against the weight of the evidence," *Williams*, 914 F.3d at 312. Accordingly, we cannot say that the PCR court's rejection of Mahdi's Jury Sentencing Claim was unreasonable.

And even if trial counsel were somehow deficient in this regard, the PCR court's determination that Mahdi could not demonstrate prejudice was reasonable. As the PCR Court observed, there is nothing in the record to suggest that Mahdi "would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59. To the contrary, trial counsel made clear during the PCR hearing that the defense "wanted [the trial court] to sentence" Mahdi because "sitting judges that have practiced law for an extensive period of time and are also involved in the prosecution and defense of criminal cases . . . are desensitized," having "seen plenty of murder cases over and over and over again as opposed to a lay person." J.A. 2883–84. And the PCR court found trial counsel's "testimony on this issue to be credible." J.A. 7530. Mahdi has presented no argument suggesting this determination amounted to an error that is both "stark and clear." *Elmore*, 661 F.3d at 849. As such, we must be "especially deferential" to it. *Id.*

What's more, trial counsel's testimony regarding Mahdi's desire to proceed before the judge for sentencing is especially convincing given the facts of this case. The aggravating evidence was simply overwhelming. First, there were the grisly details about the events leading up to Captain Myers' murder, including the surveillance video capturing

Mahdi's execution-style murder of Boggs[35] and Pitts' testimony recounting the violent carjacking. Trial counsel also had to consider the horrid facts surrounding Captain Myers' murder itself, including Officer Curtis' description of the scene, Ross' summary of her autopsy report and the state of Captain Myers' body, as well as the numerous friends and family members' testimony about the impact Captain Myers' murder had on their lives. Further, trial counsel knew they had to contend with the events surrounding Mahdi's arrest, especially Sergeant Frost's testimony recalling Mahdi's statement that the only reason he did not fire the assault rifle was because the gun's "selector was stuck on a three shot and [he did not] think [he] could have . . . shot [Sergeant Frost], the other cop, and . . . that fucking dog." J.A. 1243.

Trial counsel were also faced with overwhelmingly negative evidence concerning Mahdi's atrocious criminal record and maladaptive behavior while in custody. This included Mahdi's repeated statements showing his utter disregard for human life. *See, e.g.*, J.A. 1280 (telling officers after the standoff that he was "going to kill a cop before [he] die[s]"); J.A. 1310 (apprising officers after fighting them that "he should have killed" his mother); J.A. 1363 (informing his neighbor that he "was going to knock [someone] off"); J.A. 1465 (stating that he would kill an SCDC officer "the next chance he [got]"); J.A. 1482, 1497 (threatening to murder Officer Driggers); J.A. 1978 (threatening to "become

---

[35] The district court granted Mahdi's motion in limine to exclude the video of Boggs' murder from being shown to the jury during trial. Nevertheless, the trial court allowed the tape to be admitted into evidence over Mahdi's objection during sentencing. There is no reason to believe—and Mahdi has presented none—that the trial court would have refused to admit the tape had the sentencing been conducted by a jury.

homicidal" while in DJJ custody). This evidence also included other violent conduct, including his participation in the standoff with his father, fighting with police officers, stabbing Rivera, and repeated disciplinary infractions while in custody. Finally, there was significant evidence concerning his efforts to escape from law enforcement and confinement, including his comments to Coulson, testimony from SCDC Officers Prioleau and Lane, as well as the fact that he had been caught smuggling a homemade handcuff key into the courthouse during the opening days of trial.

At bottom, the aggravating evidence overwhelmingly supports the PCR court's conclusion there was no "reasonable probability he would not have pled guilty, and would have proceeded to trial," in light of the "record, including counsel's credible testimony, the record of the plea proceeding, and the evidence that would have been submitted to the chosen jury." J.A. 7531. Thus, we conclude the PCR court's application of *Strickland* was reasonable, *see Harrington*, 562 U.S. at 101, and the district court properly denied Mahdi's § 2254 petition on this ground.

### 3. The Mitigation Evidence Claim

Mahdi argues the district court erred in denying relief on his Mitigation Evidence Claim for two reasons. First, he alleges the court "improperly concluded that [he] procedurally defaulted on all but one of his mitigation [sub]claims"—that trial counsel were deficient for failing to call non-family lay witnesses to testify on his behalf. Opening Br. 56. Second, Mahdi maintains the court erred in finding the PCR court's rejection of his non-procedurally barred subclaim concerning non-family lay witnesses was an objectively reasonable application of *Strickland*. We address each argument in turn.

85

### a. Procedurally Barred Claims

Mahdi submits he can overcome the procedural bar on his defaulted subclaims by demonstrating PCR counsel's alleged failure to uncover evidence obtained by federal habeas counsel. Though he raised six theories to overcome this hurdle before the district court, he only presses two here: (1) that he can establish cause and prejudice under *Martinez*; and (2) that the newly discovered evidence set out in Dworkin's affidavit fundamentally alters his Mitigation Evidence Claim.[36] Neither argument holds water.

### i. *Martinez* Cause and Prejudice

Mahdi asserts that federal habeas counsel's investigation revealed substantial mitigation information that bolstered both his Mitigation Evidence Claim and rebutted the State's evidence in aggravation. Specifically, he argues that had PCR counsel presented the five areas of newly discovered evidence set out in Dworkin's affidavit, "there is at least a reasonable probability that the outcome of the PCR proceeding would have been different." Opening Br. 58.

The State responds that Mahdi cannot rely on *Martinez* to excuse the procedural default because the narrow exception that decision created applies only to allegations of IAC by PCR counsel, not PCR *appellate* counsel. In *Martinez*, the Supreme Court specifically limited its narrow application to first-level collateral review actions, reiterating

---

[36] Though Mahdi sets out the other four theories in a footnote in his opening brief, *see* Opening Br. 57 n.14, we conclude he has waived any challenges to the district court's rejection of them. *See Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 607 (4th Cir. 2009) (holding that an issue raised in a footnote and addressed with only a single declarative sentence asserting error is waived); *see also Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 n.8 (4th Cir. 2015) (same for footnotes with argument).

that the new exception "does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings." 566 U.S. at 16. Thus, the State maintains, the fact that Mahdi has discovered additional background evidence during the federal habeas proceedings has no bearing on the analysis for whether his procedurally barred subclaims are defaulted.

The State has the better argument. As discussed, Mahdi did not appeal the PCR court's rejection of any aspect of the Mitigation Evidence Claim in the first proceeding apart from the denial of his subclaim that trial counsel were ineffective for failing to call non-family members as witnesses. And when Mahdi tried to bring up the remaining facets of the Mitigation Evidence Claim during the second state-court PCR proceeding, the Supreme Court of South Carolina rejected all of them on procedural grounds. Therefore, the subclaims are procedurally barred. *See Longworth*, 377 F.3d at 447.

The burden now falls on Mahdi to "demonstrate cause for the default and actual prejudice." *Sigmon*, 956 F.3d at 198 (quoting *Coleman*, 501 U.S. at 750). He fails at the first step. There is no dispute that the "cause" for Mahdi's procedurally defaulted subclaims was PCR appellate counsel's failure to appeal their denial to the Supreme Court of South Carolina. But "ineffective assistance of *appellate* postconviction counsel . . . do[es] not constitute cause for his failure to exhaust under the limited exception in *Martinez*." *Johnson*, 2013 WL 856731, at *1. Therefore, we affirm the district court's determination

that Mahdi cannot overcome the procedural bar through *Martinez* for his defaulted subclaims.[37]

## ii. Fundamentally Altered Claims

In another attempt to resurrect his procedurally defaulted subclaims, Mahdi contends Dworkin's newly discovered evidence "fundamentally altered" his Mitigation Evidence Claim because PCR counsel "offered no evidence to support claims of race-based trauma or the extent of Shareef's abuse." Opening Br. 60. Mahdi maintains "the new evidence places [his claim] in a significantly different and stronger posture than it was before the state courts," thereby excusing the default. Reply Br. 9.

The State responds that Mahdi did present the substance of his claim to the state courts, pointing to the principle that "the presentation of additional facts does not mean that the claim was not fairly presented." Br. 36 (quoting *Moore v. Stirling*, 952 F.3d 174, 183 (4th Cir. 2020)). From this, it concludes "Mahdi's claim is decidedly one of background information," *Id.* at 37, that may have "strengthened [his] claim that trial counsel should have done more" but does not "fundamentally alter" it, *id.* (quoting *Moore*, 952 F.3d at 185).

We agree with the State. New evidence in a federal habeas matter fundamentally alters a claim in the limited situation where the petitioner did not offer *any* evidence to the state courts supporting the existence of a material fact. *See Winston v. Kelly*, 592 F.3d 535,

---

[37] To the extent Mahdi is trying to raise the issues presented in Dworkin's affidavit as separate *Martinez* claims—and not as a means to overcome the otherwise procedurally defaulted subclaims raised in his first PCR petition—we affirm the district court's rejection of them for the reasons stated in its opinion. *See Mahdi*, 2018 WL 4566565, at *34–38.

550 (4th Cir. 2010) ("Suppose, for example, that a petitioner on federal habeas introduces new evidence to establish the existence of fact X, a fact required to prove his claim. The claim will inevitably be stronger, regardless of the evidence the petitioner presented to the state courts. However, if the petitioner presented *no evidence* to the state courts to establish the existence of fact X, the claim will be fundamentally altered by the new evidence presented to the district court."). "This standard is not satisfied with new bits of evidence but requires critical evidence that makes his claim both stronger *and* significantly different." *Moore*, 952 F.3d at 183 n.8.

At most, Dworkin's newly discovered evidence consists of additional information relating to Mahdi's troubled history and his grandmother's interactions with trial counsel. And, as the State rightly observes, Mahdi presented voluminous evidence at both sentencing and during his first state-court PCR proceeding regarding his background and trial counsel's mitigation efforts. Though this newly discovered evidence "has perhaps strengthened [Mahdi's] claim, . . . it has not 'fundamentally altered' it." *Gray v. Zook*, 806 F.3d 783, 799 (4th Cir. 2015). "The heart of the claim remains the same: his trial attorneys should have done more to show how [Mahdi's troubled childhood] lessened his culpability." *Id.*; *see Moore*, 952 F.3d at 183 ("When new evidence only elaborates on the evidence presented in state court, the claim is not fundamentally altered into a new, and unexhausted, claim."). As such, the district court was correct in rejecting Mahdi's efforts to overcome the procedural bar through this avenue as well.

The dissent disagrees, indicating instead that it would vacate the district court's grant of summary judgment on both subclaims and remand for further proceedings. As for

Mahdi's race-based-trauma subclaim, the dissent posits that "[h]ad the district court applied the correct legal standard" to Mahdi's supplemental funding request, Diss. Op. 120, it would have "granted funding to retain Dr. Hill," *id.*, which, in turn, would have supplemented Dworkin's affidavit and, when taken together, would have presented "a compelling argument that his race-based trauma subclaim was 'new,' and that *Martinez* excused the procedural default," *id.* As previously noted, the dissent is simply incorrect at the first step of its speculative journey. We do agree, however, that "[w]e don't know what we don't know," Diss. Op. 121, and thus decline to conjecture about what could have been presented, if anything, had Mahdi answered the district court's repeated inquiries.

Turning to the abuse subclaim, the dissent relies entirely on Nate's allegedly "substantial insight into the family dynamics,"[38] as contained in a single sentence in Dworkin's ten-page affidavit. J.A. 371; *see also* Diss. Op. 122. Specifically, the dissent focuses on Nate's claim that he can "recall[] [Mahdi] and Saleem being beaten by their father as children, saying that he [Nate] 'can hear them screaming still.'" J.A. 371 (alteration in original). That is the *sole reference* in the approximately 8,800-page record suggesting that Shareef physically abused Mahdi. In toto. Full stop. The dissent concedes as much. Diss. Op. 123 ("In fact, *all evidence* was to the contrary [i.e. that Shareef had not abused Mahdi]." (emphasis added)). And despite the fact that Nate provided no details as to the time period, frequency, or severity of the alleged abuse, the dissent nevertheless

---

[38] The record provides no context for this assertion. There is no way of knowing what relationship, if any, Mahdi had with his cousin Nate. At most, we know Nate's father, Nathan, had been unhelpful during the initial mitigation investigation and was proud of having identified Mahdi for the authorities.

characterizes the alleged abuse as "severe," Diss. Op. 123, and "extreme," *id.* at 123, 130 n.14, while also referring to it as "profound and chronic trauma," *id.* at 130 n.14. This portrayal has *no* basis in the record.

Even accepting Nate's statement, we could just as easily speculate that Nate was referring to a single incident when Shareef spanked Mahdi and his brother. That statement would have as much support in the record as the dissent's characterizations. Nothing in the record gives any context to Nate's isolated claim. We simply do not see how Nate's vague, unsupported, and unqualified allegation places Mahdi's "case in a *significantly different and stronger evidentiary posture* than it was when the state courts considered it." *Wise v. Warden, Md. Penitentiary*, 839 F.2d 1030, 1033 (4th Cir. 1988).

Nor do we "view[] the strength of childhood-abuse evidence as mitigating evidence much differently than the Supreme Court, the South Carolina trial court, the State's trial counsel, and the State's PCR counsel, among others—[the dissent] included." Diss. Op. 124 (footnotes omitted). The fact of this case is that there is *no* evidence of childhood abuse for us to give credence to. We will not diminish the strength of factually supported claims of childhood abuse by sensationalizing the unsupported allegation here, which is contrary to a massive record disproving any such speculation.

To that end, we also will not fault trial or PCR counsel for failing to elicit this claim. The record does not support the dissent's suggestion that Trial Counsel undertook little or no effort "to find favorable mitigation evidence once they grew frustrated with those who knew Mahdi best." Diss. Op. 129. Nor is there any record support for the dissent's assertion that "trial counsel decided that Mahdi had not been abused as a child because both the

91

abuser and the abused denied it." Diss. Op. 128.[39] In actuality, to the extent trial counsel reached the conclusion that Shareef had not abused Mahdi, they did so after multiple interviews of family members, teachers, community members, and the review of reams of Mahdi's medical, school, and court records. None of these raised even a scintilla of physical abuse, much less that Nate was a witness to anything. And Dr. Cooper-Lewter, one of Mahdi's expert witnesses during the PCR hearing, reached the same answer after conducting an extensive investigation. *See* J.A. 2953–54 (detailing each of the records he reviewed and the family members and teachers he interviewed); J.A. 2541–42 (testifying that there was "no evidence in this case" of "physical violence from his father").

### b. Non-Family Lay Witnesses

Turning to the only non-procedurally barred subclaim, Mahdi maintains that trial counsel's performance was deficient because, "[e]ven though [his] family, friends and community members were available, trial counsel did not present a single witness who personally knew [him] or who could properly bring to light the trauma [he] endured throughout his childhood." Opening Br. 62. And though Mahdi acknowledges that

---

[39] In any event, we must consider PCR counsel's actions in light of the fact that Mahdi never provided any information suggesting Shareef physically abused him. *See Strickland*, 466 U.S. at 691 ("Counsel's actions are usually based, quite properly, . . . on information supplied by the defendant . . . . And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable."); *DeCastro v. Branker*, 642 F.3d 442, 456 (4th Cir. 2011) ("[T]he state court did not act unreasonably in refusing Petitioner's attempt ot upend his conviction and sentence based on the information that he failed to timely provide to counsel.").

Hammock's testimony presented some of the troubled details of his life, he asserts "it was woefully deficient." Opening Br. 62–63.

The State suggests Mahdi's argument "cannot be squared with the record." Resp. Br. 33. Reiterating the PCR court's determination "that trial counsel made reasonable investigation into Mahdi's background," Resp. Br. 29, the State emphasizes Hammock's credentials and testimony related to the effect Mahdi's "educational, parental, and role model issues, and other recognized risk factors . . . had on his development." Resp. Br. 33–34. Moreover, the State argues, the district court correctly found the PCR court's decision that the evidence presented by non-family lay witnesses during the PCR evidentiary hearing was cumulative of that presented during the sentencing hearing was reasonable.

We agree that trial counsel's performance was not deficient. As a threshold matter, Mahdi has presented no grounds to conclude that the PCR court's determination that trial counsel "conducted a reasonable and thorough mitigation investigation and presented what mitigation they could that was favorable to Mahdi at the time of the sentencing proceeding," J.A. 7556, was "sufficiently against the weight of the evidence," *Williams*, 914 F.3d at 312.

As Mahdi's South Carolina defense team's testimony—which the PCR court found to be credible, *see Elmore*, 661 F.3d at 849 (reiterating that a state PCR court's findings on witness credibility" will not be overturned unless its error is "stark and clear")—made clear, the mitigation investigation was far from inadequate. To begin, trial counsel hired Haas, a highly credentialled mitigation investigator, who testified that she met with Mahdi and obtained records from each school Mahdi attended, hospitals (specifically seeking his

psychiatric records), and correction facilities (including DJJ, VDOC, and SCDC). She also visited his schools and spoke with several teachers who knew and remembered Mahdi but had not spent significant amounts of time with him. Haas also met with Mahdi's North Carolina mitigation investigator, and relayed information "dealing with [any] of the potential witnesses in the case" to the South Carolina defense team. J.A. 2776. In addition, trial counsel hired Hammock, a highly qualified social worker with an extensive background in death-penalty litigation. Along with speaking to various members of Mahdi's family, Hammock testified that she met with a member of the community who "didn't know much about him" as part of her efforts to "tak[e] information from anyone who would give information about [Mahdi], his life and his development." J.A. 1595. However, as the record makes clear, Haas' and Hammock's work bore little fruit in terms of soliciting non-family lay witnesses to testify on Mahdi's behalf. Indeed, according to trial counsel, they "relied on [Mahdi's] family to identify other potential witnesses," but they were "not helpful." *Mahdi*, 2018 WL 4566565, at *32.

Not only were Mahdi's family members unhelpful in this regard, the PCR court also made a credibility determination that they too were unwilling to serve as witnesses or assist trial counsel. *See* J.A. 7556 ("This Court finds the testimony of counsel and their defense team on [the Mitigation Evidence Claim] *to be credible* and the present testimony of Mahdi's witnesses regarding their previous willingness to testify *to be not credible*."); *Elmore*, 661 F.3d at 849 (reiterating that state PCR court's credibility findings are not overturned absent a "stark and clear" error in judgment). Mahdi has not challenged that assessment.

But even if Mahdi's family members had testified during sentencing, the evidence adduced during the PCR merits hearing makes clear that they would have undermined his key mitigation arguments. For example, Carson and Lawanda testified about Mahdi's manipulative behavior, including his frequent malingering about suicide and the incident when he made a false claim of abuse in an effort to retaliate against them. Indeed, Carson told Haas that he "still laughs about this today because he feels [Mahdi] was just being manipulative and really wasn't struggling [with suicide]." J.A. 2774. He also referred to Mahdi as a "demon" based on his behavior. J.A. 2706. Rose described Mahdi's anger and violent conduct as a child, including "hit[ting his mother] a couple of times." J.A. 2288. Sophia testified about an incident where Mahdi slashed his mother's tires because she would not let him use her car.

During the PCR hearing, Haas and trial counsel also testified about their interactions with other members of Mahdi's family. Shareef spent most of his time during his meeting with Haas "talking a lot about his . . . personal beliefs," J.A. 2773, and otherwise "refused to participate," J.A. 2837. Vera refused to meet with anyone from the South Carolina defense team. Saleem would not speak with them. Nathan was not "helpful at all," J.A. 2777, and indeed "was proud of the fact that he had identified his nephew for the North Carolina authorities," J.A. 2814. And Nancy "wanted to brag about the accomplishments of the family. She did not want to address the issues with regard to her grandson and how he got there." J.A. 2816. In short, Mahdi's family put up road block after road block in preventing trial counsel's efforts to gather potential witnesses—family or otherwise—to testify on Mahdi's behalf.

To that end, trial counsel did all that could be expected of them given what they had and undoubtedly conducted a constitutionally sufficient investigation. *See Byram v. Ozmint*, 339 F.3d 203, 209 (4th Cir. 2003) ("[C]ounsel is only required to make a *reasonable*"—not exhaustive—"investigation for possible mitigating evidence." (emphasis added)); *McWee v. Weldon*, 283 F.3d 179, 188 (4th Cir. 2002) ("[T]he reasonableness of an investigation, or a decision by counsel that forecloses the need for an investigation, must be considered in light of the scarcity of counsel's time and resources in preparing for a sentencing hearing and the reality that counsel must concentrate his efforts on the strongest arguments in favor of mitigation."). To be sure, one could always say that defense counsel could have done more through the lens of hindsight. And that PCR counsel were able to locate non-family lay witnesses willing to testify years later does not mean, ipso facto, that trial counsel's investigation was deficient. "[T]here comes a point at which evidence . . . can reasonably be expected to be only cumulative, and the search for it distractive from more important duties." *Bobby v. Van Hook*, 558 U.S. 4, 11 (2009) (per curiam); *Wilson v. Greene*, 155 F.3d 396, 403 (4th Cir. 1998) (holding that counsel's performance is not deficient in declining "to spend valuable time pursuing what appeared to be an unfruitful line of investigation" (quoting *Bunch v. Thompson*, 949 F.2d 1354, 1364 (4th Cir. 1991))). That trial counsel made that determination when they did in light of their fruitless mitigation investigation efforts does not render their performance deficient. "This is not a case in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face or would have been apparent from documents any reasonable attorney would have obtained." *Bobby*, 558 U.S. at 11. To the contrary,

every avenue trial counsel explored was met with resistance and dead ends. And it was not unreasonable or against prevailing professional norms for counsel to rely on their qualified mitigation team to uncover any and all possible avenues for beneficial evidence, which they did. *See Rompilla v. Beard*, 545 U.S. 374, 389 (2005) ("Questioning a few more family members and searching for old records can promise less than looking for a needle in a haystack, when a lawyer truly has reason to doubt there is any needle there."); *Sigmon*, 956 F.3d at 200–01 (holding that trial counsel's investigation was reasonable when they used a mitigation expert and team); *Rhode v. Hall*, 582 F.3d 1273, 1283 (11th Cir. 2009) (per curiam) (holding it is not unreasonable for counsel to rely on a qualified mitigation investigator or other experts).

We also agree with the district court that the PCR court's determination that "much, if not all, of the evidence Mahdi offered at PCR regarding his family and social history" through non-family lay witnesses "was cumulative to the evidence presented in Mahdi's capital sentencing proceeding" through Hammock's testimony and exhibits, J.A. 7560, was not "sufficiently against the weight of the evidence," *Williams*, 914 F.3d at 312. During the PCR evidentiary hearing, Mahdi's teachers testified or submitted affidavits about the significant gaps in his education, his behavioral outbursts, and Shareef's failures as a father, though they all acknowledged they knew nothing about Mahdi's home life. What's more, they also presented negative testimony that hurt Mahdi's mitigation efforts. Specifically, they testified about Mahdi's anger and behavioral issues, including the fact that he used to "draw pictures of people hanging, the nooses and things like that." J.A. 2345.

Smith and Douglas Pond provided testimony concerning Shareef's troubled behavior in the community, specifically recounting the incident at the local Whites-only pool. Sheriff Woodley, who testified and was cross-examined by trial counsel during the sentencing hearing, submitted an affidavit about Shareef's violent behavior towards his mother and Vera as well as his lack of respect for authority. And Sharon Pond testified about Shareef's mental health issues, though she conceded she had never met Mahdi before and that medical professionals ultimately did not find any health or major mental illness in Shareef.

Trial counsel recognized the importance of Mahdi's family history and background, which explains why Hammock alluded to all of it in her testimony during the sentencing hearing. Specifically, she testified about Mahdi's "rather chaotic" childhood, J.A. 1597, including the extensive gaps in his education. She also testified at length concerning Shareef's violent and outlandish behavior towards Nancy and Vera; his reputation for being "at odds with people in the community, with his own family and with law enforcement," J.A. 1610; and his "inability . . . to parent appropriately and correctly," J.A. 1597. Trial counsel could hardly be said to have performed deficiently by presenting evidence that "would have added nothing of value," *Bobby*, 558 U.S. at 12, and was cumulative of what had already been submitted to the trial court. *See Morva v. Zook*, 821 F.3d 517, 530 (4th Cir. 2016) ("That the mitigating evidence [the petitioner] insists should have been presented at trial is merely cumulative to the evidence actually heard . . . further undercuts [his] claim for deficient performance."). And the PCR court's determination to that effect was certainly not "an error that lies beyond any possibility for fairminded disagreement."

98

*Mays*, 141 S. Ct. at 1146. Therefore, we affirm the district court's holding that the PCR court reasonably applied the first prong of the *Strickland* analysis to the Mitigation Evidence Claim.

But even if we were to reach the prejudice prong of the *Strickland* analysis, we would reach the same conclusion as the district court. Mahdi claims that "[w]ithout the mitigating evidence [presented during the PCR evidentiary hearing], the [trial court] had no context to understand [his] criminal history, presented by the State as aggravation, as a product of his long-term abuse and suffering." Opening Br. 64. Thus, in his view, the trial court "heard almost nothing that would humanize [Mahdi]" during the sentencing phase. *Id.* at 64 (quoting *Porter v. McCollum*, 558 U.S. 30, 41 (per curiam) (2009)). Had it possessed the "full picture of Mahdi's life," Opening Br. 64, he argues, "there is a reasonable probability that [the judge] would have struck a different balance" and sentenced him to life without parole *Id.* (quoting, *Wiggins v. Smith*, 539 U.S. 510, 537 (2003)). The State counters that Mahdi cannot show prejudice because the evidence adduced during the PCR evidentiary hearing would not have outweighed the overwhelming aggravating evidence before the trial court during sentencing.

We agree with the State. The PCR court's determination that Mahdi suffered no prejudice because the additional testimony would have added nothing of value was not so fundamentally flawed as to warrant habeas relief. "The question of whether counsel's deficiency prejudiced the defense centers on whether there is a reasonable probability that, absent counsel's errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Sigmon*, 956 F.3d at 192 (cleaned

up). And here, "when considered against the sheer magnitude of the aggravating evidence against" Mahdi, as discussed at length earlier, "it is difficult to see the allegedly unreasonable omission of this mitigation evidence [from the non-family lay witnesses] as prejudicial." *Plath v. Moore*, 130 F.3d 595, 602 (4th Cir. 1997). "[I]n weighing the omitted evidence against that actually used to convict and sentence [Mahdi], the mitigating evidence seems insufficient to shift the balance in [his] favor." *Id.*; *accord Wong v. Belmontes*, 558 US. 15, 20 (2009) (per curiam) (observing that to establish prejudice, the petitioner must show "a reasonable probability" that had counsel presented the evidence the court "would have returned with a different sentence".

It is also worth noting that each witness who testified during the PCR hearing would have likely introduced evidence that would have undermined Mahdi's mitigation strategy at sentencing. This is exemplified by the testimony from Mahdi's mental health experts, who opined that he malingered, expressed suicidality for purposes of manipulation, and had antisocial personality disorder. *See Satcher v. Pruett*, 126 F.3d 561, 572 (4th Cir. 1997) (finding counsel were not ineffective for declining to put on "potentially damaging psychiatric evidence" that the defendant had antisocial personality disorder). Unsurprisingly, this testimony was also consistent with the opinions from Dr. Martin and Dr. McKee, who reached the same conclusion.

Therefore, even if we were to reach this second prong of the *Strickland* analysis, we would still affirm the district court's holding.

### 4. The Judicial Sentencing Claim

Mahdi's third IAC claim contends the district court erred in rejecting his argument

100

that trial counsel were ineffective for failing to object to the trial court's sentencing in light of the Supreme Court's decisions in *Apprendi*,[40] *Ring*, and *Blakely*.[41] In response, the State argues that Mahdi has procedurally defaulted the Judicial Sentencing Claim. *See* Resp. Br. 45–46 & n.21–22 (raising the procedural bar argument and maintaining that it "did not abandon the procedural bar below and do[es] not do so here"). Mahdi suggests that if this Court determines the Judicial Sentencing Claim to be procedurally barred, we should remand for the district court to conduct an evidentiary hearing to determine whether he can clear the necessary hurdles to merit review. However, he cites no controlling precedent to support this approach. And he failed to provide any argument in his reply brief addressing the State's invocation of the procedural bar.[42] *See Alvarez v. Lynch*, 828 F.3d 288, 295 (4th Cir. 2016) ("[A]n outright failure to join in the adversarial process would ordinarily result in waiver."); *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument results in waiver.").

As previously noted, Mahdi did not appeal the PCR court's rejection of this claim in his first state PCR proceeding. And the Supreme Court of South Carolina dismissed the Judicial Sentencing Claim on procedural grounds during the second proceeding. *See* S.C.

---

[40] *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

[41] *Blakely v. Washington*, 542 U.S. 296 (2004).

[42] The district court reached the merits of this claim without addressing whether it was procedurally barred. *See Mahdi*, 2018 WL 4566565, at *43 n.39. Because we are "entitled to affirm on any ground appearing in the record, including theories not relied upon or rejected by the district court," *Scott*, 328 F.3d at 137, and Mahdi offered no response to this argument in his reply brief, *see Alvarez*, 828 F.3d at 295 (reiterating that failure to engage in the adversarial process by responding to an argument ordinarily results in waiver), we will reach this issue here.

101

Code Ann. §§ 17-27-45, -90; S.C. App. Ct. R. 203(d)(3), 243. As such, the claim is procedurally barred. *See Longworth*, 377 F.3d at 447. And because Mahdi failed to provide any argument in his reply brief "demonstrat[ing] cause for the default and actual prejudice," *Sigmon*, 956 F.3d at 198 (quoting *Coleman*, 501 U.S. at 750), we affirm the district court's denial of Mahdi's Judicial Sentencing Claim.

But even if we were to reach the merits of Mahdi's argument, we discern no error in the district court's rejection of it. At bottom, Mahdi maintains that the trial court erred in following the mandates of South Carolina Code § 16-3-20 rather than expressly determining whether he knowingly and voluntarily waived his *Apprendi* rights as set out in *Ring* and *Blakely*. Mahdi suggests the trial court improperly "imposed a sentence greater than the maximum [it] could have imposed under state law," Opening Br. 73 (quoting *Blakely*, 542 U.S. at 303),[43] based on its consideration of "additional" evidence and facts in aggravation, J.A. 1661, beyond those contained in Mahdi's admission during his guilty plea. We disagree.

As for his claim under *Ring*, we find no error in the PCR court's conclusion that, at the time of Mahdi's sentencing, the Supreme Court of South Carolina had already decided three cases expressly finding the death penalty statute constitutional because *Ring* is not implicated when a capital defendant pleads guilty. *See State v. Crisp*, 608 S.E.2d 429, 432–33 (S.C. 2005); *State v. Wood*, 607 S.E.2d 57, 61 (S.C. 2004) *Downs*, 604 S.E.2d at 380. Indeed, we reached the same conclusion years after Mahdi's conviction. *See Lewis v.*

---

[43] The death penalty is never required under South Carolina law, even with a finding of an aggravating circumstance. S.C. Code Ann. § 16-3-20(B), (C).

102

*Wheeler*, 609 F.3d 291, 309 (4th Cir. 2010) ("[N]either *Apprendi* nor *Ring* holds that a defendant who pleads guilty to capital murder and waives a jury trial under the state's capital sentencing scheme retains a constitutional right to have a jury determine aggravating factors."). Thus, the PCR court's determination that trial counsel could not have been deficient for failing to raise a meritless claim was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

Similarly, there is no reason to conclude that *Blakely* would somehow render Mahdi's sentence unconstitutional.[44] In that decision, the Supreme Court stated that, under *Apprendi*, a judge may impose any sentence authorized "on the basis of the facts . . . admitted by the defendant." *Blakely*, 542 U.S. at 303. And pursuant to S.C. Code Ann. § 16-3-20(B), the death penalty may only be imposed upon a murder conviction when an aggravating circumstance is found. Here, Mahdi admitted to the two charged aggravating circumstances in his guilty plea: killing Captain Myers while in the commission of burglary and while in the commission of larceny with use of a deadly weapon. J.A. 1217; S.C. Code Ann. § 16-3-20(C)(a)(1)(d), (f). So no *Blakely* violation occurred in sentencing Mahdi to death.

And while the trial court did not need Mahdi's consent to judicial factfinding to

---

[44] Mahdi did not directly present this issue in the state courts. Rather, he consistently framed the Judicial Sentencing Claim as being unconstitutional solely under *Ring*. Thus, the PCR court did not consider the arguments under *Blakely* he now raises in his § 2254 petition. Nevertheless, because any claim under *Blakely* would fail on the merits, we will not address whether this additional aspect of the Judicial Sentencing Claim is independently procedurally barred.

sentence him to death, Mahdi nevertheless gave it. *Blakely* made clear that "[w]hen a defendant pleads guilty, the State is free to seek judicial sentence enhancements so long as the defendant . . . consents to judicial factfinding." 542 U.S. at 310. As the record makes abundantly clear, Mahdi did just that.

Before pleading guilty, trial counsel informed Mahdi that during sentencing "the State [would] have to put up [its] case and information and, of course, he[] [would] be allowed to put up information. The question [was] whether he [would] do that in front of a jury or whether he [would] do that in front of a judge." J.A. 1179. In response, the trial court made clear that if Mahdi "plead[ed] guilty, the sentencing proceeding [would] be conducted before the judge." J.A. 1183.

During the plea hearing, the trial court went to great lengths to ensure Mahdi understood that if it were to accept his guilty plea, "the jury [would] have no role in [his] sentencing and the decision as to what sentence [he would] receive [would] be left solely up to [the trial court]." J.A. 1198. Acknowledging that he understood all of this information, Mahdi affirmatively gave up his right to a jury trial, *see* J.A. 1198 ("I've given up *all of my rights* to a 12 party jury." (emphasis added)), and agreed to judicial sentencing.

Mahdi's consent to judicial factfinding during the plea hearing is also consistent with his trial attorneys' testimony during the PCR hearing. As the PCR court observed, trial counsel testified that "Mahdi decided to plead guilty because [he] believed he had a better chance of receiving a life sentence from [the trial court] than from the jury he had selected." J.A. 7636. The PCR court found this testimony credible, and Mahdi has presented no evidence suggesting this determination constitutes error, much less one that

104

is "stark and clear." *Elmore*, 661 F.3d at 849. What's more, "Mahdi offered no testimony to contradict trial counsel's testimony on these issues." J.A. 7636. Thus, the PCR court reasonably determined that "Mahdi wanted to be sentenced by [the trial court], not the jury he had initially selected and [e]mpaneled." J.A. 7636. And Mahdi has failed to present "clear and convincing evidence," *Bennett*, 842 F.3d at 322, that this determination was "sufficiently against the weight of the evidence," *Williams*, 914 F.3d at 312.

In short, the record leaves no doubt that Mahdi admitted to two aggravating circumstances in his guilty plea and knowingly and voluntarily waived any challenge to judicial factfinding by the trial court and that challenge would have been futile. Thus, the PCR court's determination was neither "diametrically different, opposite in character or nature, or mutually opposed" to *Ring* or to *Blakely*, *Vick*, 233 F.3d at 216, nor "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," *Harrington*, 562 U.S. at 103. For these reasons, we affirm the district court's denial of the Judicial Sentencing Claim.

### 5. The Guilty Plea Claim

Turning to Mahdi's final IAC claim, he maintains that trial counsel were ineffective by "actively advising [him] that his guilty plea would be considered [a] mitigating [factor] at his judge sentencing." Opening Br. 78. In response, the State asserts that Mahdi procedurally defaulted this claim.[45] We agree with the State.

---

[45] As with the Jury Sentencing Claim, the district court expressly declined to address whether the Guilty Plea Claim was procedurally defaulted. *See Mahdi*, 2018 WL 4566565, at *44 n.42. Like the Judicial Sentencing Claim, however, the State raised the procedural (Continued)

Mahdi did not raise the Guilty Plea Claim during his first state PCR proceeding. And the South Carolina Supreme Court rejected his efforts to do so during the second state-court PCR proceeding on procedural grounds. Thus, Mahdi has procedurally defaulted this claim. *See Breard*, 134 F.3d at 619 (reiterating these grounds constitute a procedural bar). And because he made no effort to "demonstrate cause for the default and actual prejudice," *Sigmon*, 956 F.3d at 198 (quoting *Coleman*, 501 U.S. at 750), in his reply brief, we affirm the district court's denial of Mahdi's Guilty Plea Claim.[46] *See Alvarez*, 828 F.3d at 295 (recognizing that failure to respond to an argument in briefing ordinarily results in waiver).

## III.

For the foregoing reasons, we affirm the district court's judgment in its entirety.

*AFFIRMED*

---

bar in its brief before this Court and Mahdi offered no response to this argument in his reply brief. As we are entitled to do, *Scott*, 328 F.3d at 137, we elect to reach this issue here.

[46] Even if we were to reach the merits, we would still affirm for the reasons stated by the district court. *See Mahdi*, 2018 WL 4566565, at *45–47. To that end, we emphasize that, contrary to Mahdi's efforts to contort the record, the trial court expressly considered his guilty plea as a "nonstatutory mitigating circumstance." J.A. 1670. It merely gave the argument no "significant weight." J.A. 1670; *see also Lockett*, 438 U.S. at 605 (1978) (noting the importance of "an individualized decision" in capital cases). And, of course, there is a clear distinction between "no significant weight" and "no weight." Thus, trial counsel's advice was correct, meaning their performance was not deficient.

GREGORY, Chief Judge, dissenting:

Mikal Mahdi does not claim that he is innocent. Rather, Mahdi asserts his humanity: his capacity for redemption. This appeal then raises questions, not of Mahdi's guilt, but of whether it is too late to remedy trial counsel's failure to show the many ways in which Mahdi was a product of a traumatic and tragic upbringing.

In some ways, it is. Here, as in countless other cases, AEDPA's often-unforgiving exhaustion requirement, 28 U.S.C. § 2254(b)(1), works with its merits review, 28 U.S.C. § 2254(d), to pose an insurmountable barrier for most of Mahdi's claims. In my view, much like the majority's, the district court did not err in granting summary judgment on Mahdi's claims that his trial counsel were ineffective for (1) failing to challenge the constitutionality of S.C. Code Ann. § 16-3-20; (2) failing to advise Mahdi of the advantages of jury sentencing; or (3) incorrectly advising Mahdi that the district court considered his guilty plea as mitigation.[1] Nor

---

[1] Although I agree with these conclusions, I do not join in all of the majority's rationale. For example, I disagree with the majority's suggestion that an attorney is necessarily effective when she declines to raise a federal constitutional claim that is thought meritless by a state supreme court. *See* Maj. Op. at 52. The United States Supreme Court enjoys the final say when it comes to interpreting the United States Constitution. *See Arkansas v. Sullivan*, 532 U.S. 769, 772 (2001) (holding that a state supreme court may not interpret the United States Constitution to provide different protection than the Supreme Court's federal constitutional precedents provide). I am not at all convinced that an attorney's failure to preserve an issue that, while foreclosed by a state court, remains an open question of federal constitutional law will in all cases reflect a reasoned, strategic decision. But the focus of this opinion is highlighting how the district court erred in denying Mahdi a full opportunity to seek federal habeas relief.

did the district court err in holding that Mahdi procedurally defaulted many of his failure-to-investigate "subclaims."[2]

But, unlike the majority, I believe the district court unquestionably applied the wrong legal standard to Mahdi's request for additional funding to hire an expert in race-based trauma. Without a valid ruling on Mahdi's request for supplemental funding, it is premature to determine whether Dr. Hill's testimony would allow Mahdi to present a "fundamentally altered" ineffective assistance of counsel claim based on trial counsel's failure to present evidence of Mahdi's race-based trauma. I would therefore vacate the district court's grant of summary judgment on this subclaim. Finally, I would vacate the district court's grant of summary judgment on Mahdi's abuse subclaim and remand for an evidentiary hearing. New evidence of the physical abuse Mahdi suffered as a child fundamentally alters his failure-to-investigate claim, and genuine disputes of material fact preclude summary judgment on whether *Martinez* excuses the procedural default that resulted from Mahdi's failure to raise this subclaim earlier.

Because I differ from the majority in these respects, I respectfully dissent.

## I.

The district court first erred when it denied Mahdi additional funding based on the wrong legal standard. The CJA creates various entitlements for capital defendants who are financially unable to mount their own defense. 18 U.S.C. § 3599(a)(1). Relevant here,

---

[2] Mahdi raises four theories of ineffective assistance of counsel. He then divides one of those theories, trial counsel's failure to investigate and present mitigating evidence, into sub-categories, labeling each a "subclaim."

district courts may authorize defense counsel to obtain "investigative, expert, or other services [that] are reasonably necessary for the representation of the defendant." 18 U.S.C. § 3599(f). In my view, the district court understood "reasonably necessary" to require more than precedent allows. *See Ayestas v. Davis*, 138 S. Ct. 1080, 1092–94 (2018).

We typically defer to district courts' funding decisions, only finding error when faced with an abuse of discretion. *Id.* at 1094. But when a court applies the wrong legal standard, we're called to withhold that deference, *Koon v. United States*, 518 U.S. 81, 100 (1996)—a call that only rings clearer when the error impedes a defendant's ability to challenge the most permanent sentence a state may impose. Heeding that charge, I would vacate the district court's denial of Mahdi's funding request and remand for the district court to apply the correct legal standard.

A.

Shortly after Mahdi petitioned the district court for federal habeas relief, the court appointed counsel and granted him $34,500 to retain a mitigation investigator and a social historian.[3] Mahdi filed an ex parte motion for additional funding to present "recently

---

[3] Mahdi later realized he did not require the assistance of a social historian; he did not use any portion of the $12,500 allocated for that expert. There's no question that imposing the death penalty with any measure of due process carries a high price tag. Federal courts must award capital defendants funding for all reasonably necessary services covered by 18 U.S.C. § 3599(a)(2). As the Supreme Court has admonished death is different. *See Furman v. Georgia*, 408 U.S. 238, 306 (1972) (Stewart, J., concurring) ("[t]he penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability. It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice."); *see also Gregg v. Georgia*, 428 U.S. 153, 187 (1976) (recognizing that "there is no question that death as a punishment is unique in its severity and irrevocability.").

discovered" evidence that would explain the severe impact of his past race-based trauma. J.A. 886; J.A. 29–33 (describing the recently discovered evidence that Dr. Hill would examine in-depth, distinguishing the recently discovered evidence from existing evidence, and explaining its impact on "address[ing] the multiple aspects of trauma that Mr. Mahdi experienced throughout his life."); *see* J.A. 31 ("Dr. Hill will be able to examine the impact of these traumatic events and stress factors on Mr. Mahdi in the context of his unique ancestry and extrinsic and intrinsic racial identity."). He argued that an expert's assessment of his unique and severe race-based trauma would produce new evidence that was "compelling and warrant[ed] presentation as a *Martinez* claim." J.A. 11. He then requested $25,000 to retain Dr. Hope Hill,[4] a professor and clinical psychologist, to develop and present this recently discovered evidence. *Id*.

At the court's request, Mahdi then provided (1) a brief outline of the "recently discovered evidence" related to Mahdi's race-based trauma; (2) a brief summary of how this information impacted the claims Mahdi sought to raise in the Amended Petition; and (3) a detailed description of the work to be performed by Dr. Hill to substantiate the estimated 90 hours of requested funding. J.A. 29–36. Mahdi argued that "the impact of the extrinsic trauma that [he had] experienced throughout his childhood [could] only be understood by looking at the intrinsic trauma that [he] suffered in relation to his racial

---

[4] Dr. Hill specializes in child development and social policy. J.A. 13. She has conducted extensive research on the development of at-risk youth and the effects of childhood exposure to violence, with a particular focus on Black youth. J.A. 21–24. Based on this expertise, Dr. Hill has qualified as an expert witness in courts across New York, Washington, D.C., Maryland, Pennsylvania, and North Carolina. J.A. 14–16.

identity." J.A. 32. Dr. Hill could clinically detail the effects of that trauma, "systemically evaluat[ing] how Mr. Mahdi's background, racial identity, and the trauma that he experienced emboldened his 'survivalist' mentality."[5] *Id.*

The district court nonetheless denied Mahdi's request. At the time, the court was bound by our decision in *Wright v. Angelone*, 151 F.3d 151, 163 (4th Cir. 1998). In *Wright*, we held that § 3599(f)'s "reasonably necessary" standard only allowed courts to provide funds for "investigative, expert, or other services" when "a substantial question exists over an issue requiring expert testimony for its resolution and the defendant's position *cannot be fully developed* without professional assistance." 151 F.3d at 163 (quoting *Williams v. Martin*, 618 F.2d 1021, 1026 (4th Cir. 1980)) (emphasis added). Understanding *Wright*— and, by extension, § 3599(f)—to impose a strict necessity requirement, the district court held that Mahdi failed to demonstrate that his *Martinez* claim "could not be fully developed" through the mitigation investigator and the social historian for which he'd

---

[5] It is not clear what the majority means when it maintains that Mahdi failed to either "identify any themes that he intended to pursue through this supplemental funding request" or "forecast what Dr. Hill's psychological report would contribute beyond the information his previously approved $34,500 in funding for a mitigation investigator and social historian had already yielded." Maj. Op. 67, 66–68. Assuming, as I must, that these statements take on something other than their literal meaning, I read the majority as requiring greater specificity than what Mahdi's supplemental funding request provided. But the problems with imposing such a demanding specificity requirement seem clear. First, the requirement finds no footing in the text of § 3599. Second, it runs counter to § 3599's objectives. Section 3599 provides funding for services that are reasonably needed, *but not yet available*, to a petitioner. If Mahdi had access to the full scope of Dr. Hill's clinical findings and assessments, he would not need additional funding to secure her expertise.

111

already secured funding. J.A. 40. In other words, the district court denied Mahdi's request because he had not shown it was impossible to develop his claim without Dr. Hill.

Eight months later, the Supreme Court unanimously rejected a similarly narrow construction of "reasonably necessary." *Ayestas*, 138 S. Ct. at 1093–95.

## B.

*Ayestas* involved a challenge to the Fifth Circuit's two-step approach to evaluating federal habeas petitioners' funding requests. In the Fifth Circuit's view, an applicant for § 3599(f) funding could not show that investigative services were "reasonably necessary" unless the applicant could (1) show that he had a "substantial need" for the services; and (2) supplement his funding request with a "viable constitutional claim that [was] not procedurally barred."[6] *Ayestas*, 138 S. Ct. at 1088 (citing *Ayestas v. Stephens*, 817 F.3d 888, 895–96 (2016)). But § 3599(f), the Court held, does not impose these burdens.

*Ayestas*'s analysis begins and ends with the text of the statute: specifically, the phrase "reasonably necessary." "Necessary," *Ayestas* acknowledges, has two possible meanings: one strict and one ordinary. *Id.* at 1093. "In the strictest sense of the term, something is 'necessary,' only if it is 'essential.'" *Id.* (citing Webster's Third New Int'l Dictionary 1510 (1993) (something is necessary if it "must be by reason of the nature of things," if it "cannot be otherwise by reason of inherent qualities"); 10 Oxford English

---

[6] The majority makes much of the fact that the standard once used by the Fifth Circuit differs from the one that *Wright* imposed. *See* Maj. Op. 69–70. The question of course is not whether *Wright*'s standard is identical to the one *Ayestas*, 138 S. Ct. at 1093–95 rejected, but whether it is consistent with the standard *Ayestas*, 138 S. Ct. at 1093–94 set forth. In my view, it is not.

112

Dictionary 275–276 (2d ed. 1989) (OED) (defining the adjective "necessary" to mean "essential"). The strict understanding of "necessary" fared poorly in the context of § 3599(f). *Id.* As *Ayestas* explains, it makes "little sense to refer to something as reasonably essential." *Id.*

Instead, *Ayestas* defines "necessary" in its ordinary sense—a term "used more loosely to refer to something that is merely important or strongly desired." *Id.* Understood this way, § 3599(f) does not require a petitioner to "*prove* that he will be able to win relief if given the services he seeks." *Id.* at 1094. Rather, the "statutory phrase calls for . . . a determination by the district court in the exercise of its discretion, as to whether a reasonable attorney would regard the [requested] services as *sufficiently important.*" *Id.* at 1093 (emphasis added). The Fifth Circuit erred by requiring more. And because the district court understood *Wright* to impose a similar burden, it did too.

By its own explanation, the district court denied Mr. Mahdi's funding request because he failed to prove that he *could not* develop his *Martinez/Trevino* claim without the assistance of Dr. Hill. J.A. 40. Requiring that Mahdi prove that it was impossible to develop his claim without expert assistance was tantamount to imposing an *absolute* need requirement—a burden akin to, if not greater than, the "substantial need" requirement that *Ayestas* rejected. 138 S. Ct. at 1093–94.

The State contends that the fatal flaw in the Fifth Circuit's two-part test was not the "substantial need" requirement, but the requirement that a petitioner present a viable constitutional claim that was not procedurally barred. Response Br. at 26. This argument doesn't even appear to find favor with the majority. *See* Maj. Op. at 64–70. To be sure,

113

*Ayestas* rejected the Fifth Circuit's "viable constitutional claim" requirement. *Ayestas*, 138 S. Ct. at 1093–94. This requirement permitted district courts to deny a petitioner's request for funding if her underlying claim was procedurally defaulted. But, as *Ayestas* explains, the rule did not account for *Martinez v. Ryan*, 566 U.S. 1, 17 (2012) or *Trevino v. Thaler*, 569 U.S. 413, 416–17 (2013)—decisions that permit some federal habeas petitioners to present a substantial but procedurally defaulted ineffective-assistance-of-counsel claim by showing that state postconviction counsel was ineffective for failing to raise it. Sometimes, funding may be reasonably necessary to overcome that default. *Ayestas*, 138 S. Ct. at 1087, 1093–94. In those cases, where "funding stands a credible chance" of allowing petitioners to make that showing, "it may be error for a district court to refuse [it]." *Id.* at 1094.

But the egregiousness of the error at step two does not erase the error at step one. *Ayestas* explains in no uncertain terms that the difference between "reasonably necessary" and "substantial need" is a "problem"—a problem that was exacerbated by the "viable constitutional claim" requirement, but a problem no less. 138 S. Ct. at 1093. Nothing in *Ayestas* suggests that a "substantial need" requirement, standing alone, is consistent with § 3599(f). Even the Fifth Circuit understands *Ayestas* to prohibit both parts of its former two-part test. *See, e.g., Nelson v. Davis*, 952 F.3d 651, 666 (5th Cir. 2020) ("In *Ayestas*, the Supreme Court determined that this circuit's requirement that petitioners demonstrate a 'substantial need' . . . was impermissibly more demanding than the 'reasonably necessary' standard established in [§ 3599(f)]."); *Crutsinger v. Davis*, 929 F.3d 259, 263 (5th Cir. 2019) ("[*Ayestas*] held that the Fifth Circuit's requirement that a movant show a 'substantial need' to demonstrate that funds were 'reasonably necessary' was not supported

114

by the text of § 3599"); *Jones v. Davis*, 927 F.3d 365, 373 (5th Cir. 2019) ("[*Ayestas*] held that the 'substantial need' requirement was more demanding than [§ 3599's] requirement that the services sought be 'reasonably necessary' to a defendant's post-conviction challenge."). I, too, take *Ayestas* to mean what it says.

C.

The district court did not cure its pre-*Ayestas* error when resolving Mahdi's post-*Ayestas* Rule 59 motion. Properly applied, § 3599(f) tasked the court with asking "whether a reasonable attorney would regard the [requested] services as sufficiently important." *Ayestas*, 138 S. Ct. at 1084. Three principal considerations drive this inquiry: (1) "the potential merit of the claims that the applicant wants to pursue"; (2) "the likelihood that the services will generate useful and admissible evidence," and (3) "the prospect that the applicant will be able to clear any procedural hurdles along the way." *Id.* at 1094.

The district court's Rule 59 order acknowledges *Ayestas* in form only, reciting the relevant standard but not applying it. *See* J.A. 909–11. The order lays bare the district court's belief that *Ayestas* merely echoed the standard set forth in the district court's original order:

> In denying Mahdi's request, the court recited the applicable standard under § 3599 and focused on whether the requested services were reasonably necessary to adequately represent Mahdi and develop his anticipated ineffective assistance of counsel claim.[] Ultimately, the court found that counsel had not shown that the requested psychologist's services were reasonably necessary in addition to the services of the mitigation investigator and social historian the court had already funded.

J.A. 911 (internal citations omitted).

115

But, as discussed, it did not. The district court's original order denying funding overstated § 3599's "reasonably necessary" requirement and failed to discuss the three considerations that, as *Ayestas* explains, drive the § 3599 analysis. The Rule 59 order is similarly silent on how the *Ayestas* factors apply to Mahdi's request. *See* J.A. 909–12.

At most, the district court's Rule 59 order impliedly considered the likelihood that the services Mahdi requested would generate useful and admissible evidence. *See* J.A. 912. But even here, the analysis fell short because it misunderstood the services Mahdi sought. Noting that Mahdi's mitigation investigator "had already gathered all of the pertinent factual information" and that Mahdi's counsel "had already formed reasoned arguments as to why that information was critical to Mahdi's mitigation presentation," the district court found itself unable to see what "additional value" Dr. Hill could provide. J.A. 912. The majority shares this view, insisting that the evidence that Dr. Hill would have provided was "already developed and presented to the PCR court." Maj. Op. at 65–66. This reasoning either ignores or misapprehends the expertise that mental health clinicians bring to the table. They do not, like mitigation investigators, detail the facts of a person's life in a historic sense. *Compare* J.A. 32 (explaining that Dr. Hill could discuss how the impact of Mahdi's traumatic childhood was exacerbated by his complex racial identity and his father's militant racial extremism), *with* J.A. 377 (detailing Dworkin's skills and responsibilities as a mitigation investigator). And their opinions are far from the common-sense intuitions that may guide an attorney's arguments absent a mental health expert's guidance. *See* J.A. 13–21 (detailing Dr. Hill's clinical training and experience); *see also* ABA Guidelines for the Appointment and Performance of Defense Counsel in Death

116

Penalty Cases 4.1, Commentary (rev. ed. 2003) ("ABA Guidelines"), reprinted in 31 Hofstra L. Rev. 913, 956–57 (2003) ("Counsel's own observations of the client's mental status, while necessary,[] can hardly be expected to be sufficient to detect the array of conditions [parenthetical omitted] that could be of critical importance.").

For the sake of illustration, consider the relationship of a physician to a claim that someone's physical injury entitles her to economic damages. Lay fact witnesses can detail physical symptoms, describe limitations, and set forth relevant timelines. Attorneys can then take that information and argue that it warrants relief for their client. And still, many factfinders would find the presentation lacking, left only to wonder whether a medical doctor would agree with the attorney's view of the injuries; whether there was a physiological explanation for the claimant's symptoms; whether the pain she described aligned with a physician's understanding of the disability. No one questions the need for medical experts when assessing the scope of physical injuries. That we find mental health experts unnecessary when defining the impact of past trauma says little about the need for that expertise, and much about us.

\* \* \*

The standard that the district court applied—both in its original denial of supplemental funding and its Rule 59 order—is outdated and asks too much of petitioners seeking funds under § 3599(f). I would vacate the district court's denial of Mahdi's funding request and remand for the district court to correctly apply *Ayestas*.

## II.

I would also vacate the district court's grant of summary judgment on two of Mahdi's failure-to-investigate subclaims: (1) that trial counsel were ineffective for failing to investigate and present mitigating evidence of Mahdi's race-based trauma, and (2) that trial counsel were ineffective for failing to investigate and present evidence of the childhood abuse he suffered at the hands of his father. The district court's error in adjudicating Mahdi's funding request precludes full review of his race-based trauma subclaim. Moreover, the district court erred in holding that Mahdi's childhood-abuse subclaim did not present a "substantial" claim of attorney ineffectiveness.

## A.

Because the district court applied the wrong legal standard to Mahdi's request for funding, it is premature to review his race-based-trauma subclaim. The very reason Mahdi requested additional funding was to "develop and effectively present" the arguments for this subclaim. Opening Br. at 50. Mahdi explained that "[c]ounsel [] recently discovered evidence related to race-based trauma that [Mahdi] experienced during his childhood," J.A. 11, and that "Dr. Hill [would] be able to examine the impact of these traumatic events and stress factors on Mr. Mahdi in the context of his unique ancestry and extrinsic and intrinsic racial identity," J.A. 31. Mahdi argued that Dr. Hill's "in-depth examination of [his] lineage" would stand in stark contrast to the "very generally pieced together family biographies" that PCR counsel presented in the initial postconviction proceeding. J.A. 29. Stated differently, Dr. Hill's testimony might have fundamentally altered Mahdi's failure-to-investigate claim.

118

The majority maintains that Dr. Hill's investigation, as proposed by Mahdi's "vague representations", *see* Maj. Op. at 70, would add nothing new that the other seven mental health experts had already evaluated. Specifically, the majority argues that Dr. Cooper-Lewter "had already conducted an extensive evaluation of Mahdi's race-based trauma and family history." Maj. Op. at 70 (referencing J.A. 2955–65). While it is true that Dr. Cooper-Lewter examined *some* of Mahdi's family socio-history, Dr. Cooper-Lewter did not conduct an in-depth examination of Madhi's family lineage of the kind proposed by Dr. Hill to understand how Mahdi's inter-generational family trauma impacted him and his crimes. *Compare* J.A. 2955–64 (discussing Madhi's grandparents and parents' history) *with* J.A. 31–33 (proposing that Dr. Hill will investigate Mahdi's "unique ancestry and extrinsic and intrinsic racial identity" and how these experiences "emboldened his 'survivalist mentality.'"). Further, while I agree with the majority that Dr. Cooper-Lewter examined *some* of Mahdi's race-based trauma history, Mahdi identified some key gaps in Dr. Cooper-Lewter's investigation that are reasonably necessary to painting a complete picture of his psychological well-being leading up to this crime. For example, while Dr. Cooper-Lewter noted that Mahdi's father was "anti-government," constantly "raved about the 'New World Order' and 'white folks coming to kill them[,]' [and . . .] taught [Mahdi and his brother] how to shoot guns, fight with knives, and how to fist-fight and box." J.A. 2978. Mahdi noted Dr. Hill would fill in a gap of detailing how "he struggled with the inherent contradiction of his father's black separatist beliefs and his father's complete and

119

utter inability to provide for Mr. Mahdi's most basic needs." J.A. 32.[7] Dr. Hill's recently discovered evidence is reasonably necessary in this case because it would have explained the impact of his race-based trauma and lineage on Mahdi's psychological well-being, in context of his traumatic upbringing with his father, who indoctrinated Mahdi to have separatist, anti-government, and antagonistic views against whites. This is the evidence that jurors should have been appraised of to get a holistic view of all the stressors that Mahdi had leading up to his crimes. I disagree that "Mahdi did not present *any* meaningful argument . . ." and I disagree with the district court's incorrect application of the legal standard. Maj. Op. at 71 (emphasis added).

Had the district court applied the correct legal standard—with the correct understanding of the requested services—and granted funding to retain Dr. Hill, Mahdi's claim would stand on much different footing. Without Dr. Hill's testimony, Mahdi's only additional evidence of race-based trauma is Dworkin's affidavit. To be sure, this affidavit details some of the facts underlying Mahdi's race-based trauma in a way that PCR counsel

---

[7] Dr. Cooper-Lewter's general descriptions of Mahdi's family history are distinct from Dr. Hill's. At best, Dr. Cooper-Lewter stated that: "Shareef would constantly tell Mikal what he did wrong, but would provide him with no solutions. While he lectured on work ethic, he had no job and made no attempt to work. The family lived on public assistance, what his grandmother provided, and ultimately what Mikal could steal. While Shareef would spend hours lecturing Mikal about stealing being wrong, he would then "thank him" and keep the stolen property or funds." J.A. 2980. Dr. Cooper-Lewter also described Mahdi's upbringing before committing his first offense, at age 14, as "Mikal described it though, he was basically on his own, stealing to survive and continuing to get the preaching/lectures from Shareef, followed by Shareef keeping the property and thanking him." J.A. 2981. Thus, while Dr. Cooper-Lewter provided a descriptive history, Dr. Hill, according to Mahdi, would connect his family's intergenerational history of race-based trauma to his criminal history.

120

did not. *See* J.A. 367–69, 517 ("While PCR counsel may not have traced Mahdi's lineage all the way back to 1648, as Mr. Dworkin did, they did present evidence regarding Mahdi's family's history, racial views, and significant experiences with racism, and the very segregated nature of their environment."). But at its core, Dworkin's affidavit, like the PCR testimony, reflects only the existence of segregation, racial animus, and self-loathing in Mahdi's lineage—not their effects. J.A. 367–69. It strengthens but does not change "[t]he heart of the claim." *Gray v. Zook*, 806 F.3d 783, 799 (4th Cir. 2015); *see also Vandross v. Stirling*, 986 F.3d 442, 451 (4th Cir. 2021) (explaining that to assert a new claim, a petitioner must do more than "merely strengthen[] the evidence presented in the state PCR hearing").

In my view, Dr. Hill's testimony was likely to do what Dworkin's affidavit cannot. We don't know what we don't know. But Dworkin's affidavit gives me good reason to believe that, aided by Dr. Hill's expertise, Mahdi would have had a compelling argument that his race-based trauma subclaim was "new," *Wise v. Warden*, 839 F.2d 1030, 1033 (4th Cir. 1988), and that *Martinez* excused the procedural default that resulted from Mahdi's failure to timely exhaust this claim, *see* Maj. Op. at 66 (citing *Vandross*, 986 F.3d at 450 (4th Cir. 2021) (noting that one of the requirements for invoking *Martinez* is that "it is likely that no state court will hear the prisoner's claim")). Because the district court's *Ayestas* error precludes meaningful review, I would vacate the district court's grant of summary judgment on the race-based-trauma subclaim and remand for further proceedings.

B.

The district court also erred in holding that Mahdi could not overcome the procedural default on his subclaim that trial counsel were ineffective for failing to uncover and present evidence of his childhood abuse. This subclaim is new and presents a substantial claim of ineffective assistance. The only remaining issue is whether PCR counsel performed deficiently by failing to raise this claim in the state postconviction proceedings—an issue that, on this record, should not have been resolved with summary judgment.

1.

To begin, this subclaim is a new one. A federal habeas petitioner presents a new and unexhausted claim when he submits evidence which (1) "was not presented to the state court," and (2) "places his case 'in a significantly different and stronger evidentiary posture than it was when the state courts considered it.'" *Wise*, 839 F.2d at 1033. New evidence, even when favorable, will not always change a claim at its core. *Gray*, 806 F.3d at 799. But when a federal habeas petitioner "presented *no evidence* to the state courts to establish the existence of fact X, the claim will be fundamentally altered by the new evidence presented to the district court." *Winston v. Kelly*, 592 F.3d 535, 550 (4th Cir. 2010).

The question of whether Mahdi has presented a new claim "is necessarily case and fact specific." *Id.* at 549 (quoting *Morris v. Dretke*, 413 F.3d 484, 491 (5th Cir. 2005)). Here, Mahdi's first cousin, Nate Burwell, IV, recently revealed "substantial insights into the family dynamics," recalling "Mikal and [his brother] being beaten by their father as children." J.A. 317.

Years later, Nate can "hear them screaming still." *Id.*

122

PCR counsel did not interview Nate or present any evidence that Mahdi suffered severe physical abuse as a child at the hands of his father, Shareef. In fact, all evidence was to the contrary. *See*, *e.g.*, J.A. 2240 ("[Shareef] was always doting on his sons and always very, very affectionate with them."), 2243 ("[Shareef] couldn't institute discipline. There was no discipline and he was real soft with his discipline . . . he was not heavy-handed at all."), 2541–42 (Q: Isn't it true that there was no evidence in this case that Mr. Mahdi was physically abused by his father? A: . . . In the medical reports there was [an] incident where he fell off his bike and hurt his leg and another time his arm, but as far as physical violence from his father, no."). The only evidence of Shareef's physical abusiveness related to Vera and Nancy. J.A. 2285–86 ("[Vera] told me Shareef raped her on her wedding night."), 2298 ("[Vera] was covered in bruises from head to toe and she said Shareef beat her up. She was trying to see the children and he beat her up."), 2403 ("[Mahdi] then saw his father kidnap and beat his mother and he saw his father also beat his own mother.").

Trial counsel also failed to interview Nate or present any evidence of the extreme physical abuse Mahdi suffered as a child. Looking only to the picture of Shareef that trial counsel painted, a factfinder would believe that Shareef was specifically *not* physically abusive toward his children. Given that Mahdi "presented *no evidence*" on this issue in both the PCR and trial courts, I see no way to view this subclaim as anything but new. *See Winston*, 592 F.3d at 550.

The majority does not dispute that defense counsel, at both the trial and PCR stage, painted Shareef as a loving and doting father—affectionate—who particularly favored Mahdi. Maj. Op. at 29. Rather, it simply considers allegations of severe childhood abuse to

123

be "new bits of evidence" rather than "critical evidence that makes [Mahdi's] claim both stronger *and* significantly different." Maj. Op. at 89 (quoting *Moore v. Stirling*, 952 F.3d 174, 183 (4th Cir. 2020)). By doing so, it views the strength of childhood-abuse evidence as mitigating evidence much differently than the Supreme Court,[8] the South Carolina trial court,[9] the State's trial counsel,[10] and the State's PCR counsel,[11] among others—myself included.

2.

Notably, a new claim often poses as much of an obstacle for petitioners as it does an opportunity. In failing to raise and exhaust his abuse-based theory of ineffectiveness, Mahdi procedurally defaulted it, saddling himself with the task of identifying a basis to excuse that default. *Owens v. Stirling*, 967 F.3d 396, 409, 421–22 (4th Cir. 2020). As onerous as that burden may be, *Martinez v. Ryan* paved a way for him to carry it. 566 U.S. 1, 14 (2012).

---

[8] *See*, *e.g.*, *Williams v. Taylor*, 529 U.S. 362, 398 (2000) (indicating that the "graphic description" of a "childhood[] filled with abuse and privation . . . . might well [] influence[ a] jury's appraisal of [a defendant's] moral culpability"); *Penry v. Johnson*, 532 U.S. 782, 796–803 (2001) (rejecting jury instructions because they failed to provide an adequate vehicle for jurors to consider childhood abuse as mitigation evidence); *Eddings v. Oklahoma*, 455 U.S. 104, 114–16 (1982) (noting that the "beatings by a harsh father" were "particularly relevant" as mitigating evidence for young defendants).

[9] J.A. 1669–70 ("In reviewing the testimony of Marjorie Hammock, the defense's clinical social worker expert, there's no reference to physical or sexual abuse suffered by the defendant."), 1684 (same).

[10] J.A. 1283–84 (emphasizing that Mahdi did not suffer physical abuse), 1631 ("There's never any evidence of . . . physical abuse"), 1632 ("And, again, what's not in here? He was never physically abused"), 1695–96 ("In reviewing Ms. Hambrick's [*sic*] testimony, what is absent is any reference to physical abuse"), 1696 ("There is absolutely no evidence of [] abuse").

[11] J.A. 2491 (emphasizing that Mahdi did not suffer physical abuse); 2541–42 (same).

124

As the majority notes, *Martinez* requires petitioners to show that: (1) their underlying ineffective-assistance-of-trial-counsel claim is "substantial"—that is, it must have "some merit" under the governing ineffective-assistance-of-counsel standards; (2) they were not represented or had ineffective counsel during the state PCR proceeding; (3) the state PCR proceeding was the initial review proceeding; and (4) state law required the prisoner to bring the claim in the initial-review collateral proceeding. *Trevino*, 569 U.S. at 423; *see also* Maj. Op. at 74. It's undisputed that Mahdi's claim satisfies *Martinez's* third and fourth elements. To satisfy the first two elements, Mahdi need only show that there was "some merit" to his claim that he was prejudiced by constitutionally deficient trial counsel, and that PCR counsel "performed deficiently, under the first prong of *Strickland*, by failing to exhaust the underlying ineffective-assistance-of-trial-counsel claim." *Owens*, 967 F.3d at 423.

Our assessment of counsel's performance under *Strickland* is "highly deferential." *Id.* at 412. But that deference is not without limits. *Stokes v. Stirling*, 10 F.4th 236, 246 (4th Cir. 2021); *Williams v. Stirling*, 914 F.3d 302, 313–16 (4th Cir. 2012). The American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases indicate "[a] 'well-defined norm' . . . 'that investigations into mitigating evidence should comprise efforts to discover *all reasonably available* mitigating evidence.'" *United States v. Runyon*, 989 F.3d 716, 731 (4th Cir. 2020) (quoting *Williams*, 914 F.3d at 313).

Capital defense counsel are therefore deficient when they "fail[] to investigate and to present substantial mitigating evidence to the sentencing jury." *Williams*, 529 U.S. at 390 (2000). To be sure, "strategic choices made after thorough investigation of law and facts

125

relevant to plausible options are virtually unchallengeable." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 690–91). "[A]nd strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* But a cursory investigation does not "automatically justif[y] a tactical decision with respect to sentencing strategy." *Id.* at 527. Courts must look further, "consider[ing] not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Id.*; *see also id.* at 534 (counsel performed deficiently by abandoning investigation after discovering that the defendant had alcoholic parent, spent childhood in foster care, lacked consistent schooling, and suffered from child hunger); *Williams*, 529 U.S. at 396 (counsel performed deficiently by failing to uncover and present mitigating evidence at sentencing) (citing 1 ABA Standards for Criminal Justice - 4-4.1, Commentary, pp.4–55 (2d ed. 1980)).

a.

The district court appears to have rejected Mahdi's *Martinez* claim based on its conclusion that the underlying IAC claim did not have even *some* merit. *See* J.A. 518. The district court recognized the significance of childhood abuse as mitigation evidence, *id.* (citing *Porter v. McCollum*, 558 U.S. 30, 43 (2009)), but nonetheless felt that it could not fault trial counsel's failure to uncover it. J.A. 518. Why? Because the "two people who would have known about the abuse—Shareef and Mahdi—[failed to] disclose[] this information." *Id.*

I cannot join in reasoning that requires so little of capital defense counsel. Common sense should have led trial counsel to suspect that Mahdi and Shareef might deny or understate past abuse. "One of the things that we know is that abused children–even abused adults–tend to cling to their abuser." J.A. 2424; *see also* ABA Guidelines 10.7, Commentary ("Obtaining [sensitive] information typically requires overcoming considerable barriers such as shame, denial, and repression, as well as other mental emotional impairments from which the client may suffer."). And those who have perpetrated abuse are likely to deny it for different, but equally obvious, reasons. Let us not forget that someone once accused Shareef of physical abuse—he then tied her to a tree and whipped her legs with the buckle end of a belt. J.A. 2925.

Even if common sense didn't lead trial counsel to uncover Mahdi's abuse, the evidence should have. *Williams*, 914 F.3d at 314–16. Trial counsel knew that Shareef was incredibly violent to vulnerable people in his life. At the sentencing phase, they elicited testimony from Hammock that Shareef had abused his wife so severely that she left her two children to escape it. J.A. 1600. Hammock also testified that Shareef had "issues that prohibited him from being a good father." J.A. 1608. She explained that Shareef was "extremely troubled," J.A. 1598, prone to "outburst," J.A. 1610, and "not really able to function well," J.A. 1600. The postconviction proceedings reveal that trial counsel also knew that violent outbursts were a hallmark of Shareef's parenting. J.A. 2819, 2823, 2898. In contrast, there is no evidence that trial counsels' decision not to investigate or present mitigating evidence of childhood abuse was a strategic one. Nor is there any evidence that

127

they believed evidence of childhood abuse would in some way harm Mahdi's defense or undermine their theory of the case.

Trial counsel ignored both common sense and unrefuted evidence of Shareef's impulsiveness, violence, irrationality, and poor parenting. They ignored the signs that some of the other adults in Mahdi's life likely towed the line between discipline and uncontrolled physical force. *See* J.A. 2774, 2811. And they ignored the very likely possibility that the violence Mahdi exhibited as a child reflected the violence he saw and experienced firsthand. Instead of following these "red flags" to their logical conclusion, *Williams*, 914 F.3d at 315, trial counsel decided that Mahdi had not been abused as a child because both the abuser and the abused denied it. Surely, we do not set the bar so low. *See Porter*, 558 U.S. at 40 (citing *Rompilla v. Beard*, 545 U.S. 374, 381–82 (2005)). A defendant's "fatalistic or uncooperative" behavior "does not obviate the need for defense counsel to conduct *some* sort of mitigation investigation."[12] *Id.* (citing *Rompilla*, 545 U.S. at 381–82); *see also* J.A. 2424.

---

[12] The district court cited our decision in *DeCastro v. Branker*, 642 F.3d 442, 456 (4th Cir. 2011) in support of its contrary view. *Mahdi v. Stirling*, No. 8:16-3911-TMC, 2018 WL 4566565, at *36 (D.S.C. Sept. 24, 2018). In *DeCastro*, we reviewed a state PCR court's decision that trial counsel were not ineffective for failing to investigate and present mitigating evidence that the defendant had withheld pre-trial but disclosed following sentencing. 642 F.3d at 456. Because this claim was "adjudicated on the merits," we reviewed the state court's decision through 28 U.S.C. § 2254(d)(1)'s rigorous standard and concluded that it was not unreasonable. *Id.* at 449, 456. Even setting aside the factual differences between these two cases, the differing legal standards precludes *DeCastro* from being a helpful analog. I cannot overstate the difference between our review of an ineffective assistance of counsel claim through the lens of § 2254(d)(1) and our review of the ineffectiveness that undergirds a *Martinez* claim. When petitioners invoke *Martinez* to excuse a procedural default, they necessarily present claims of ineffectiveness that have not been presented to state courts nor adjudicated on the merits. *Martinez*, 566 U.S. at 11. District courts evaluate those claims de novo, unconstrained by § 2254(d)(1). *Gray*, 806 (Continued)

Nor does the peculiar demeanor of a defendant's family members free capital counsel from uncovering all reasonably available mitigation evidence. And yet, the record does not reveal what, if any, efforts trial counsel undertook to find favorable mitigation evidence once they grew frustrated with those who knew Mahdi best. Indeed, it is difficult to imagine counsel showing more disrespect for a former client's family (and most likely source of mitigation evidence) than trial counsel demonstrated at Mahdi's state postconviction hearing.[13] At one point, lead trial counsel testified:

> So, we had grandmother who wanted to save the family name. We had [an uncle] who is the dean of men frying fish and he just didn't care. He was proud of the fact he identified [Mahdi to the police]. We had [an aunt] who still harbored resentment about the fact that [Mahdi's brother] attempted to burn down her house and you had [another uncle] who thought it was funny that [Mahdi] was threatening to kill himself.

J.A. 2820–21. Later, upon labeling Mahdi's family "dysfunctional," lead trial counsel lamented, "There are many [B]lack families like that." J.A. 2829.

---

F.3d at 789. Thus, a holding that a state court did not act unreasonably in rejecting a petitioner's ineffective-assistance-of-counsel claim should not be understood to mean that counsel was not, in fact, ineffective.

[13] *See*, *e.g.*, J.A. 2814 ("When we arrived in the yard [Nathan] drove up. He was slightly overweight and he was inside a Mazda Miata two-seater . . . . So he drove up in this Miata and he was slightly overweight. He walked in the house and we introduced ourselves to him, but he had an attitude . . . . He is in this car that's too small. He is the Dean of Men. He walks inside of the house. He has an attitude toward us. This is a guy who's probably in his late to early 50's and he's living with his mama . . . ."), J.A. 2819 ("[Shareef] is preaching black power every day, empowerment of the black man, but he can't hold a job. He can't pay his bill."), J.A. 2822 ("[Nancy] was older and she was confused . . . . Each time you talked to her she would sit down [with] . . . some little pamphlets and booklets about different people in the family and what they had accomplished. It was almost as if she wanted to be absolved of all responsibility and she wanted the world to know that [they were] still good people.").

129

Counsels' belief that the adults in Mahdi's life were "dysfunctional" should have caused them to seek information from another generation of family members—Mahdi's cousins—not to abandon his search altogether. *See* ABA Guidelines 10.7, Commentary ("Barring exceptional circumstances, counsel should seek out and interview potential witnesses, including, but not limited to . . . . members of the client's immediate and extended family."); *id.* (detailing the importance of "[a] multi-generational investigation" that "extend[s] as far as possible both vertically and horizontally"). Had they done so, trial counsel would have easily uncovered the same key witness federal habeas counsel found: Nathan's son, Nate Burwell, IV.

Instead of investigating further, trial counsel tapped a social worker and prison adaptability expert as Mahdi's only mitigation witnesses. Counsel gave Hammock sole responsibility for conveying the trauma of Mahdi's childhood experience—she presented a sanitized version of Mahdi's life, concluding that Mahdi had "a rather chaotic and different kind of childhood."[14] J.A. 1597. But, as this Court has recently explained, the need to

_____

[14] A rather chaotic and different kind of childhood. To be clear: Mahdi was raised by a single parent after his mother—upon suffering severe and sustained physical and sexual abuse—left. Vera left without her two young boys because Shareef threatened to kill them if she tried to take them. As Mahdi was growing up, Shareef withheld access to formal schooling. In the summer after Mahdi's second-grade year, Shareef used him as bait to see Vera. When Vera arrived, Shareef abused her, threatened to kill her in front of Mahdi, then took her to the woods to assault her. When Shareef's mother learned of this and confronted him, he bound her to a tree and whipped her legs with a belt. Eventually, Shareef took Mahdi out of public school to "homeschool" him. Shareef's curriculum involved teaching Mahdi how to shoot guns so that he would be ready when the "white folks" came to get them; teaching Mahdi how to stab people; and indoctrinating Mahdi with an ideology of racial and religious supremacy. This is not a "rather chaotic and different kind of childhood," *see* J.A. 1597; it is "profound and chronic trauma that [is] (Continued)

130

present the "profound and chronic trauma" of someone's childhood is at its highest when the alternative is to put forth "almost no mitigation presentation at all." *Stokes*, 10 F.4th 236, 253 (4th Cir. 2021). In my view, there is at least some merit to Mahdi's claim that trial counsel were deficient for cutting their investigation short.

Moreover, this deficiency was likely prejudicial. Trial counsel did not present any lay witnesses during the sentencing phase of Mahdi's capital proceedings. And Hammock's brief rendition of Mahdi's family history did very little to humanize him when considered alongside his serious crimes. *See* J.A. 1597–1612. As the majority's thorough recitation of the facts illustrate, Hammock's testimony was vague, only hinting at the chaos and transience of Mahdi's living circumstances; Shareef's "inability . . . to parent appropriately and correctly," J.A. 1597; and the "confrontational" relationship between Shareef and other members of the family that led to Mahdi's isolation and radicalization, J.A. 1601. These abstractions did very little to deepen the trial court's understanding of "the individual behind the aggravating evidence." *Stokes*, 10 F.4th at 252 (4th Cir. 2021) (citing *Allen v. Woodford*, 395 F.3d 979, 1000 (9th Cir. 2005)).

As much is reflected in the trial court's sentencing decision. The court's consideration of Mahdi's "turbulent and transient childhood and upbringing" as a mitigating circumstance spans four sentences. J.A. 1669. It *first* notes that there was "no reference to physical . . . abuse suffered by the defendant" and that "defendant's father . . . continually

_____

about as extreme as any child can experience." *Stokes*, 10 F.4th at 253 (holding that capital counsel performed deficiently when they conveyed profound and chronic trauma as merely a "difficult upbringing" and "struggles growing up").

expressed great care and concern for [Mahdi's well-being]." J.A. 1669–70. Then, viewing Hammock's testimony as a whole, the court concludes that Mahdi's upbringing was simply "less than ideal" but bore no relation to his criminal conduct. J.A. 1670. In the end, the trial court gave Mahdi's upbringing "no weight" as a mitigating circumstance. *Id.*

Evidence of childhood abuse is always "especially mitigating, and its omission is thus particularly prejudicial." *Andrews v. Davis*, 944 F.3d 1092, 1117 (9th Cir. 2019). Against this backdrop—where trial counsel's mitigation presentation had no bearing on the factfinder—evidence of childhood abuse would have been particularly powerful. In my view there is at least some merit to Mahdi's argument that he was prejudiced by trial counsel's deficient mitigation presentation.

b.

For many of the same reasons, there is a good reason to believe that PCR counsel's failure to investigate Mahdi's childhood abuse and challenge trial counsels' effectiveness was deficient. That said, I would not reach that question because genuine issues of material fact preclude judgment on the issue.

As discussed above, the question of whether an attorney's performance was deficient turns in large part on whether their decisions were strategic. *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 690–91). Even though the district court proceeding was parties' first opportunity to create a record for why PCR counsel made the decisions it did, the district court denied Mahdi's request for an evidentiary hearing. J.A. 529–30. A perhaps unintended result of this is that the State did not produce evidence or argue that PCR counsel's failure to investigate and present evidence of Mahdi's childhood abuse was a

strategic choice. Instead, it sought judgment on this claim on other grounds—namely, that the abuse subclaim was not new and that, even if it were, trial counsel were not ineffective for failing to raise it. *See* J.A. 117–18. But, as discussed above, both of these premises are incorrect.

In contrast, Mahdi presented evidence that state counsel's failure to uncover Mahdi's childhood abuse was not at all strategic. In his opposition brief, Mahdi argued that "PCR counsel . . . . had no strategic reason . . . for failing to interview witnesses uncovered by Federal habeas counsel who witnesse[d] abuse at the hand of Mr. Mahdi's father." J.A. 339–40 (citing Dworkin Aff., Ex. 1). Dworkin's affidavit then gave substance to this argument, identifying the witness that PCR counsel overlooked and previewing the relevant testimony. J.A. 370–71. Viewed against Stirling's silence on the issue, this evidence—while limited—should have been fatal to Stirling's motion. *See* Fed. R. Civ. Proc. 56(a), (c)(1)(A).

I would vacate the district court's judgment on this subclaim and remand for the district court to hold the evidentiary hearing that Mahdi requested.

## III.

The district court's standard for denying Mahdi's funding request was inconsistent with the directives set forth in 18 U.S.C. § 3599. And its grant of summary judgment unduly discounted the gravity of Mahdi's abuse subclaim. Because the majority overlooks these errors for the sake of finality, I respectfully dissent.

133